Robert P. Goe – State Bar No. 137019
Reem J. Bello – State Bar No. 198840
**GOE FORSYTHE & HODGES LLP**
17701 Cowan, Bldg. D, Suite 210
Irvine, CA 92614
rgoe@goeforlaw.com
rbello@goeforlaw.com

Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Debtor and Debtor-in-Possession,
Serenade Newport, LLC

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>**SERENADE NEWPORT, LLC,**<br><br>        Debtor and Debtor-in-possession. | Case No. 8:25-bk-11898-MH<br><br>Chapter 11 Proceeding<br><br>**OPPOSITION TO MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 [DOCKET NO. 51]; MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE; DECLARATIONS OF SAHAND ZARGARI AND ROBERT P. GOE IN SUPPORT THEREOF**<br><br>Date:        September 9, 2025<br>Time:       2:30 p.m.<br>Dept:       6C |

**TO THE HONORABLE MARK D. HOULE, UNITED STATES BANKRUPTCY JUDGE, MOVING PARTIES, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN INTEREST:**

      Serenade Newport, LLC, debtor and debtor-in-possession hereby files its opposition ("Opposition"), memorandum of points and authorities, request for judicial notice ("RJN"), declaration of Sahand Zargari ("Zargari Declaration"), and declaration of Robert P. Goe ("Goe Declaration") to the motion for relief from the automatic stay under 11 U.S.C. § 362 ("Motion")

1

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................... ii

**MEMORANDUM OF POINTS AND AUTHORITIES** ........................................ 2

**I.     INTRODUCTION** ................................................................................................ 2

    A.    The Motion is Deficient on Its Face and Should be Denied ................................ 2

    B.    Cause Does Not Exist to Grant Relief From the Automatic Stay or to Annul the Automatic Stay ................................................................................................ 2

**II.    STATEMENT OF FACTS** ................................................................................. 5

    A.    Formation of the Debtor and Debtor's Purchase of the Property ........................ 5

    B.    The Gadol Testa Action .......................................................................................... 8

    C.    Debtor's Filing of the Bankruptcy Case ................................................................ 8

    D.    Gadol Testa Violations of the Automatic Stay and Attempt to Circumvent the Order of Priority of Creditors ......................................................................... 9

**III.   CAUSE DOES NOT EXIST TO GRANT RELIEF FROM THE AUTOMATIC STAY** ............................................................................................. 9

    A.    Case Was Not Filed in Bad Faith ......................................................................... 11

    B.    There is No Evidence of "New Debtor Syndrome" ............................................ 14

    C.    Each Curtis Factor Weighs Against Granting Relief from the Stay ..................... 15

**IV.    CAUSE DOES NOT EXIST TO ANNUL THE STAY** .............................. 22

**V.     CAUSE DOES NOT EXIST TO GRANT RELIEF FROM STAY TO ALLOW GADOL TESTA TO RECORD THE POST-PETITION WRIT AND POST-PETITION LIS PENDENS** .......................................................... 27

**VI.    CONCLUSION** ................................................................................................. 28

i

1

# TABLE OF AUTHORITIES

2

**Cases**

3

4

Crespo Torres v. Santander Fin. Servs. (In re Crespo Torres), 532 B.R. 195, 200 (Bankr. D.P.R. 2015) ............................................................................................................... 12

Drummond v. Welsh, 711 F.3d 1120, 1129 n.45 (9th Cir.2013).................................................. 0

Fjeldsted v. Lien (In re Fjeldsted), 293 B.R. 12, 24-25 (9th Cir. BAP 2003) ............................ 23

In re Aquarius Disk Servs., Inc., 254 B.R. 253, 258 (Bankr. N.D. Cal. 2000)........................... 27

In re Arnold, 806 F.2d 937, 939 (9th Cir. 1986)........................................................................ 24

In re Can-Alta Properties, Ltd., 87 B.R. 89 *, 1988 Bankr. LEXIS 1261, Bankr. L. Rep. (CCH) P72, 393 (B.A.P. 9th Cir. Ariz. 1988).................................................................................. 14

In re Capgro Leasing Assocs., 169 B.R. 305, 310 (Bankr. E.D.N.Y. 1994) ......................... 3, 13

In re Cassis Bistro, Inc., 188 B.R. 472 (Bankr. S.D. Fla. 1995) ............................................... 20

In re Curtis, 40 B.R. 795, 799 (Bankr. D. Utah 1984) .............................. 3, 11, 13, 15, 16, 17, 21

In re Dawson, 390 F.3d 1139, 1147 (9th Cir. 2004) ................................................................. 18

In re Kim, 71 B.R. 1011 (Bankr. C.D. Cal. 1987) ...................................................................... 9

In re Kronemyer, 405 B.R. 915, 921 (B.A.P. 9th Cir. 2009) ..................................................... 16

In re Landmark Fence Co., Inc., 2011 WL 6826253, at *4 (C.D. Cal. Dec. 9, 2011) ...... 16, 18, 20

In re Martha Washington Hosp., 157 B.R. 392, 395 (N.D. Ill. 1993) .................................. 18, 21

In re Mitchell, 357 B.R. 142, 153 (Bankr. C.D. Cal. 2006)........................................................ 0

In re New York Medical Group, P.C., 265 B.R. 408, 416 (Bankr. S.D.N.Y. 2001) ................... 20

In re Plumberex Specialty Products, Inc., 311 B.R. 551, 557 (Bankr. C.D. Cal. 2004)... 10, 16, 18

In re Roach, 660 F.2d 1316, 1318 (9th Cir. 1981)................................................................ 11, 12

In re Siciliano, 13 F.3d 748, 750 (3rd Cir. 1994).......................................................................... 12

In re Smith, 389 B.R. 902, 919 (Bankr. D. Nev. 2008) ............................................................. 16

In re Texaco, 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988)............................................................ 11

In re Towner Petroleum, 48 B.R. 182, 191 (Bankr .D. Ok. 1985)............................................... 11

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In re Wang, 2010 WL 6259970, *5 (9th Cir. BAP 2010) .............................................................. 16

In re Worldcom, Inc., 2006 WL 2270379 (S.D.N.Y. 2006) ........................................................ 18

In re Yukon Enter., Inc., 39 B.R. 919, 921 (Bankr. C.D. Cal.1984)........................................... 15

Marsch v. Marsch, 36 F.3d 825, 827-28 (9th Cir. 1994) ............................................................ 24

MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986)......................................... 29

National Environmental Waste Corp. v. City of Riverside (In re National Environmental Waste

   Corp.), 129 F.3d 1052, 1054 (9th Cir. 1997) ........................................................................ 23

Ritzen Group, Inc. v. Jackson Masonry, LLC, 140 S. Ct. 582, 589 (2020)................................. 12

Shepard v. Patel, et al (In re Patel), 291 B.R. 169, 173-174 (Bankr. D. Ariz. 2003) .................. 21

Small Business Admin. v. Rinehart, 887 F.2d 165, 168 (8th Cir. 1989) ..................................... 11

Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 973 (1st Cir. 1997).................... 12

U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir.

   1992) ..................................................................................................................................... 29

**Statutes**

11 U.S.C. § 341 ........................................................................................................................ 15

11 U.S.C. § 362 ..................................................................................................................... 1, 17

11 U.S.C. § 362(d)(1) .......................................................................................................... 10, 11

11 U.S.C. § 362(d)(3) ............................................................................................................... 14

11 U.S.C. § 362(g) ...................................................................................................................... 9

11 U.S.C. § 510 ........................................................................................................................ 19

11 U.S.C. § 510(c) .................................................................................................................... 20

11 U.S.C. § 522(f) ..................................................................................................................... 20

11 U.S.C. § 549 ........................................................................................................................ 17

11 U.S.C. § 726(a)(4) .......................................................................................................... 19, 20

11 U.S.C. § 1129(a)(7)(A)(ii) .............................................................................................. 19, 20

iii

California Code of Civil Procedure Section 493.030(b).................................................... 27

Federal Rules of Bankruptcy Procedure Rule 2004...................................................... 15

Local Bankruptcy Rule 4001-1(c)(1)........................................................................ 2

Local Bankruptcy Rule 9013-1(d) ........................................................................... 2

filed by Bryan Gadol and Darren Testa (collectively, "Gadol Testa") and respectfully represents

as follows:

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODICTION

### A.    The Motion is Deficient on Its Face and Should Be Denied

The Motion must be denied in its entirety. Gadol Testa failed to comply with the Local

Bankruptcy Rules in serving the Motion. Pursuant to Rule 4001-1(c)(i), with respect to a motion

for relief from the automatic stay, "[t]he motion, notice of hearing, and all supporting documents

must be served by the moving party in the time and manner prescribed in LBR 9013-1(d) on …

**The debtor and debtor's attorney** (emphasis added)". *See* Rule 4001-1(c)(i). As evidenced by

the proof of service attached to the Motion, Gadol Tesa failed to serve the Motion on the Debtor.

Moreover, the Motion asserts that a supplemental declaration and optional Memorandum

of Points and Authorities is attached to the Motion. *See* Motion at p. 4, Section 6.b. and Section

7. Gadol Testa fail, however, to attach the supplemental declaration and the optional

Memorandum of Points and Authorities. There is no evidence or legal analysis attached to the

Motion supporting the relief sought. As such, the Motion must be denied in its entirety.

### B.    Cause Does Not Exist to Grant Relief From the Automatic Stay or to Annul the Automatic Stay

Cause does not exist to grant relief from the automatic stay or annulment of the automatic

stay. The Motion does not request to simply liquidate claims in state court. Rather, Gadol Testa

seek stay relief to actually enforce their claims against the bankruptcy estate ("Estate") by

recording a lis pendens and writ of attachment against the Debtor's real property. The Motion

should be denied in its entirety. There is absolutely no evidence that Debtor was created for the

purpose of filing this bankruptcy case ("Case") or that Debtor filed this Case in bad faith. Gadol

Testa submit no evidence because none exists. In fact, Debtor filed the instant Case to ensure an

orderly distribution to creditors from the Debtor's bankruptcy estate ("Estate") based upon the

order of priority of creditors. Gadol Testa are attempting to circumvent the order of priority in

this Case by filing encumbrances against the Debtor's real property. Gadol Testa seek to return

1    to state court in an attempt to jump in the front of the line ahead of other creditors.  Debtor is

2    looking out for the best interest of all creditors whereas Gadol Testa are only looking out for their

3    own best interest.

4        As set forth herein, when Debtor purchased the real property located at 1501 Serenade

5    Terrace, Corona del Mar, CA 92625 (the "Property"), the title report on the Property did not list

6    or reflect any writs of attachment, lis pendens, temporary protective orders, or pending actions by

7    Gadol Testa, or any other plaintiff.  Indeed, Debtor would never have purchased the Property if it

8    had known of any pending litigation involving the Property or if it had known that Gadol Testa

9    were seeking a writ of attachment against the Property.

10        Gadol Testa are seeking extraordinary relief by way of "annulment of the stay" seeking

11    unprecedented relief to record a post-petition lis pendens against the Property which is in direct

12    contravention to "the policy underlying the automatic stay [which] is to protect the debtor's estate

13    from 'the chaos and wasteful depletion resulting from multifold, uncoordinated and possibly

14    conflicting litigation" that could occur in the absence of the automatic stay.  *See In re Curtis,* 40

15    B.R. 795, 799 *(Bankr. D. Utah 1984) (quoting Litton Sys., Inc. v. Frigitemp Corp. (In*

16    *re Frigitemp Corp.),* 8 B.R. 284, 289 (S.D.N.Y. 1981)).  "The automatic stay provides debtors a

17    breathing spell from creditors by preventing 'all collection efforts, all harassment, and all

18    foreclosure actions."  *In re Capgro Leasing Assocs.,* 169 B.R. 305, 310 (Bankr. E.D.N.Y. 1994)

19    *(quoting Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir. 1991)).  Debtor

20    sought to protect creditors from Gadol Testa who were attempting to act "unilaterally in [their]

21    self-interest to obtain payment from a debtor to the detriment of other creditors."  *Id.* (*quoting*

22    *Maritime Elec. Co.*, 959 F. 2d at 1204).

23        In their concurrently filed motion to dismiss [Docket No. 53] ("Motion to Dismiss"),

24    Gadol Testa make desperate and unfounded claims of a "new debtor syndrome" scheme linked to

25    the Property's prior owner, The Haim Family Trust ("Haim Trust"), or to Mordechai Ferder and

26    Edit Ferder, the trustees of the Haim Trust ("Ferders").  Debtor and its members, however, have

27    no relationship with the Haim Trust, or the Ferders.  Moreover, Debtor's members have never

28    met the Ferders and only communicated through Mr. Jacob Wolf ("Mr. Wolf"), the real estate

3

1   agent representing the Haim Trust.  Furthermore, Debtor negotiated the purchase of the Property

2   in good faith through Mr. Wolf which resulted in the consummation of an arms-length

3   transaction.  Whatever bad acts may have been committed by the Haim Trust or Ferders cannot

4   be attributed to the Debtor or its members.  More importantly, Debtor was not created with the

5   intent to file this Case.  Instead, the Debtor was created for the purpose of acquiring the Property.

6   The Property was not distressed when the Debtor purchased it.  The evidence is uncontroverted

7   that at the time that Debtor purchased the Property, there were no writs of attachment, lis

8   pendens, temporary protective orders, or pending actions recorded, listed or reflected on the

9   preliminary title report.

10          Gadol Testa also make unfounded claims in the Motion to Dismiss that the Case was filed

11  to evade litigation involving the Property.  The facts and evidence show otherwise.  First,

12  Debtor's manager, Sahand Zargari ("Mr. Zargari") was approached by Mr. Wolf regarding the

13  Property on or about May 25, 2025.  Mr. Zargari viewed the Property and discussed possibly

14  writing an offer to purchase the Property with Mr. Wolf on or about May 27, 2025.  Mr. Wolf

15  was showing the Property to other prospective buyers and entertaining verbal offers from these

16  other prospective buyers.  Mr. Zargari submitted an initial offer to purchase the Property on May

17  30, 2025.  All of these events **preceded** the filing of the initial complaint by Gadol Testa, which

18  did not even name the Debtor as a defendant.  Gadol Testa filed their original complaint against

19  the Haim Trust, Ferders and others on June 6, 2025, **more than a week after Mr. Zargari**

20  **viewed the Property and made his initial offer**.  Second, escrow closed on the Debtor's

21  purchase of the Property on June 18, 2025 ("Debtor Sale Closing Date").  *See* docket report of

22  Gadol Testa Action attached to the RJN as **Exhibit 9** which evidences that the original complaint

23  was filed on June 6, 2025.  At that point in time, Gadol Testa had not even served the initial

24  complaint on any of the defendants.

25          It is clear that Gadol Testa are only looking out for their own best interest.  Debtor, on the

26  other hand, is looking out for the best interest of all creditors.  Debtor has moved forward

27  diligently in this Case to obtain the highest and best value for the Property.  In fact, Debtor has

28  already filed a motion to sell the Property which is set for hearing on September 2, 2025.  Debtor

1    made improvements on the Property and secured a buyer after marketing the Property for sale.

2    Relief from the automatic stay and annulment of the automatic stay should be denied so that

3    Debtor can sell the Property which will net the Estate significant proceeds which can be used to

4    distribute to allowed claims in order of their priority.

5    **II.    STATEMENT OF FACTS**

6        **A.    Formation of the Debtor and Debtor's Purchase of the Property**

7        The Property was purchased by the Debtor from the Haim Trust after the Debtor

8    participated in good faith, arms-length negotiations with Mr. Wolf, the Haim Trust's real estate

9    agent.  Mr. Zargari is a licensed real estate agent with The Daftarian Group ("DG") and regularly

10   acquires properties to purchase and resell for a profit.  *See* ¶ 3 of Zargari Declaration.  On or about

11   May 25, 2025, Mr. Wolf, a licensed real estate agent with DG, approached Mr. Zargari regarding

12   the Property which was potentially being offered for sale off-market.  Id.  On or about May 27,

13   2025, Mr. Zargari viewed the Property and discussed possibly writing an offer to purchase the

14   Property with Mr. Wolf.  *See* ¶ 4 of Zargari Declaration.

15       On or about May 30, 2025, Mr. Zargari submitted an offer to purchase the Property for

16   $8,800,000 in his individual capacity and the Property's prior owner, The Haim Family Trust

17   ("Haim Trust") accepted this offer.  *See* ¶ 5 of Zargari Declaration.  This offer was subject to a due

18   diligence period.  As reflected by the signed initial purchase offer, Mr. Zargari, an individual,

19   made the offer to purchase the Property.

20       The purchase agreement contained an inspection contingency and also provided that it

21   could be assigned.  *Id.*  On or about June 6, 2025, Mr. Zargari had an inspection performed of the

22   Property.  *See* ¶ 6 of Zargari Declaration.  During this time period, Mr. Zargari was looking for a

23   second investor and hard money lender to fund the purchase of the Property.  *See* ¶ 7 of Zargari

24   Declaration.  Mr. Zargari was also viewing other properties in the area in order to give him a

25   clearer idea of market value of the Property during the due diligence period.  *Id.*  It is important to

26   note that all of these events took place prior to Gadol Testa's filing of their initial complaint

27   against the Haim Trust, the Ferders and others.  Moreover, as reflected by the docket in the Gadol

28   Testa Action, the initial complaint that was filed on June 6, 2025, was never served on the Haim

Trust, the Ferders or the other defendants.  *See* docket report of Gadol Testa Action attached to the RJN as **Exhibit 9**.  Gadol Testa have no evidence that Debtor had any knowledge of any litigation involving the Property.  Instead, the evidence shows the opposite.  The evidence proves that Debtor and its members had no notice of any litigation involving the Property.  The preliminary title report at the time of Debtor's purchase of the Property did not list or reflect any writs of attachment, lis pendens, temporary protective orders, or pending actions.  *See* ¶ 17 of Zargari Declaration; Attached as **Exhibit 3** to the Zargari Declaration is a true and correct copy of the preliminary title report at the time of the Debtor Sale Closing Date.

Mr. Zargari contacted Michael Gerro ("Mr. Gerro") about co-investing in the Property through a limited liability company and securing a hard money loan.  *See* ¶ 8 of Zargari Declaration.  Mr. Zargari and Mr. Gerro determined that the purchase price needed to be reduced to $7,400,000 in order to bring in outside capital.  *See* ¶ 9 of Zargari Declaration.  On or about June 13, 2025, Mr. Zargari and Mr. Gerro formed the Debtor, and the purchase agreement was assigned to the Debtor.  *See* ¶ 9 of Zargari Declaration.

The purchase price was then reduced further to $7,037,500 because of a number of factors.  First, the United States was going to war with Iran, and the situation could have escalated to involve other major powers such as Russia and China.  Debtor sought a further discount for the purchase price to reflect the heightened uncertainty and changed circumstances under those market conditions.  *See* ¶ 10 of Zargari Declaration.  Pursuant to the liquidated damages clause in the purchase agreement, Debtor would lose its 3% deposit if it walked away from the purchase of the Property.  *See* ¶ 11 of Zargari Declaration.  Mr. Zargari agreed to waive his 2% commission as the Debtor's agent, and Mr. Wolf agreed to reduce his commission as the seller's agent by 1%.  Id.  As part of these negotiations, the seller requested that the closing occur sooner, with no further physical inspection, and no loan or appraisal contingency, and Debtor agreed as part of the agreement to reduce the purchase price of the Property.  *See* ¶ 12 of Zargari Declaration.  On or about June 16, 2025, the Debtor presented the Haim Trust with a final offer of $7,037,500.00 for the purchase of the Property ("Debtor's Purchase Price") which the Haim Trust accepted.  Id.  Escrow closed on the Debtor's purchase of the Property on June 18, 2025 ("Debtor Sale Closing

1    Date"). *See* ¶ 13 of Zargari Declaration; Attached as **Exhibit 2** to the Zargari Declaration is a true

2    and correct copy of the escrow closing statement on Debtor's purchase of the Property.

3        Debtor has no relationship with the Haim Trust, the Ferders, Lugano Diamonds or Simba.

4    *See* ¶ 24 of Zargari Declaration.  Mr. Zargari and Mr. Gerro have never met the Ferders and only

5    communicated with the Ferders through Mr. Wolf, the real estate agent representing the Haim

6    Trust.  *See* ¶ 15 of Zargari Declaration.  Debtor negotiated the purchase of the Property through

7    Mr. Wolf in good faith, arms-length negotiations and through a good faith, arms-length

8    transaction.  See ¶ 16 of Zargari Declaration.  Again, when Debtor purchased the Property, there

9    were no writs of attachment, lis pendens, temporary protective orders, or pending actions,

10   recorded, listed or reflected on the preliminary title report.  *See* ¶ 17 of Zargari Declaration;

11   Attached as Exhibit 3 to the Zargari Declaration is a true and correct copy of the preliminary title

12   report at the time of the Debtor Sale Closing Date.  Indeed, Debtor would never have purchased

13   the Property if it had known of any pending litigation involving the Property or if it had known

14   that Gadol Testa were seeking a writ of attachment against the Property.  *Id.*

15       In connection with the purchase of the Property, Debtor made a down payment of

16   $1,373,753.39 through member contributions and financed the balance of the purchase price with

17   two secured loans from PPRF Reit LLC ("PPRF") in the amount of $5,278,125 as a first priority

18   lien with a first priority deed of trust recorded against the Property and from Sitlani Holdings LLC

19   and Mahesh Tilokani (collectively, "Sitlani") in the amount of $500,000 as a second priority lien

20   with a second priority deed of trust recorded against the Property.  See ¶ 18 of Zargari

21   Declaration; see also **Exhibit 2** to the Zargari Declaration; see also PPRF loan documents a true

22   and correct copy of which are attached as Exhibit 4 to the Zargari Declaration; see also Sitlani

23   loan documents a true and correct copy of which are attached as Exhibit 5 to the Zargari

24   Declaration.  Mr. Gerro and Mr. Zargari do not have any relationship with either PPRF or Sitlani.

25   See ¶ 19 of Zargari Declaration.  The loans from PPRF and Sitlani were brokered by Raj

26   Mulchandani ("Mr. Mulchandani"), a Senior Partner at First Capital Trust Deeds, which loans

27   were fully funded for Debtor to acquire the Property.  See ¶ 20 of Zargari Declaration.  Other than

28   brokering the loans from PPRF and Sitlani for the Debtor, and for an unrelated limited liability

1  company, Mr. Zargari does not have any relationship with Mr. Mulchandani.  See ¶ 21 of Zargari

2  Declaration.

3  **B.      The Gadol Testa Action**

4      Gadol Testa filed their action against the Haim Trust, Mr. Ferder, Lugano

5  Diamonds, Simba, Debtor, and others, ("Gadol Testa Action") in the Orange County Superior

6  Court ("State Court") on June 6, 2025, more than a week after Mr. Zargari viewed the Property

7  and made the initial offer on the Property.  *See* ¶¶ 4-5 of Zargari Declaration; *see also* docket

8  report of Gadol Testa Action attached to the RJN as **Exhibit 9**.  Gadol Testa did not serve the

9  initial complaint on any of the defendants.  *See* docket report of Gadol Testa Action attached to the

10 RJN as **Exhibit 9**.  Again, Mr. Zargari first learned about the Property on or about May 25, 2025,

11 prior to the Gadol Testa Action being filed.  *See* ¶¶ 4-5 of Zargari Declaration.  From May 25,

12 2025, until June 18, 2025, when escrow closed on the Debtor's purchase of the Property, Debtor

13 and its members had no knowledge of the Gadol Testa Action.  After escrow closed on the

14 Debtor's purchase of the Property, Gadol Testa amended their complaint on July 1, 2025, to

15 include the Debtor.  *See* ¶ 23 of Zargari Declaration.  As such, the evidence shows that Debtor's

16 purchase of the Property was not part of a scheme on the part of the Debtor to obstruct Gadol

17 Testa from obtaining relief in the Gadol Testa Action.  Instead, Debtor purchased the Property in

18 good faith as a bona fide purchaser.  The claims against the Debtor and its principals in the Gadol

19 Testa Action are frivolous and Debtor has scheduled claims in the Bankruptcy Case for malicious

20 prosecution and slander of title and other potential claims.

21 **C.      Debtor's Filing of this Bankruptcy Case**

22      Only after Debtor purchased the Property did Debtor discover actions had been filed in

23 state and federal court involving the Property.  It was after review and consideration of the various

24 lawsuits and Gadol Testa's efforts to cloud title did Debtor determine that the filing of this Case

25 was in the best interest of all creditors.  Debtor filed the instant Case in order to ensure that there

26 was not a race to the courthouse by all of these plaintiffs, including Gadol Testa, but an orderly

27 distribution to creditors based upon the validity, extent and priority of their purported claims.

28 Gadol Testa, however, are not interested in what is in the best interest of all creditors, but only

what is in their own best interest.  Indeed, Gadol Testa admit that the relief they seek is to return to the state court in the Gadol Testa Action to record a post-petition lien against the Property to get ahead of other similarly situated creditors.  In fact, Gadol Testa committed various violations of the automatic stay in this Case in an attempt to jump the line of priority in front of other creditors as set forth below.

### D.    Gadol Testa Violations of the Automatic Stay and Attempt to Circumvent the Order of Priority of Creditors

After the Petition Date, on July 14, 2025, in violation of the automatic stay in Debtor's Bankruptcy Case, Gadol Testa recorded a Notice of Pendency of Action in the Official Records of the County of Orange ("Post-Petition Lis Pendens").  Attached as **Exhibit 8** to the attached RJN is a true and correct copy of the recorded Post-Petition Lis Pendens.  In addition, on July 16, 2025, in violation of the automatic stay in Debtor's bankruptcy Case, Gadol Testa also recorded a Writ of Attachment in the Official Records of the County of Orange ("Post-Petition Writ").  *See* ¶ 2 of Goe Declaration.  Furthermore, Gadol Testa had a Notice of the Post-Petition Writ ("Notice") posted by a levying officer on Debtor's Property on or about August 8, 2025, in violation of the automatic stay in Debtor's Bankruptcy Case.  *See* ¶ 3 of Goe Declaration.  The Post-Petition Lis Pendens and Post-Petition Writ were recorded after the Petition Date and are void pursuant to Section 549 of the Bankruptcy Code.  Debtor, through its counsel, sent correspondence to counsel for Gadol Testa requesting that they cease direct and intentional violations of the automatic stay and to expunge the Post-Petition Lis Pendens and Post-Petition Writ which are clouds on title to the Property.  *See* ¶ 4 of Goe Declaration*; see also* **Exhibit 1** to the Goe Declaration which is email correspondence from Debtor's counsel sent to counsel for Gadol Testa on August 11, 2025, which attaches a copy of the Notice.

## III.    CAUSE DOES NOT EXIST TO GRANT RELIEF FROM THE AUTOMATIC STAY

As discussed in detail in *In re Kim*, 71 B.R. 1011 (Bankr. C.D. Cal. 1987), Gadol Testa carry the initial burden of establishing a prima facie basis for the relief requested in their Motion, as well as the burden imposed pursuant to Bankruptcy Code section 362(g).

1

2

A creditor seeking relief from the automatic stay has the burden of producing evidence to make a prima facie case that the creditor is entitled to relief from stay ….

3

4

5

6

[T]he impact of the burden of producing evidence is substantive if the burden is not met:  The party who fails to carry his burden loses on the issue to which the burden applies, and the ultimate burden of persuasion, which may lie on a different party, plays no role.  In a motion for relief from stay, the motion must be denied if the moving creditor fails to make a prima facie case for relief from stay, and the burden of proof set forth in section 362(g) plays no role.

7

8

9

10

The substantive impact of the allocation of the burden of producing evidence has two substantial policy foundations.  First, a party is not permitted to prevail on an issue, even where the party does not have the ultimate burden of persuasion, unless the party introduces a certain quantum of evidence sufficient to put his opponent to the burden of producing evidence.  Unless the quantum of proof on an issue reaches a certain threshold, no issue is raised that the opposing party is required to meet.

11

12

13

14

15

("To obtain relief from the automatic stay, the party seeking relief must first establish a prima facie case. A prima facie case requires the movant to establish 'a factual and legal right to the relief that it seeks' that cause' exists for relief under §362(d)(1).  If the movant fails to meet its initial burden to demonstrate cause, relief from the automatic stay should be denied.").  "'Because there is no clear definition of what constitutes "cause," discretionary relief from the stay must be determined on a case by case basis.'" *In re Castlerock Properties*, 781 F.2d 159, 163 (9th Cir. 1986) (quoting *In re MacDonald,* 755 F.2d 715, 717 (9th Cir. 1985).

16

17

18

19

20

The mere existence of state court litigation is insufficient, as a matter of law, to constitute "cause" for relief from the automatic stay.  *In re Curtis*, 40 B.R. 795, 803 (Bankr. D. Utah 1984).  ("The determination of 'cause' is one that necessarily requires exercise of judicial judgment and involves mixed questions of fact and law.  The Court holds that the existence of pending litigation in another forum filed after the commencement of the bankruptcy case, without more, does not constitute 'cause.'"); *In re Plumberex Specialty Products*, 311 B.R. 551 (Bankr. C.D. Cal. 2004).

21

22

23

24

25

26

27

*Id*. at 1015-1016 (emphasis added); *see also In re Plumberex Specialty Products, Inc.,* 311 B.R. 551, 557 (Bankr. C.D. Cal. 2004) ("To obtain relief from the automatic stay, the party seeking relief must first establish a prima facie case.  [A prima facie case requires the movant to establish 'a factual and legal right to the relief that it seeks.'] that 'cause' exists for relief under §362(d)(1). If the movant fails to meet its initial burden to demonstrate cause, relief from the automatic stay should be denied.").

28

1       Similarly, a mere allegation of irreparable harm (which was not even made by Gadol

2  Testa) is also insufficient.  *In re Curtis*, 40 B.R. 795, 803 (Bankr. D. Utah 1984)("A creditor's

3  mere unsupported allegation that continuance of the stay will cause it irreparable harm will not

4  suffice."); *In re Texaco*, 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988) ("Conclusory statements that a

5  continuance of the stay will cause irreparable harm or that injury will occur if relief is denied are

6  insufficient to establish cause.");  *In re Towner Petroleum*, 48 B.R. 182, 191 (Bankr .D. Ok. 1985)

7  ("A creditor's unsupported allegation that continuance of the stay will cause it irreparable harm

8  will not suffice.").

9       Gadol Testa have not met their burden of demonstrating that cause exists for the relief

10  requested.  No trial date, or any other dates or deadlines have been set in the Gadol Testa Action.

11  Here, Gadol Testa fail to make a prima facie case for relief from the stay under section 362(d)(1)

12  because they fail to establish any facts that would support a finding of bad faith. Because the

13  Motion fails to establish a prima facie case for finding cause for granting under section 362(d)(1),

14  the Motion should be denied prior to and without the need for burden shifting to occur to the

15  Debtor.

16     **A.**     **Case Was Not Filed in Bad Faith**

17       The Motion is filed on the basis of a "bad faith filing".  *See* Motion at p. 4, Section f.1.

18  Gadol Testa urge the Court to grant relief from the stay for "cause" under Bankruptcy Code

19  section 362(d)(1) based on unsubstantiated allegations of bad faith.  As detailed herein, this case

20  was filed in good faith, has none of the hallmarks of a bad faith filing and was filed for the entirely

21  proper purpose of effectuating a timely reorganization.

22       "A primary purpose of stay is to afford debtors in Chapter 11 reorganizations the

23  opportunity to continue their businesses with their available assets." *Small Business Admin. v.*

24  *Rinehart*, 887 F.2d 165, 168 (8th Cir. 1989) *citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 183

25  (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News at 6144. "The purpose of the

26  automatic stay is to give the debtor a breathing spell from his creditors, to stop all collection

27  efforts, harassment and foreclosure actions."  *In re Roach*, 660 F.2d 1316, 1318 (9th Cir. 1981)

28  citing Notes of Committee on the Judiciary, Sen. Rep. No. 989, 95th Cong., 2d Sess. 54, reprinted

in [1978] U.S. Code Cong. & Ad. News 5787, 5840.  The purpose of the automatic stay is to afford debtor "breathing spell" by halting collection process; it enables debtor to attempt repayment or reorganization plan with aim toward satisfying existing debt. *In re Siciliano*, 13 F.3d 748, 750 (3rd Cir. 1994), *citing Maritime Electric Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991) and H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 6296-97.  *Accord*, *In re Roach*, 660 F.2d 1316, 1318 (9th Cir. 1981), *citing* Notes of Committee on the Judiciary, Sen. Rep. No. 989, 95th Cong., 2d Sess. 54, reprinted in [1978] U.S. Code Cong. & Ad. News 5787, 5840, (The purpose of the automatic stay is to give the debtor a breathing spell from its creditors, to stop all collection efforts, harassment and foreclosure actions.).

In this Case, the Motion was filed less than five weeks after the Petition Date.  Debtor filed its petition on July 11, 2025, and the Motion was filed on August 14, 2025.  This is clearly not the breathing spell envisioned by Congress, as discussed further below yet is an action characteristic of an overly aggressive litigant.

Debtor's goal in filing the Case is precisely the goal intended by Congress in offering bankruptcy protection to debtors through the Bankruptcy Code.  First, "the filing of a bankruptcy petition stays the commencement or continuation of all nonbankruptcy judicial proceedings against the debtor".  *See Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 973 (1st Cir. 1997); *accord, e.g.*, 11 U.S.C. § 362(a)(1).  Second, the filing of a bankruptcy precludes creditors from taking "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case", and prohibits creditors from taking almost any action "against the debtor or the property of the estate," including the enforcement of preexisting liens or judgments against the debtor and the exercise of control over the debtor's property.  *Crespo Torres v. Santander Fin. Servs. (In re Crespo Torres)*, 532 B.R. 195, 200 (Bankr. D.P.R. 2015) (*quoting* Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 362.03 (16th ed. 2015)); *see also Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 589 (2020).

"The policy underlying the automatic stay is to protect the debtor's estate from 'the chaos and wasteful depletion resulting from multifold, uncoordinated and possibly conflicting litigation"

1    that could occur in the absence of the stay.  *In re Curtis*, 40 B.R. 795, 799 (Bankr. D. Utah 1984)

2    (*quoting Litton Sys., Inc. v. Frigitemp Corp. (In re Frigitemp Corp.)*, 8 B.R. 284, 289 (S.D.N.Y.

3    1981)).  "The automatic stay provides debtors a breathing spell from creditors by preventing 'all

4    collection efforts, all harassment, and all foreclosure actions."  *In re Capgro Leasing Assocs.*, 169

5    B.R. 305, 310 (Bankr. E.D.N.Y. 1994) (*quoting Maritime Elec. Co. v. United Jersey Bank*, 959

6    F.2d 1194, 1204 (3d Cir. 1991)).  "The stay protects creditors, too, by precluding certain 'creditors

7    from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other

8    creditors."  *Id.*

9        At the time of the Debtor Sale Closing Date, Debtor and its members were not aware of

10    any writs of attachment, lis pendens, temporary protective orders, or pending actions, recorded,

11    listed or reflected on the preliminary title report.  *See* ¶ 17 of Zargari Declaration; *see also* **Exhibit**

12    **3** attached to Zargari Declaration which is a true and correct copy of the preliminary title report at

13    the time of the Debtor Sale Closing Date.  Debtor would never have purchased the Property if its

14    members had known of any pending litigation involving the Property or if they had known that

15    Gadol Testa were seeking a writ of attachment against the Property.  *Id.*

16        Immediately upon filing the Case, Debtor began working on selling the Property for the

17    benefit of **all creditors**.  A sale of the Property as set forth in Debtor's motion filed on August 12,

18    2025, as Docket No. 43 ("Sale Motion"), is in the best interest of creditors of the Estate because it

19    allows the Property to be sold for the highest and best price and preserving the net proceeds for the

20    benefit of all creditors of the Estate.  Gadol Testa, however, do not want the Property sold because

21    they seek to secure a first priority lien in the Property ahead of other creditors.  It is Gadol Testa

22    that is seeking to circumvent the purpose of the Bankruptcy Code for their own best interest and

23    their own best interest alone.  Gadol Testa are seeking extraordinary relief by way of relief from

24    stay or annulment of the stay so that they can record a post-petition lis pendens against the

25    Property in order to jump ahead of other creditors in this Case.

26        In a case similar in some respects to this case regarding a corporate debtor possessing

27    massive equity in real estate and relatively few creditors, the BAP reversed a bankruptcy court's

28    lifting of the stay a mere six (6) months into the case and after the debtor had the opportunity to

1  file a plan of reorganization for "bad faith" because,

2      Debtor was not formed on the eve of bankruptcy as was the case in both *Little Creek* and
       *Thirtieth Place*. Furthermore, the Debtor has approximately one million dollars in equity in
3      the subject real property which it should be given the reasonable opportunity to protect.
       Moreover, the bankruptcy petition in this case was filed only six months prior to the order
4      lifting the stay. That the Debtor received only one offer to purchase the property since the
       filing of the case is not surprising in light of the great value of the property. Given the
5      complications incident to a refinancing or sale of this magnitude, the bankruptcy court
       abused its discretion in concluding that the Debtor's failure in this regard justified the
6      lifting of the stay.

7  *In re Can-Alta Properties, Ltd.*, 87 B.R. 89 *, 1988 Bankr. LEXIS 1261, Bankr. L. Rep. (CCH)

8  P72, 393 (B.A.P. 9th Cir. Ariz. 1988). Even more starkly than in *Can-Alta*, this Motion is

9  unjustifiably premature. Debtor has substantial equity that it should be given a reasonable

10  opportunity to preserve.

11      As set forth on the Debtor's bankruptcy petition, Debtor checked the bankruptcy petition's

12  single asset real estate box and will be filing a plan by October 7, 2025, which is within the 90-day

13  deadline of Section 362(d)(3) of the Bankruptcy Code.

14      **B.    There is No Evidence of "New Debtor Syndrome"**

15      In the Motion to Dismiss, Gadol Testa repeat the same unsupported attacks against the

16  Debtor. The Haim Trust, the Ferders, Lugano Diamonds and Simba, the purported wrongdoers,

17  have no relationship whatsoever with the Debtor or its members. *See* ¶¶ 14-24 of Zargari

18  Declaration. The evidence overwhelmingly shows that that Debtor's purchase of the Property

19  from the Haim Trust was through good faith, arms-length negotiations and through a good faith,

20  arms-length transaction. *See* ¶ 16 of Zargari Declaration. The escrow closing statement attached

21  as **Exhibit 2** to the Zargari Declaration shows that Debtor paid value for the Property, made a

22  significant down payment for the purchase of the Property, and obtained two loans to finance the

23  purchase of the Property. *See* **Exhibit 2**. The Property was not "transferred to Debtor" for "no

24  consideration". Significant consideration was paid by Debtor for the Property. *Id.* The "facts"

25  asserted by Gadol Testa do not show a bad faith filing and do no support cause for relief from the

26  automatic stay. It is common business practice for a single purpose entity to be created to hold an

27  expensive piece of real property, and, in fact, most lenders require it. It is common business

28  practice for an entity to hold only one piece of real property. The pattern of conduct cited by

1   Gadol Testa to evidence "new debtor syndrome" do not exist in this Case.  *See In re Yukon Enter.,*

2   *Inc.,* 39 B.R. 919, 921 (Bankr. C.D. Cal.1984).  First, the Property in this Case is not distressed but

3   has significant equity.  More importantly, at the time that Debtor purchased the Property, the

4   Property had no writs of attachment, lis pendens, temporary protective orders, or pending actions

5   recorded, listed or reflected on the preliminary title report.  *See* ¶ 17 of Zargari Declaration; *see*

6   *also* **Exhibit 3**.  The Case was filed only after Debtor discovered litigation had just been filed

7   involving the Property.  *See* ¶ 17 of Zargari Declaration.  Finally, the Debtor purchased the

8   Property for substantial consideration.   As such, there is no evidence of "new debtor syndrome"

9   and no evidence of bad faith.

10         Debtor has been cooperative with the various creditors, including Gadol Testa, throughout

11   its Case.  Debtor has agreed to produce documents and has also agreed to produce documents and

12   appear for an examination pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

13   Debtor attended its initial debtor interview and its meeting of creditors examination pursuant to

14   Section 341 of the Bankruptcy Code ("Meeting of Creditors") which was concluded.  *See* ¶¶ 35-37

15   of Zargari Declaration.  Debtor has cooperated with the Office of the United States Trustee

16   ("OUST") and produced all documents and information requested by the OUST both before and

17   after the Meeting of Creditors.  *Id.*

18         Furthermore, the reason for Debtor's filing of the instant Case is to protect the best interest

19   of all creditors.  Cause does not exist to grant relief from the automatic stay or to annul the

20   automatic stay and Debtor should be allowed to sell Property which will net the Estate significant

21   proceeds which can be used to distribute to allowed claims in order of their validity, extent and

22   priority and not just to Gadol Testa.  Debtor's Case was filed precisely within the letter and spirit

23   of the Bankruptcy Code – in order to protect the interest of creditors and provide an orderly

24   distribution to creditors based upon the validity, extent and priority of their claims.

25         **C.**    **Each Curtis Factor Weighs Against Granting Relief from the Stay**

26         The most widely accepted test requires for whether to grant relief to allow litigation to

27   resume in another forum involves application of the factors set forth in *In re Curtis*.  Numerous

28   courts, including the Ninth Circuit Bankruptcy Appellate Panel, have adopted the *Curtis* test of

twelve potentially relevant factors in deciding whether to lift the automatic stay to permit litigation to continue in another forum, which include:

> (1) whether relief would result in a partial or complete resolution of the issues;  (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*In re Plumberex Specialty Products*, 311 B.R. at 559; *In re Landmark Fence Co., Inc.*, 2011 WL 6826253, at *4 (C.D. Cal. Dec. 9, 2011);  *see also In re Kronemyer*, 405 B.R. 915, 921 (B.A.P. 9th Cir. 2009) ("We agree that the *Curtis* factors are appropriate, nonexclusive, factors to consider in deciding whether to grant relief from the automatic stay to allow pending litigation to continue in another forum.");  *In re Smith*, 389 B.R. 902, 919 (Bankr. D. Nev. 2008) (denying relief from stay based upon analysis of *Curtis* factors); *In re Wang*, 2010 WL 6259970, *5 (9th Cir. BAP 2010) (*citing Curtis* factors).

Here, Gadol Testa failed to establish "cause" pursuant to the *Curtis* factors. While a few of the factors have no direct bearing on this case, either "for" or "against", the *Curtis* factors that apply all favor denying relief from the automatic stay.

### 1.    Whether the relief will result in a partial or complete resolution of the issues.

This factor weighs in favor of denial of the Motion.  Relief from the automatic stay will not result in a complete resolution of outstanding issues between the parties, especially since other alleged creditors have asserted competing claims.  Gadol Testa seek punitive damages against the Debtor.  These issues relating to allowance, priority and subordination are within the exclusive jurisdiction of the bankruptcy court and thus weigh against relief from stay.  *See Landmark Fence Co.*, at *5 ("Priority of claims and subordination issues in this case are within the exclusive

1  jurisdiction of the bankruptcy court and cannot be resolved in a state action.") citing *Pepper v.*

2  *Litton*, 308 U.S. 295, 305, 60 S. Ct. 238, 84 L. Ed. 281 (1939) (ruling that the bankruptcy court has

3  exclusive jurisdiction over subordination, allowance, and disallowance of claims).  Accordingly,

4  relief from stay will not result in a complete resolution of the issues.  Moreover, Gadol Testa have

5  recorded liens against the Property in violation of the automatic stay of Section 362 and Debtor

6  disputes these liens and seeks expungement of these void liens pursuant to Section 549 of the

7  Bankruptcy Code.  Therefore, this factor weighs against granting the Motion.

8              **2.       The lack of any connection with or interference with the bankruptcy**

9                          **case.**

10         This factor overwhelmingly weighs in favor of denial of the Motion.  Gadol Testa are not

11  merely asking to liquidate their claims, but to take enforcement action against property of the

12  Estate.  Forcing the Debtor to litigate meritless claims filed against it by Gadol Testa would be

13  hugely disruptive to the bankruptcy estate and would force the Debtor to employ special counsel,

14  unduly raising the administrative expenses in the Case and diminishing the recover to creditors.

15         In determining whether relief from stay should be granted to allow litigation to proceed in

16  an alternate forum, the most important factor is the effect of such litigation on the administration of

17  the Estate.  Even slight interference with the administration may be enough to preclude relief in the

18  absence of a commensurate benefit.  *Curtis*, 40 B.R. at 806.  Curtis noted that,

19             Financial hardship to the movants must, of course, be balanced against financial
20             hardship to the debtors.  In the absence of some other justification, the court will
               not shift the burden from another party to the debtors.  To do so would contravene
21             the fundamental policy in favor of economic administration of debtors' estates.

22             **The most important factor in determining whether to grant relief from the**
               **automatic stay to permit litigation against the debtor in another forum is the**
23             **effect of such litigation on the administration of the estate.  Even slight**
               **interference with the administration may be enough to preclude relief in the**
24             **absence of a commensurate benefit…**

25             …The Court finds…that this case would be more conveniently administered if the
               stay remained in effect…Relief from the stay would frustrate, rather than advance,
26             the economical administration of this case.  The potential disruption and expense
               to the debtors' estate in defending the state court action would cause great
27             prejudice to the administration of this case.  *Curtis*, 40 B.R. at 803-807.  *See also*
               *In re Conejo Enterprises, Inc*., 96 F.3d 346, 353 (9th Cir. 1996) ("Judicial economy
28             and efficient administration of the estate were also properly considered by the
               bankruptcy court in denying relief from the stay.").

*Id.* at 806-807.

"[I]t is not enough for the creditor to merely show that it will be hurt by the continuation of the stay, rather the creditor must show that neither the debtor nor the other creditors, will be injured if the stay is lifted." *See In re Martha Washington Hosp.*, 157 B.R. 392, 395 (N.D. Ill. 1993) *citing Ginsberg, Bankruptcy*, at 3306 (1985).

Here, Gadol Testa do not address, never mind demonstrate, how they would be hurt from continuation of the stay. The Gadol Testa Action against the Debtor was filed less than 2 weeks prior to the Petition Date. It is well established in the Ninth Circuit that the automatic stay provides "the debtor a breathing spell from his creditors during which the debtor can try to reorganize." *In re Dawson*, 390 F.3d 1139, 1147 (9th Cir. 2004). "This 'breathing spell' afforded by the automatic stay permits a chapter 11 debtor in possession to focus its efforts on reorganization." *In re Plumberex Specialty Products*, 311 B.R. 551, 556 (Bankr. C.D. Cal. 2004). Allowing Gadol Testa to record liens on property of the Estate is not only unprecedented but would defeat the entire bankruptcy priority scheme. Having to defend the entire Gadol Testa Action from start to finish would cause a huge financial burden upon the Debtor and the Estate, especially when the Bankruptcy Court can easily handle this matter efficiently through either the claims allowance process or through an adversary proceeding. The bankruptcy filing is supposed to allow the Debtor a breathing spell from attempts by its creditors to collect and litigate with the Debtor. Accordingly, this factor weighs heavily in favor of denial of the Motion.

### 3.    Whether the foreign proceeding involves the debtor as a fiduciary.

The Gadol Testa Action does not involve the Debtor acting as a fiduciary and, as such, this factor does not support granting the Motion.

### 4.    Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases.

The state court is not a specialized tribunal to hear the fraudulent conveyance claims Gadol Testa have asserted. As a result, this factor weighs in favor of denial of the motion. See *Landmark Fence Co.*, 2011 WL 6826253 (C.D. Cal. Dec. 9, 2011) ("The bankruptcy court did not

clearly err in finding that 'the state court is a court of general jurisdiction' and is not a specialized tribunal.'"); *In re Worldcom, Inc.,* 2006 WL 2270379 (S.D.N.Y. 2006).

The Bankruptcy Court is in fact the specialized tribunal that will need to resolve the bankruptcy related issues with respect to subordination (11 U.S.C. §§ 510, 726(a)(4) and 1129(a)(7)(A)(ii)) as Gadol Testa seek punitive and special damages against the Debtor. *See* **Exhibit 7** attached to the RJN which is the First Amended Complaint filed by Gadol Testa in the Gadol Testa Action. The Bankruptcy Court is a specialized tribunal and has exclusive jurisdiction over these issues. Thus, this factor weighs in favor of denial of the Motion.

     **5.**    **Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation**.

This factor weighs in favor of denying the Motion as Debtor likely has no insurance that would cover Gadol Testa's baseless claims asserted against the Debtor and Debtor will be forced to assume full financial responsibility for defending the Gadol Testa Action.

     **6.**    **Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question.**

This factor is really not applicable but there are other parties seeking similar relief who Gadol Testa are trying to beat to the courthouse.

     **7.**    **Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties.**

This factor strongly favors denial as other parties are pursuing the Property when Gadol Testa are trying to jump the line by obtaining stay relief to actually record the Post-Petition Lis Pendens and Post-Petition Writ against property of the Estate. As noted above, the Gadol Testa Action will unduly increase the cost of administering this Estate, which harms the factions listed in this factor. Having to defend the entire Gadol Testa Action which is at the very early stages would cause a huge financial burden upon the Debtor and prejudice the interests of creditors of the Estate, especially when the Bankruptcy Court can easily handle this matter efficiently

1  through either the claims allowance process or through an adversary proceeding.   Accordingly,

2  this factor weighs heavily in favor of denial of the Motion

3        **8.      Whether the judgment claim arising from the foreign action is subject**

4                  **to equitable subordination under Section 510(c).**

5        This factor weighs in favor of denial of the Motion.  Gadol Testa engaged in inequitable

6  conduct by willfully violating the automatic stay.  Gadol Testa also assert punitive damages

7  against Debtor.  *See* **Exhibit 7** to the RJN.  Punitive damages against Debtor are subject to

8  subordination pursuant to §§ 726(a)(4) and 1129(a)(7)(A)(ii). See *In re Cassis Bistro, Inc*., 188

9  B.R. 472 (Bankr. S.D. Fla. 1995); *In re New York Medical Group, P.C*., 265 B.R. 408, 416 (Bankr.

10  S.D.N.Y. 2001).  Accordingly, even assuming Gadol Testa are successful in the Gadol Testa

11  Action, portions of the claims are subject to subordination and/or disallowance under the

12  Bankruptcy Code, which further weighs in favor of denial of relief from stay. *See Landmark*

13  *Fence*, at *8 (C.D. Cal. Dec. 9, 2011) (affirming denial of relief from stay inter alia where there

14  were issues of subordination relating to subordination of punitive damage claims).

15        **9.      Whether movant's success in the foreign proceeding would result in a**

16                  **judicial lien avoidable by the debtor under Section 522(f).**

17        This factor does not apply as the Debtor is a limited liability company.

18        **10.     The interest of judicial economy and the expeditious and economical**

19                  **determination of litigation for the parties.**

20        As set forth in great detail above, this factor weighs in favor of denial of the Motion.

21  Gadol Testa are claiming compensatory damages, punitive damages, and an order of attachment

22  against the Property.  *See* **Exhibit 7** to the RJN.  Debtor would be forced to defend these claims.

23  The Gadol Testa Action will require a full panoply of discovery, including interrogatories

24  requests, document production demands, depositions of the key witnesses, the retention of expert

25  witnesses, dispositive motions, pre-trial motions, and the trial itself.  The fees and costs to be

26  incurred by Debtor to defend will be significant.  The claims of Gadol Testa can be litigated faster

27  and more efficiently in the Bankruptcy Court for the reasons noted above.  Finally, it is far more

28  economical for the Estate and its creditors if the dispute is resolved through the claims allowance

1    process, adversary proceeding process and/or plan confirmation process.

2    **11.    Whether the foreign proceedings have progressed to the point where**

3    **the parties are prepared for trial.**

4    This factor weighs in favor of denying the Motion as the Gadol Testa Action

5    was filed about one month prior to the Petition and the complaint was only amended to include

6    the Debtor less than two weeks prior to the Petition Date.  The Gadol Testa Action had not

7    progressed significantly prior to the Petition Date and no trial date has even been set.  Therefore,

8    this factor weighs against granting the Motion.

9    **12.    The impact of the stay on the parties and the balance of harms.**

10    Based on all of the foregoing, this factor strongly favors denial of the Motion. Again,

11    Gadol Testa's intent to place post-petition liens on the Property not only harms the Debtor but also

12    harms the other creditors of the Estate.  In considering the balance of harms, the Court must first

13    and foremost, consider the potential harm to the Estate.  When considering relief from automatic

14    stay, the bankruptcy court must consider the interests of the debtor and the bankruptcy proceeding

15    in addition to the interests of the creditors. As noted in *In re Martha Washington Hosp.,* 157 B.R.

16    392, 395 (N.D.Ill.1993).  "It is not enough for the creditor to merely show that it will be hurt by

17    the continuation of the stay, rather the creditor must show that neither the debtor nor the other

18    creditors will be injured if the stay is lifted." (Landmark Op. Br. 34.).  The "most important

19    factor," however, "is the effect of such litigation on the administration of the estate." *Curtis*, 40

20    B.R. at 800.  As such, the Bankruptcy Court can and should consider the interests of the Estate as

21    well as the interests of the creditors of the Estate.

22    Moreover, as set forth in *Shepard v. Patel, et al (In re Patel)*, 291 B.R. 169, 173-174

23    (Bankr. D. Ariz. 2003), where a creditor was seeking relief from stay to finish litigation in state

24    court, the Court denied relief from stay for the following reasons, among others: 1) the claims

25    concern the management and continued operation of business ventures which are assets of the

26    estate; 2) a fundamental purpose of the automatic stay is to give the debtor breathing room from,

27    among other things, litigation; 3) the bankruptcy court is in a better position than the state court to

28    ascertain what is important to be decided and when, and what may be moot or may be resolved by

alternative processes such as confirmation of a plan; 4) to promote judicial economy by preventing the duplication of litigation (even if claim liquidated in state court, other creditors could object to the claim asserting that they are not subject to collateral estoppel or res judicata, or claim may but subject to unique bankruptcy defenses, among other reasons); and 5) to maintain a level playing field such that no creditor be given the opportunity to liquidate his claim on his schedule in his chosen forum, while other creditors are denied that strategic advantage. *Id.*

As set forth in great detail above, if the Motion is granted, Gadol Testa will record liens on the Property, and the Debtor will be required to defend the Gadol Testa Action which will substantially harm the Debtor's reorganization and diminish recovery to creditors of the Estate. On the other hand, there is no harm to Gadol Testa to file a proof of claim and have the validity, extent or priority of their purported lien against the Property decided by the Bankruptcy Court. The Gadol Testa Action against the Debtor was filed less than 2 weeks prior to the Petition Date. To Gadol Testa, it is essentially the same work, regardless of which Court determines the extent and priority its claim against the Estate. Gadol Testa merely want to jump the line ahead of other creditors by returning to State Court to record a lis pendens and writ of attachment against the Property. Gadol Testa already violated the automatic stay by recording the Post-Petition Lis Pendens and now seek to wash away this stay violation. The Gadol Testa Action has not proceeded significantly at all. Therefore, the balance of harms weighs greatly in favor of the Debtor. There has been no showing by Gadol Testa of any harm they will suffer from having their claim litigated in the Bankruptcy Court.

The Debtor requires breathing room from litigation; the Bankruptcy Court is in a better position to resolve Gadol Testa's claims so judicial economy will be served by allowing the matter to be resolved in the Bankruptcy Court. Based upon the foregoing, the Debtor asserts that Gadol Testa failed to establish "cause" for relief from stay. Therefore, the Motion must be denied.

## IV.    <u>CAUSE DOES NOT EXIST TO ANNUL THE STAY</u>

It is incredible that Gadol Testa request that this Court annul the stay with respect to the Post-Petition Lis Pendens recorded **post-petition on July 14, 2025,** and Post-Petition Writ recorded **post-petition on July 16, 2025**. Gadol Testa's motives are made crystal clear. Gadol

1   Testa only want to secure their purported "lien priority" in the Property, despite the fact that this

2   "lien priority" was obtained in violation of the automatic stay.  Exercising a fundamental

3   misunderstanding of bankruptcy proceedings, Gadol Testa have the nerve to assert that if relief is

4   not granted, the will be "robbed" of their lien priority.  *See* Motion to Dismiss at p. 21, line 24.

5   Gadol Testa argue that this Case is weaponizing the Bankruptcy Code in favor of other creditors

6   over them when in reality, it is Gadol Testa that is seeking to circumvent the Bankruptcy Code by

7   requesting that they be permitted to record a lien on the Property ahead of Debtor's other creditors.

8   No cause exists for such extraordinary relief.  Gadol Testa admit they learned of the Debtor's Case

9   on July 14, 2025.  As such, Gadol Testa admit they knew of the Debtor's bankruptcy at the time

10  that the Post-Petition Writ  was recorded **post-petition on July 16, 2025**.  *See* Motion to Dismiss

11  at p. 22, lines 11-17.  Therefore, the recording of the Post-Petition Writ  was an intentional

12  violation of the automatic stay.  Gadol Testa should not be rewarded for their intentional violation

13  of the automatic stay.

14          The two key considerations set forth in established Ninth Circuit case law do not support

15  annulment of the stay.  *See National Environmental Waste Corp. v. City of Riverside (In re*

16  *National Environmental Waste Corp.)*, 129 F.3d 1052, 1054 (9th Cir. 1997); *see also Fjeldsted v.*

17  *Lien (In re Fjeldsted)*, 293 B.R. 12, 24-25 (9th Cir. BAP 2003).  The factors set forth in *Fjeldsted*

18  are as follows and all support denial of annulment of the stay:

19          **1.      Gadol Testa Admit They Knew of the Case and Violated the Stay**

20          The first of the two key considerations to be considered by the Court is whether Gadol

21  Testa was aware of the Debtor's bankruptcy petition.  Gadol Testa **admit that they knew of the**

22  **Debtor's bankruptcy at the time that the Post-Petition Writ was recorded on July 16, 2025**.

23  *See* Motion to Dismiss at p. 22, lines 11-17.  Annulment of the stay should be denied on this basis

24  alone.

25          **2.      Debtor Has Not Engaged in Any Unreasonable or Inequitable Conduct**

26          The second key consideration is whether the Debtor engaged in unreasonable or

27  inequitable conduct, or prejudice would result to the creditor.  *Id.*  Debtor has submitted

28  overwhelming evidence that Debtor has no relationship to the Haim Trust, the Ferders, Lugano

1   Diamonds or Simba.  *See* ¶¶ 14-24 of Zargari Declaration.  More importantly, Debtor has

2   submitted uncontroverted evidence that when Debtor purchased the Property, there were no writs

3   of attachment, lis pendens, temporary protective orders, or pending actions recorded, listed or

4   reflected on the preliminary title report.  *See* ¶ 17 of Zargari Declaration; *see also* **Exhibit 3** to the

5   Zargari Declaration.  Therefore, there is absolutely no evidence that the Debtor was created to

6   evade the Gadol Testa Action which had not even been filed when Mr. Zargari viewed the

7   Property and made the initial offer on the Property.  *See* ¶¶ 4-5 of Zargari Declaration; *see also*

8   docket report of Gadol Testa Action attached to the RJN as **Exhibit 9**.   This evidence supports

9   denying the request to annul the stay.

10          **3.      Debtor has Never Filed for Bankruptcy Before**

11          The number of prior bankruptcy cases is also a factor to be examined by the Court.  Debtor

12   has never filed for bankruptcy before and as such, this factor does not support annulling the stay.

13          **4.      Whether Debtor is a Repeat Filer**

14          Debtor is not a repeat filer and as such, this factor does not support annulling the stay.

15          **5.      Extent of Prejudice to Creditors or Third Parties, Including a Bona Fide**

16   **Purchaser**

17          Debtor has a buyer for the Property who can close quickly once the Court approves the

18   sale.  Allowing a post-petition lien to be recorded against the Property will prevent the Debtor

19   form selling the Property and will prejudice all creditors of the Estate.  This factor supports denial

20   of annulment of the stay.

21          **6.      Debtor's Overall Good Faith Supports Denying Annulling the Stay**

22          As set forth in *In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986), the Court is to ascertain

23   "whether [the] debtor is attempting to unreasonably deter and harass creditors or attempting to

24   effect a speedy, efficient reorganization on a feasible basis." *Marsch v. Marsch, 36 F.3d 825, 827-*

25   *28 (9th Cir. 1994)* (*citing In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986)).  Debtor filed this Case

26   for the sole purpose of effectuating a "speedy [and] efficient reorganization" and to avoid the

27   chaotic race to the courthouse led by Gadol Testa.  Debtor has already filed the Sale Motion and

28   will be filing a plan of reorganization shortly thereafter.  Gadol Tesa, however, do not want the

1    Debtor to sell the Property or to reorganize.  Instead, Gadol Testa want the Court to bless their

2    intentional post-petition violation of the stay so that they can secure their "priority lien" against

3    the Property.  Annulment of the stay should be denied.

4        **7.    Gadol Testa Knew of the Stay, But Nonetheless Intentionally Violated the Stay**

5    **by Recording the Void Post-Petition Lien, Thereby Compounding the Problem**

6        Debtor has also submitted uncontroverted evidence that it filed the instant Case in good

7    faith to protect the interests of all creditors.  On the other hand, Gadol Testa knew of the stay, but

8    nonetheless recorded **the Post-Petition Writ post-petition on July 16, 2025**.  This void lien

9    recorded post-petition has compounded Debtor's ability to sell the Property as set forth in the Sale

10   Motion.  Gadol Testa have refused to expunge their void liens recorded post-petition.

11       Further, Gadol Testa also had a Notice of the Writ of Attachment ("Notice") posted by a

12   levying officer on Debtor's Property on or about August 8, 2025, in further violation of the

13   automatic stay in Debtor's Bankruptcy Case.  *See* ¶ 3 of Goe Declaration.

14       **8.    Debtor Has Complied with the Bankruptcy Dode and the Bankruptcy Rules**

15       Debtor has been cooperative with all parties in its Case.  It has agreed to produce

16   documents, sit for a deposition and has also complied with all of its duties as a chapter 11 debtor-

17   in-possession.  Debtor produced all documents and information requested by the OUST and

18   Debtor answered all questions posed at its Meeting of Creditors which was concluded.  *See* ¶¶ 35-

19   37 of Zargari Declaration.

20       **9.    The relative ease of restoring parties to the status quo ante**

21       It is impossible to restore the parties to the status quo ante.  Debtor as a bona fide

22   purchaser of the Property closed on the sale of the Property which was financed by two good faith

23   lenders who provided $5,278,125 in financing.

24       **10.    The Costs of Annulment to the Debtor and Creditors**

25       The cost of annulment to the Debtor and creditors of the Debtor's Estate would be

26   devastating.  Debtor has entered into an agreement to sell the Property and will likely lose the sale

27   to the Buyers if the annulment is granted and the post-petition liens on the Property are not

28   expunged.

**11.    How Quickly Gadol Testa Moved for Annulment**

Gadol Testa moved for annulment only **after** the Debtor filed the Sale Motion exposing Gadol Testa's numerous stay violations and only **after** Debtor sent correspondence to Gadol Testa demanding that the void liens be expunged.  Gadol Testa admit that seeking annulment was only in response to the Debtor's demand to expunge the void post-petition liens.  *See* Motion to Dismiss at p. 25, lines 6-7.  Therefore, this factor does not favor annulment of the stay.

**12.    After Learning of the Bankruptcy, Gadol Testa Continued to Violate the Stay**

Gadol Testa's ridiculous request for the Court to validate an intentional violation of the stay when Gadol Testa admit they were aware of the Debtor's Case should be denied.  The recording of the post-petition liens has compromised Debtor's ability to sell the Property.  Gadol Testa's post-petition liens should be expunged, and the Court should set a further hearing on whether sanctions and attorneys' fees should be awarded to the Debtor for this admitted intentional violation of the stay.

**13.    Annulment Will Cause Irreparable Injury to the Debtor**

As set forth above, annulment of the stay will cause irreparable injury to the Debtor and creditors of the Debtor's Estate.  Debtor is prepared to close on the sale of the Property to the Buyers in short order after the Court grants the Sale Motion, but Debtor will most certainly lose the sale to the Buyers if the annulment is granted and the post-petition liens on the Property are not expunged.

**14.    Annulling the Stay Will not Promote Judicial Economy**

Just as relief from the stay to proceed with the Gadol Testa Action does not promote judicial economy, neither does annulment of the stay.  As set forth in great detail above, this factor weighs in favor of denying annulment of the stay.  The fees and costs that Debtor will be forced to incur to defend will be significant.  Judicial economy favors having the claims of Gadol Testa litigated faster and more efficiently in the Bankruptcy Court for the reasons noted above.  It is far more economical for the Estate and its creditors if the dispute is resolved through the claims allowance process, adversary proceeding process and/or plan confirmation process

Therefore, the request to annul the stay should be denied.

1
2
3

**V.    CAUSE DOES NOT EXIST TO GRANT RELIEF FROM STAY TO ALLOW
GADOL TESTA TO RECORD THE POST-PETITION WRIT AND POST-
PETITION LIS PENDENS**

4    Gadol Testa seek further alternative relief from the Court for relief from stay to record the

5    Post-Petition Writ and Post-Petition Lis Pendens.  In the Motion to Dismiss, Gadol Testa cite to *In*

6    *re Aquarius Disk Servs., Inc.*, 254 B.R. 253, 258 (Bankr. N.D. Cal. 2000), to support their

7    position, but that case does not support relief from stay based upon the facts present here.  In the

8    *Aquarius* case, the creditor had a seasoned lien that could not be avoided.  Gadol Testa did not

9    obtain a prejudgment writ of attachment outside of the Debtor's preference period.  In the instant

10    case, Gadol Testa admit that on June 12, 2025, they obtained their Right to Attach Order and

11    Order for Issuance of a Writ of Attachment ("Writ of Attachment").  The instant bankruptcy Case

12    was filed on July 11, 2025 (less than 30 days after the Writ of Attachment).  Therefore, the Writ of

13    Attachment was obtained immediately prior to the Petition Date and certainly within the

14    preference period.

15    Moreover, as cited in Debtor's Sale Motion [Docket No. 43], pursuant to California Code

16    of Civil Procedure Section 493.030(b): "The filing of a petition commencing a voluntary or

17    involuntary case under Title 11 of the United States Code (Bankruptcy) terminates a lien of a

18    temporary protective order or of attachment if the lien was created within 90 days prior to the filing

19    of the petition."  As such, the Writ of Attachment is terminated as it was obtained within 30 days

20    of the Petition Date.  Gadol Testa completely ignore California Code of Civil Procedure Section

21    493.030(b) and completely ignore the fact that the Writ of Attachment was obtained within the

22    preference period so Gadol Testa are not in a similar position as the creditor in the *Aquarius* case

23    and relief from stay should be denied.

24    \\\

25    \\\

26

27

28

27

1

**VI.**     **CONCLUSION**

2          For all of the foregoing reasons, Gadol Testa fail to show that the Case was filed in bad

3    faith and that cause exists to grant relief from the automatic stay or to annul the automatic stay.

4    As such, the Court should deny the Motion.

Respectfully submitted,

5

6                                                     **GOE FORSYTHE & HODGES LLP**

7

8    Dated: August 26, 2025                        /s/Robert P. Goe

9                                                   By:  Robert P. Goe
                                                        Attorneys for Debtor and Debtor in
10                                                       Possession, Serenade Newport, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### REQUEST FOR JUDICIAL NOTICE

Pursuant to Rule 201 of the Federal Rules of Evidence, Serenade Newport, LLC, a California limited liability company, the debtor and debtor-in-possession ("Debtor") hereby requests that this Court take judicial notice, in connection with the attached Motion, of the following documents.  Federal Rule of Evidence 201(b) provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Judicial notice of the following documents is proper as the Court may take judicial notice of court records and their contents.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).  The Ninth Circuit has held that it "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'" *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc*., 971 F.2d 244, 248 (9th Cir. 1992).  Judicial notice of these documents is proper as the Court may also take judicial notice of documents recorded in the Official Records of the County of Orange.

1.   **Exhibit 7** attached hereto is First Amended Complaint filed on July 1, 2025 (to include the Debtor), by Bryan Gadol and Darren Testa (collectively, "Gadol Testa"), against the Haim Trust, Mr. Ferder, Lugano Diamonds, Simba, Debtor, and others, ("Gadol Testa Action") in the Orange County Superior Court ("State Court").

2.   **Exhibit 8** attached hereto is the Notice of Pendency of Action recorded on July 14, 2025, by the Gadol Testa Plaintiffs in the Official Records of the County of Orange ("Post-Petition Lis Pendens").

3.    **Exhibit 9** attached hereto is the docket report of the Gadol Testa Action.

Dated: August 26, 2025                              Respectfully submitted by
                                                    GOE FORSYTHE & HODGES LLP


                                                    By: /s/Robert P. Goe
                                                          Robert P. Goe
                                                          Attorneys for Debtor and Debtor-in-
                                                          Possession, Serenade Newport, LLC

30

**DECLARATION OF SAHAND ZARGARI**

I, Sahand Zargari, declare and state as follows.

I am the managing member of Serenade Newport, LLC, the debtor and debtor-in possession in this bankruptcy (the "Debtor"). I have personal knowledge of the facts alleged herein and if called upon as a witness, I could and would competently testify thereto.  I make this declaration in support of Debtor's opposition ("Opposition") to the motion for relief from the automatic stay under 11 U.S.C. § 362 ("Motion") filed by Bryan Gadol and Darren Testa (collectively, "Gadol Testa"), to which this declaration is attached.  Any capitalized terms not otherwise defined herein have the same meanings as they do in the Opposition.

1.      Debtor's voluntary Chapter 11 petition commencing this bankruptcy case ("Bankruptcy Case") was filed on July 11, 2025 ("Petition Date").

2.      The Debtor was formed on June 13, 2025, to purchase the residential real property consisting of a single-family home located at 1501 Serenade Terrace, Corona del Mar, CA 92625-1753 (the "Property").  The Property is the principal asset of Debtor's bankruptcy estate ("Estate").

3.      I am a licensed real estate agent with The Daftarian Group ("DG") and acquire properties to purchase and resell for a profit.  Luxe Real Estate ("Luxe Real Estate") is a dba of Luxe Maison Properties, Inc. which holds the License Number 01993277 ("Luxe Maison") with the State of California Department of Real Estate.  The Daftarian Group ("DG") is also a dba of Luxe Maison.  Lux Real Estate, DG and Luxe Maison shall be referred to herein collectively as "DG".  On or about May 25, 2025, Jacob Wolf ("Mr. Wolf"), a licensed real estate agent with DG, approached me regarding the Property which was potentially being offered for sale off-market.

4.      On or about May 27, 2025, I viewed the Property and discussed possibly writing an offer to purchase the Property with Mr. Wolf.

5.      On or about May 30, 2025, I submitted an offer to purchase the Property for $8,800,000 in my individual capacity and the Property's prior owner, The Haim Family Trust

("Haim Trust") accepted this offer.  The purchase agreement contained an inspection contingency and also provided that it could be assigned.

6.      On or about June 6, 2025, I had an inspection performed of the Property.

7.      During this time period, I was looking for a second investor and hard money lender to fund the purchase of the Property.  I was also viewing other properties in the area in order to give him a clearer idea of market value of the Property during the due diligence period

8.      I contacted Michael Gerro ("Mr. Gerro") about co-investing in the Property through a limited liability company and securing a hard money loan.

9.      Mr. Gerro and I determined that the purchase price needed to be reduced to $7,400,000 in order to bring in outside capital.  On or about June 13, 2025, Mr. Gerro and I formed the Debtor.

10.     Debtor then sought a further discount for the purchase price to reflect the heightened uncertainty and changed circumstances under those market conditions.

11.     Pursuant to the liquidated damages clause in the purchase agreement, Debtor would lose its 3% deposit if it walked away from the purchase of the Property.  I agreed to waive the 2% commission as the Debtor's agent, and Mr. Wolf agreed to reduce his commission as the seller's agent by 1%.

12.      As part of these negotiations, the seller requested that the closing occur sooner, with no further physical inspection, and no loan or appraisal contingency, and Debtor agreed as part of the agreement to reduce the purchase price of the Property.  On or about June 16, 2025, the Debtor presented the Haim Trust with a final offer of $7,037,500.00 for the purchase of the Property ("Debtor's Purchase Price") which the Haim Trust accepted.

13.     Escrow closed on the Debtor's purchase of the Property on June 18, 2025 ("Debtor Sale Closing Date").  Attached as **Exhibit 2** is a true and correct copy of the escrow closing statement on Debtor's purchase of the Property.

14.     The Debtor and I have no relationship with the prior owner of the Property, the Haim Trust or Mordechai Ferder and Edit Ferder, the trustees of the Haim Trust ("Ferders").

15.    I have never met the Ferders and only communicated with the Ferders through Jacob Wolf, the real estate agent that was representing the Haim Trust.

16.    Debtor negotiated the purchase of the Property through Mr. Wolf in good faith, arms-length negotiations and through a good faith, arms-length transaction.

17.    At the time of the Debtor Sale Closing Date, neither I nor Debtor was aware of any writs of attachment, lis pendens, temporary protective orders, or pending actions, recorded, listed or reflected on the preliminary title report.  Attached as **Exhibit 3** is a true and correct copy of the preliminary title report at the time of the Debtor Sale Closing Date.  Debtor would never have purchased the Property if I had known of any pending litigation involving the Property or if I had known that Gadol Testa were seeking a writ of attachment against the Property.

18.    In connection with the purchase of the Property, through member funding, Debtor made a down payment of $1,373,753.39 and financed the balance of the purchase price with two secured loans from PPRF Reit LLC ("PPRF") in the amount of $5,278,125 as a first priority lien with a first priority deed of trust recorded against the Property and from Sitlani Holdings LLC and Mahesh Tilokani ("Sitlani") in the amount of $500,000 as a second priority lien with a second priority deed of trust recorded against the Property.  A true and correct copy of the PPRF loan documents is attached as **Exhibit 4**.  A true and correct copy of the Sitlani loan documents is attached as **Exhibit 5**.

19.    I do not have any other relationship with either PPRF or Sitlani.

20.    The loans from PPRF and Sitlani were brokered by Raj Mulchandani ("Mr. Mulchandani"), a Senior Partner at First Capital Trust Deeds.

21.    Other than brokering the loans from PPRF and Sitlani for the Debtor, and for an unrelated limited liability company, I do not have any relationship with Mr. Mulchandani.

22.    After Debtor purchased the Property, Debtor discovered that there were two actions filed in the Superior Court of the State of California involving Haim Trust, the Ferders, and Mr. Ferder's businesses, Diamonds and Jewelry, Inc. ("Lugano Diamonds") and Simba IL Holdings, LLC ("Simba"), including the Gadol Testa Action.

23.    After Debtor purchased the Property, Debtor also discovered that there was an action filed by Kristoffer Winters ("Winters") in the United States District Court, Central District of California ("District Court Action") against Lugano Diamonds, Haim Trust, Mr. Ferder and Simba.

24.    The Debtor and I have no relationship with Lugano Diamonds or Simba.

25.    After Debtor purchased the Property and in order to prepare it for resale, Debtor performed extensive repairs to the Property at the cost of approximately $40,000 as follows:

    a.   Painted the Property throughout;

    b.   Sanded and painted the kitchen island;

    c.   Sanded and painted the wooden shelving and built-ins;

    d.   Removed wallpaper;

    e.   Repaired damaged flooring;

    f.   Patched drywall;

    g.   Repaired damaged stonework in the primary bathroom and repaired the flooring in the shower of the primary bathroom; and

    h.   Put in new landscaping for the front and rear of the Property.

26.    After Debtor purchased the Property, Debtor had the Property professionally staged and professionally photographed and videoed for marketing.

27.    After Debtor purchased the Property, the Property was advertised and had an unveiling open house on June 28, 2025, to agents and potential buyers in the local market.  Phone calls and messages were made to prospective buyers and brokers inviting them to the unveiling open house and to view the Property.  Approximately 30 groups of potential buyers came to the unveiling open house, including the Buyers.  The very first weekend of the unveiling open house created a lot of interest in the Property, despite the fact that the Property does not have a backyard and many stairs in the floor plan.

28.    Pre-petition, Debtor employed DG to sell the Property.  Pre-petition, DG terminated its Residential Listing Agreement with the Debtor.

29.    The Debtor incurs the following carrying costs associated with the Property:

| Carrying Cost | Amount |
|---|---|
| PPRF Reit LLC Lien ("1st DOT Lien") | $43,940.39 |
| Sitlani Holdings LLC Lien ("2nd DOT Lien") | $5,412.50 |
| HOA | $420 |
| Insurance | $922.17 |
| Landscaping | $200 |
| Utilities | $530 |
| Property Taxes | $8,796.87 |
| **Monthly Carrying Cost of Property** | **$60,221.94** |
| **Per Diem Carrying Cost of Property on 1st DOT and 2nd DOT** | **$2,007.40** |

30.     Debtor entered into a written Purchase Agreement dated June 30, 2025, and Amendment of Existing Terms No. One dated July 30, 2025 (collectively, "Agreement") with Gadi Weinreich and Caren Weinreich (collectively, "Buyers") for the sale and purchase of the Property.  The Agreement provides that Buyer will pay the amount of $8,800,000, subject to qualified overbids.

31.     Debtor intends to sell the Property free and clear of all liens to Buyers, subject to overbid ("Sale"), and subject to the terms and conditions set forth in the Agreement.

32.    The Property is encumbered by the following liens (disputed and undisputed) and the estimated proceeds from the Sale are as follows:

| | |
|---|---:|
| **Sale Price** | **$8,800,000.00** |
| PPRF Reit LLC Lien<br><br>("1st DOT Lien") | Approx. $5,278,125<br><br>(Per Debtor's Schedules) |
| Sitlani Holdings LLC Lien<br><br>("2nd DOT Lien") | Approx. $500,000<br><br>(Per Debtor's Schedules) |
| Temporary Protective Order Recorded Within 30 Days of the Petition Date | 0<br><br>(Per Current Title Report - DISPUTED) |
| Post-Petition Lis Pendens | 0<br><br>(DISPUTED) |
| Post-Petition Writ | 0<br><br>(DISPUTED) |
| California taxes and fees expected to be owed from sale of Property | $12,590 |
| Property Taxes | 0<br><br>(Per Current Title Report) |
| Buyer's Broker's Sales Commission (2%) | $176,000 |
| Costs of Sale (est. at 1% of sale) | Approx. $88,000 |
| **Net Proceeds to Estate (est.)** | **$2,745,285**<br><br>**(after deducting liens set forth above)** |

33.    A true and correct copy of a current preliminary title report reflecting the liens against the Property is attached hereto as **Exhibit 6**.

1    34.    Debtor disputes the Post-Petition Lis Pendens which was recorded by Gadol Testa

2    after the Petition Date on July 14, 2025, and the Post-Petition Writ which was recorded by Gadol

3    Testa after the Petition Date on July 16, 2025.  Debtor asserts that Gadol Testa do not hold a valid

4    lien against the Property and dispute that Gadol Testa hold any lien or claims against the Property

5    or the Estate.

6    35.    Debtor has been cooperative with the various creditors, including Gadol Testa,

7    throughout its Case.  Debtor has agreed to produce documents and has also agreed to sit for a

8    deposition.

9    36.    Debtor has cooperated with the Office of the United States Trustee ("OUST") and

10   produced all documents and information requested by the OUST.

11   37.    Debtor attended its initial debtor interview, its meeting of creditors examination

12   pursuant to Section 341 of the Bankruptcy Code ("Meeting of Creditors") which was concluded.

13   I declare under penalty of perjury under the laws of the state of California and United

14   States of America, that the foregoing is true and correct.

15   Executed on August 26, 2025.

16

17   Sahand Zargari

18

19

20

21

22

23

24

25

26

27

28

37

# DECLARATION OF ROBERT P. GOE

I, Robert P. Goe, declare and state,

I am a partner of the firm of Goe Forsythe & Hodges LLP ("Firm"), counsel for Serenade Newport, LLC, the debtor and debtor-in possession in this bankruptcy (the "Debtor"). I have personal knowledge of the facts alleged herein and if called upon as a witness, I could and would competently testify thereto.  I make this declaration in support of Debtor's opposition ("Opposition") to the motion for relief from the automatic stay under 11 U.S.C. § 362 ("Motion") filed by Bryan Gadol and Darren Testa (collectively, "Gadol Testa"), to which this declaration is attached.  Any capitalized terms not otherwise defined herein have the same meanings as they do in the Opposition.

1.    After the Petition Date, on July 14, 2025, in violation of the automatic stay in Debtor's Bankruptcy Case, Gadol Testa recorded a Notice of Pendency of Action in the Official Records of the County of Orange ("Post-Petition Lis Pendens").  Attached as **Exhibit 8** to the RJN is a true and correct copy of the recorded Post-Petition Lis Pendens.

2.    In addition, on July 16, 2025, in violation of the automatic stay in Debtor's Bankruptcy Case, Gadol Testa also recorded a writ of attachment ("Post-Petition Writ") in the Official Records of the County of Orange.

3.    I am informed and believe that Gadol Testa also had a Notice of the Writ of Attachment ("Notice") posted by a levying officer on Debtor's Property on or about August 8, 2025, in violation of the automatic stay in Debtor's Bankruptcy Case.

4.    My law firm sent correspondence to counsel for Gadol Testa requesting that they cease direct and intentional violations of the automatic stay and to expunge the Post-Petition Lis Pendens and Post-Petition Writ which are clouds on title to the Property.  Attached as **Exhibit 1** is email correspondence from my firm to counsel for Gadol Testa on August 11, 2025, which

1    attaches a copy of the Notice posted by a levying officer on Debtor's Property on or about August

2    8, 2025, in violation of the automatic stay in Debtor's Bankruptcy Case.

3         I declare, under penalty of perjury under the laws of the United States of America that the

4    foregoing is true and correct to the best of my knowledge.  Executed this 26the day of August

5    2025, at Irvine, California.

6

7                                          _/s/Robert P. Goe_____
                                           Robert P. Goe

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

| From: | Reem Bello |
|---|---|
| To: | Sam Zargari; Gerro Enterprises LLC |
| Cc: | Rob Goe; Susan Stein |
| Subject: | Serenade sale motion and declarations |
| Date: | Monday, August 11, 2025 3:50:33 PM |
| Attachments: | ███████████████ |

Sam & Michael,

See attached sale motion which incorporates the revisions/suggestions/additional comments received after I sent Friday's draft.  Please review your declarations carefully and let us know immediately if you have any further revisions or comments.

I spoke with Rob and he asked that the Debtor's purchase documents not be included with the motion, just the escrow closing statement.

In response to my call with Sam this afternoon, I talked to Rob about the overbidding. Rob said he spoke with Gadi and Gadi is aware of the overbid requirement.

This must be filed tomorrow for the 9/2 hearing date.  If you have no comments or revisions, please send your signatures.  Thank you!

***PRIVILEGED AND CONFIDENTIAL - ATTORNEY CLIENT COMMUNICATION***
*This entire e-mail and its attachments are covered by the Electronic Communications Privacy Act (18 U.S.C. 2510-2521) and is legally privileged. Do NOT Forward This Message.*

*This message originates from the law firm of Goe Forsythe & Hodges LLP. The information contained herein is intended for the personal and confidential use of the recipient(s) named above. This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying, or other use of this communication or its attachments is strictly prohibited by law and is subject to criminal and civil penalties. All personal messages express solely the sender's views and not those of Goe Forsythe & Hodges LLP.*
*ANY TAX ADVICE CONTAINED IN THE BODY OF THIS E-MAIL WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY THE RECIPIENT FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OR APPLICABLE STATE OR LOCAL TAX LAW PROVISIONS.*
Please take into consideration the environment before printing this email…save a Tree.

EXHIBIT 1                                                      Page 1 of 8

AT-165

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar Number, and Address)* | FOR RECORDER USE ONLY |
|---|---|
| Theodora Oringher PC<br>535 Anton Blvd., 9th Floor<br>Costa Mesa, CA 92626<br><br>TELEPHONE NO:                                    FAX NO:<br>E-MAIL ADDRESS<br>ATTORNEY FOR *(Name)* **Bryan Gadol and Darren Testa, through their counsel of recor** | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Orange** | LEVYING OFFICER *(NAME AND ADDRESS)* |
|---|---|
| STREET ADDRESS **700 W Civic Center Drive**<br>MAILING ADDRESS<br>CITY AND ZIP CODE **Santa Ana, CA 92701**<br>BRANCH NAME **Orange County Superior Court** | Orange County Sheriff's Department<br>909 N Main St, Suite 2<br>Santa Ana, CA 92701 |

| PLAINTIFF/PETITIONER **Bryan Gadol and Darren Testa**<br>DEFENDANT/RESPONDENT **Mordechai Ferder et al.** | COURT CASE NUMBER<br>**30-2025-01488102-CU-BC-CJC** |
|---|---|

| **Notice of Attachment**<br>**Under Writ of Attachment (Attachment)** | LEVYING OFFICER FILE NUMBER<br>**2025508039** |
|---|---|

| TO THE PERSON NOTIFIED *(name):*      Occupant<br>                                          1501 Serenade Terrace<br>                                          Corona Del Mar, CA 92625 | FOR COURT USE ONLY |
|---|---|

1.  Plaintiff in this action seeks to attach property in which defendant has an interest. The property to be attached is:

    a.  [ x ]  *(describe property):*

    See attachment for Legal Description of Property

    b.  [ x ]  described in the Writ of Attachment and Order for Issuance of Writ of Attachment, attached hereto and incorporated by reference.

2.  You are notified as

    a.  [  ]  a defendant.

    b.  [ x ]  a person other than defendant (state capacity in which person is being notified):      **ATTACHEE**

*(Read Information for Defendant or Information for Person Other than Defendant on reverse.)*

3.  A notice was filed with the

    a.  [  ]  Secretary of State.

    b.  [  ]  Department of Motor Vehicles.

    c.  [  ]  Department of Housing and Community Development.

4.  Notice of Attachment was

    a.  [  ]  mailed on *(date):*
    b.  [  ]  delivered on *(date):*
    c.  [  ]  posted on *(date):*
    d.  [  ]  filed on *(date):*
    e.  [ V ]  recorded on *(date):*  7/16/25
            Doc # 2025000198578

    Attachee:
    Occupant
    1501 Serenade Terrace
    Corona Del Mar, CA 92625

    Signed by:      **Don Barnes**
                        **Sheriff-Coroner**

    *Nate #9418*

    [ x ]  Levying officer          [  ]  Registered process server

| Form Approved for Optional Use<br>Judicial Council of California<br>AT-165 [Rev. January 1, 2003] | **NOTICE OF ATTACHMENT**<br>**Notice of Attachment - (ORIGINAL)** | Code of Civil Procedure,<br>§ 482.020, 488.060 |
|---|---|---|

409896

EXHIBIT 1                                                Page 2 of 8

### Legal Description of Property

1501 Serenade Terrace, Corona Del Mar, CA 92625

Lot 39, Tract No. 1701, City of Newport Beach, County of Orange, CA, Book 52, pp. 9-10 Office of County Recorder of Orange County

EXHIBIT 1                                    Page 3 of 8

AT-135

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
Todd C. Theodora (SBN 130325), Jonathan L. Altman (SBN 170123), Alice M. Hodsden (SBN 326720)
Theodora Oringher PC
535 Anton Blvd, Ninth Floor
Costa Mesa, CA 92626

TELEPHONE NO: (714) 549-6200
EMAIL ADDRESS (Optional): jaltman@tocounsel.com    FAX NO. (Optional): (714) 549-6201
ATTORNEY FOR (Name): Plaintiffs, Bryan Gadol and Darren Testa

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana CA 92701
BRANCH NAME: Central Justice Center

PLAINTIFF    Bryan Gadol and Darren Testa

DEFENDANT    Mordechai Ferder et al

WRIT OF ATTACHMENT
☐ AFTER HEARING    ☐ EX PARTE

Pursuant to California Government Code § 68150(f), the Clerk of the Court hereby certifies this document accurately reflects the official court record. The electronic signature and seal on this document have the same validity and legal force and effect as an original clerk's signature and court seal. California Government Code § 68150(g).

CASE NUMBER:
30-2025-01488102-CU-BC-CJC

1. TO THE SHERIFF OR ANY MARSHAL OR CONSTABLE OF THE COUNTY OF ORANGE

2. TO ANY REGISTERED PROCESS SERVER You are only authorized to serve this writ in accord with CCP 488.080

3. This writ is to attach property of defendant (name and last known address)
   Mordechai Ferder, 1501 Serenade Terrace, Corona Del Mar, CA 92625
   Mr. Ferder as Trustee of the Haim Family Trust, 1501 Serenade Terrace, Corona Del Mar, CA 92625
   Simba IC Holdings, LLC, 1501 Serenade Terrace, Corona Del Mar, CA 92625
   and the attachment is to secure $ 14,585,372.90

4. Name and address of plaintiff Bryan Gadol and Darren Testa, through their counsel of record, Todd C. Theodora, Jonathan L. Altman, and Alice M. Hodsden of Theodora Oringher PC, 535 Anton Blvd, 9th Floor, Costa Mesa, CA 92626

5. YOU ARE DIRECTED TO ATTACH the following property or so much thereof as is clearly sufficient to satisfy the amount to be secured by the attachment (describe property and state its location, itemize by letter)
   See Attachment A

   ☐ This information is on an attached sheet

6. ☐ An interest in the real property described in item 5 stands upon the records of the county, in the name of the following person other than the defendant
   a. Name
   b. Mailing address, if known, as shown by the records of the office of the county tax assessor (specify)

7. ☐ The real property on which the
   ☐ crops described in item 5_____ are growing
   ☐ timber described in item 5_____ to be cut is standing stands upon the records of the county in the name of
   a. Name
   b. Address

(SEAL)

David H. Yamasaki, Clerk of the Court

Date    06/20/2025    Clerk, by _____    Deputy
D. Cuevas

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
AT-135 [Rev. January 1, 2003]

WRIT OF ATTACHMENT
(Attachment)

Code of Civil Proc. § 488.075

EXHIBIT 1                    Page 4 of 8

### Attachment A

**Defendant Mordechai H. Ferder:**

Property held or owned by Defendant Mordechai H. Ferder, with a last known address of 1501

Serenade Terrace. Corona Del Mar, CA 92625, either by himself or with others:

- Brokerage accounts with Charles Schwab

- Brokerage accounts with Beacon Pointe Advisors, Newport Beach, CA

### Defendant Mordechai H. Ferder as Trustee for the Haim Family Trust

Property held or owned by the Haim Family Trust u/d/t February 24, 2009 with Defendant

Mordechai H. Ferder either by himself or with others as the Trustee thereof:

- 1501 Serenade Terrace, Corona Del Mar, CA 92625

- Brokerage accounts with Charles Schwab

- Brokerage accounts with Beacon Pointe Advisors, Newport Beach, CA

### Defendant Simba IC Holdings, LLC

Property held or owned by Defendant Simba IC Holdings, LLC:

- Brokerage accounts with Charles Schwab

- Brokerage accounts with Beacon Pointe Advisors, Newport Beach, CA

EXHIBIT 1                                    Page 5 of 8

Electronically Received by Superior Court of California, County of Orange, 06/11/2025 01:46:00 PM.
30-2025-01488102-CU-BC-CJC - ROA # 18 - DAVID H. YAMASAKI, Clerk of the Court By B. Romney, Deputy Clerk.

**AT-125**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*

Todd C. Theodora:SBN 120426;Jonathan E. Altman:SBN 170607
Theodora Oringher PC; 535 Anton Blvd., 9th Fl.
Costa Mesa, CA 92626
TELEPHONE NO.: (714) 549-6200    FAX NO. *(Optional):* (714) 549-6201
E-MAIL ADDRESS *(Optional):* ttheodora@tocounsel.com; jaltman@tocounsel.com
ATTORNEY FOR *(Name):* Plaintiffs Bryan Gadol and Darren Testa

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: 700 Civic Center Drive West
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central Justice Center

PLAINTIFF: Bryan Gadol and Darren Testa

DEFENDANT: Mordechai Ferder et al.

FOR COURT USE ONLY

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

JUN 1 2 2025

DAVID H. YAMASAKI, Clerk of the Court

BY: _____, DEPUTY

| EX PARTE | CASE NUMBER: |
|---|---|
| [✓] RIGHT TO ATTACH ORDER AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT (RESIDENT) | 30-2025-01488102 |
| [ ] ORDER FOR ISSUANCE OF ADDITIONAL WRIT OF ATTACHMENT (RESIDENT) | |

1. The application and supporting declaration or affidavit of plaintiff *(name):* Bryan Gadol and Darren Testa
   for an ex parte [✓] right to attach order and order for issuance of writ of attachment [ ] order for issuance of an additional
   writ of attachment   has been considered by the court.

**FINDINGS**

2. THE COURT FINDS
   a. Defendant *(specify name):* Mordechai Ferder   is a [✓] natural person
      [ ] partnership   [ ] unincorporated association   [X] corporation   [✓] other *(specify):* Mr. Ferder as Trustee of the Halm Family Trust
   b. The claim upon which the application is based is one upon which an attachment may be issued under
      [✓] Code of Civil Procedure section 483.010   [ ] Welfare and Institutions Code section 15657.01.
   c. Plaintiff has established the probable validity of the claim upon which the attachment is based.
   d. The attachment is not sought for a purpose other than the recovery on the claim upon which the application is based.
   e. The amount to be secured by the attachment is greater than zero.
   f. The affidavit or declaration accompanying the application shows that the property sought to be attached, or the portions thereof
      to be specified in the writ, are not exempt from attachment.
   g. The portion of the property sought to be attached described in item 3b, above, is not exempt from attachment.
   h. An undertaking in the amount of: $ 10,000 —    is required before a writ shall issue, and plaintiff
      [ ] has [X] has not filed an undertaking in that amount.
   i. Great or irreparable injury will result to the plaintiff if issuance of the order is delayed until the matter can be heard on notice,
      based on the following:
      (1) [✓] There is a danger that the property sought to be attached would be
          (a) [✓] concealed.   (b) [✓] substantially impaired in value.
          (c) [✓] made unavailable to levy by other than concealment or impairment in value.
      (2) [✓] Defendant has failed to pay the debt underlying the requested attachment and is insolvent as defined in Code of Civil
          Procedure section 485.010(b)(2), as set forth in the affidavit or declaration filed in support of this application, and that
          specifies the defendant's known undisputed debts and the basis for plaintiff's determination that the defendant's debts
          are undisputed.
      (3) [ ] A bulk sales notice was recorded and published pursuant to division 6 of the Commercial Code with respect
          to a bulk transfer by the defendant.
      (4) [ ] An escrow has been opened pursuant to the provisions of Business and Professions Code section 24074 with
          respect to the sale by the defendant of a liquor license. The liquor license number is:
      (5) [ ] Other circumstances *(specify):*
   j. [✓] A Right to Attach Order was issued on *(date):*   pursuant to
      [ ] Code of Civil Procedure section 484.090 (on notice)   [✓] Code of Civil Procedure section 485.220 (ex parte)
   k. [ ] other *(specify):*

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>AT-125 [Rev. July 1, 2010] | **EX PARTE RIGHT TO ATTACH ORDER AND ORDER FOR<br>ISSUANCE OF WRIT OF ATTACHMENT (RESIDENT) (Attachment)** | Page 1 of 2<br>Code of Civil Procedure,<br>§§ 482.030, 485.010 et seq.;<br>Welfare & Institutions Code, § 15657.01<br>www.courtinfo.ca.gov |

EXHIBIT 1    Page 6 of 8

| SHORT TITLE: | | AT-125 |
|---|---|---|
| Bryan Gadol et al. v. Mordechal Ferder et al. | CASE NUMBER: 30-2025-01488102 | |

ORDER

3. THE COURT ORDERS

a. Plaintiff has a right to attach property of defendant *(name):* Mordechal Ferder, Mordechal Ferder as Trustee of the Haim Family Trust, and Simba IC in the amount of: $ 14,585,372.90    Holdings, LLC

b. The clerk shall issue ☑ a writ of attachment ☐ an additional writ of attachment in the amount state in item 3a
   ☐ forthwith ☑ upon the filing of an undertaking in the amount of: $ 10,000

   (1) ☐ for the property covered by a bulk sales notice with respect to a bulk transfer by defendant or the proceeds of the sale of such property, described as follows *(specify):*

   (2) ☐ for plaintiff's pro rata share of proceeds from an escrow in which defendant's liquor license is sold. The license number is *(specify):*

   (3) ☑ for any property of a defendant who is not a natural person for which a method of levy is provided. See Attachment A.

   (4) ☑ for property of a defendant who is a natural person subject to attachment under Code of Civil Procedure section 487.010 *(specify):*
      See Attachment A.

c. ☐ Defendant shall transfer to the levying officer possession of
   (1) ☐ any documentary evidence in defendant's possession of title to any property described in item 3b.
   (2) ☐ any documentary evidence in defendant's possession of debt owed to defendant described in item 3b.
   (3) ☐ the following property in defendant's possession *(specify):*

NOTICE TO DEFENDANT: FAILURE TO COMPLY WITH THIS ORDER MAY SUBJECT YOU TO ARREST, AND PUNISHMENT FOR CONTEMPT OF COURT.

d. ☐ Other *(specify):*

e. Total number of boxes checked in item 3: 7

Date: 6/12/25

*(signature)*

_____
(JUDICIAL OFFICER)

AT-125 [Rev. July 1, 2010]    **EX PARTE RIGHT TO ATTACH ORDER AND ORDER FOR**    Page 2 of 2
**ISSUANCE OF WRIT OF ATTACHMENT (RESIDENT) (Attachment)**

EXHIBIT 1    Page 7 of 8

## Attachment A

**Defendant Mordechai H. Ferder:**

Property held or owned by Defendant Mordechai H. Ferder, with a last known address of 1501

Serenade Terrace, Corona Del Mar, CA 92625, either by himself or with others:

- Brokerage accounts with Charles Schwab

- Brokerage accounts with Beacon Pointe Advisors, Newport Beach, CA

**Defendant Mordechai H. Ferder as Trustee for the Haim Family Trust**

Property held or owned by the Haim Family Trust u/d/t February 24, 2009 with Defendant

Mordechai H. Ferder either by himself or with others as the Trustee thereof:

- 1501 Serenade Terrace, Corona Del Mar, CA 92625

- Brokerage accounts with Charles Schwab

- Brokerage accounts with Beacon Pointe Advisors, Newport Beach, CA

**Defendant Simba IC Holdings, LLC**

Property held or owned by Defendant Simba IC Holdings, LLC:

- Brokerage accounts with Charles Schwab

- Brokerage accounts with Beacon Pointe Advisors, Newport Beach, CA

1327375.1/02237.01002

EXHIBIT 1                                    Page 8 of 8

# EXHIBIT 2

# EXHIBIT 2



170 Newport Center Drive, Suite 150, Newport Beach, CA  92660 • (949) 825-5125

Serenade Newport, LLC

3 Longboat
Newport Coast, CA 92657

Date: June 20, 2025
Escrow No.: **06-20017-SR**

RE: Property Address:  **1501 Serenade Terrace, ( Corona Del Mar Area), Newport Beach, CA  92625**

Dear **Sahand Zargari , Manager**

We are pleased to inform you that the above referenced escrow was closed on **June 18, 2025** and we enclose the following for your records:

> Your Check in the amount of **$496.01** representing your refund.
> Final  Settlement/Closing Costs Statement.
> Fire Insurance Policy or Certificate, issued by **Bamboo Insurance Services**
> Home Warranty Confirmation, issued by **Homeguard**
>
> Policy of Title Insurance No. **CBT-25005067-20**, to follow, issued by **California Best Title**

**Loan Information:**

> First Deed of Trust in favor of: **PPRF REIT, LLC, A California limited liability company**.  (Lender will notify you regarding payments.)

**Property Tax Information** - For your information, County taxes on real property become delinquent as follows: First installment after December 10th, second installment after the following April 10th.  If you do not receive a tax bill one month prior to the delinquency date, a written request for same should be made to the County Tax Collector. Your written request should include the legal description and Assessor's Parcel Number (APN) of the property. When the lender collects impound funds for payment of taxes, the tax bill is usually sent to them.

Any documents to which you are entitled will be forwarded to you directly from the appropriate governing party.

We hope this transaction has been handled to your satisfaction, and that we may be of service to you again should you have the need for escrow services in the future.

**Prominent Escrow Services, Inc.**

Stephanie Chew Rezaei
Escrow Officer

EXHIBIT 2

# PR⊙MINENT
E S C R O W   S E R V I C E S

170 Newport Center Drive, Suite 150, Newport Beach, CA 92660 • Tel: (949) 825-5125

**BUYER/BORROWER STATEMENT**
**Final**

| | |
|---|---|
| **File No.:** 06-20017-SR | **Printed Date/Time:** 06/20/2025 - 9:53:28AM |
| **Officer/Escrow Officer:** Stephanie Chew Rezaei | Page     1  of 2 |
| | **Closing Date:** 06/18/2025 |
| | **Disbursement Date:** 06/20/2025 |
| | **Loan Number:** 8159 |

**Buyer/Borrower:** Serenade Newport, LLC
  3 Longboat, Newport Coast, CA  92657

**Seller:**  The Haim Family Trust, u/d/t February 24, 2009

**Property:** 1501 Serenade Terrace, ( Corona Del Mar Area), Newport Beach, CA  92625

| DESCRIPTION | DEBITS | CREDITS |
|---|---|---|
| **TOTAL CONSIDERATION** | 7,037,500.00 | |
| Earnest Money | | 219,375.00 |
| Additional Deposit | | 686,876.69 |
| Additional Deposit | | 467,501.70 |
| **PRORATIONS/ADJUSTMENTS:** | | |
| Property Tax @ 31,394.84 per 6 month(s) 6/18/2025 to 6/30/2025 | 2,267.41 | |
| Association Dues @ 875.00 per 12 month(s) 6/18/2025 to 12/31/2025 | 469.11 | |
| **TITLE CHARGES** | | |
| Lender/Mortgagee Premium for 6,597,656.25: California Best Title | 4,246.00 | |
| Endorsement: California Best Title | 775.00 | |
| Deed Recording Fee: California Best Title | 18.00 | |
| Deed of Trust Recording Fee: California Best Title | 156.00 | |
| Deed of Trust Recording Fee - 2nd: California Best Title | 126.00 | |
| Sub-Escrow Fee: California Best Title | 62.50 | |
| Recording Service Fee: California Best Title | 6.00 | |
| Wire/Express: California Best Title | 10.00 | |
| 2nd Lender/Mortgagee Premium for 625,000.00: California Best Title | 225.00 | |
| Binder Fee for 7,037,500.00: California Best Title | 656.00 | |
| Messenger, Courier fee: California Best Title | 12.50 | |
| Messenger, Courier Fee: Karen Briseno | 25.00 | |
| Notary - Signing Fee: Abbie Adams | 250.00 | |
| Notary Fee 2nd: Abbie Adams | 200.00 | |
| **ESCROW CHARGES TO: Prominent Escrow Services, Inc.** | | |
| Escrow Settlement Agent Fee | 17,893.75 | |
| Loan Tie In Fee | 350.00 | |
| Document Preparation Fee | 100.00 | |
| HOA Processing Fee | 50.00 | |
| Wire Fee | 50.00 | |
| Escrow Fee (Credit) | | 16,393.75 |
| Loan Tie In Fee - 2nd | 350.00 | |
| **LENDER CHARGES** | | |
| New Deed of Trust to PPRF REIT, LLC, A California limited liability company: | | 5,278,125.00 |
| Prepaid Interest From  6/18/2025 To  7/01/2025, 13 Days, @ 1,464.6800/per day: FCI Lenders Services | 19,040.84 | |
| Broker Fee: First Capital Trust Deeds | 65,976.56 | |
| Wire Fee: PPRF REIT, LLC, A California limited liability company | 45.00 | |
| Legal Fee: RE Compliance Advisors | 1,495.00 | |
| Loan Boarding Fee: Martha Ramirez | 200.00 | |
| Servicing Set up Fee: FCI Lender Service, Inc. | 80.00 | |
| New  to Sitlani Holdings , a California limited liability company as to an undivided 200,000.00/500,000.00 interest; and Mahesh Tilokani, Married man as his sole and separate property as | | 500,000.00 |

**Certified to be a True and Exact**
**Copy of the Original Hereof.**

By: _____

EXHIBIT 2                                    Page 2 of 7

# P R O M I N E N T
### E S C R O W   S E R V I C E S

170 Newport Center Drive, Suite 150, Newport Beach, CA 92660 • Tel: (949) 825-5125

**BUYER/BORROWER STATEMENT**
**Final**

**File No.:** 06-20017-SR

Printed Date/Time:   06/20/2025 - 9:53:28AM
Page     2 of 2

**Property**: 1501 Serenade Terrace, ( Corona Del Mar Area), Newport Beach, CA  92625

| DESCRIPTION | DEBITS | CREDITS |
|---|---|---|
| to an undivided 300,000.00/500,000.00 interest: | | |
| Prepaid Interest From  6/18/2025 To  7/01/2025, 13 Days, @ 180.4200/per day: FCI Lender Services | 2,345.46 | |
| Wire Fee: Sitlani Holdings , a California limited liability company as to an undivided | 90.00 | |
| 200,000.00/500,000.00 interest; and Mahesh Tilokani, Married man as his sole and separate property as | | |
| to an undivided 300,000.00/500,000.00 interest | | |
| Broker Fee: First Capital Trust Deeds | 6,250.00 | |
| Loan Boarding Fee: Martha Ramirez | 220.00 | |
| Legal Fee: Re Compliance Advisors | 1,495.00 | |
| Servicing Setup Fee: FCI Lender Services | 90.00 | |
| ADDITIONAL DISBURSEMENTS: | | |
| Homeowner's Insurance: Bamboo Insurance Services | 3,775.00 | |
| Pre-Paid Association Dues - 2026 - Annual: Irvine Terrace Community Association | 875.00 | |
| **SUBTOTALS** | 7,167,776.13 | 7,168,272.14 |
| **DUE TO BUYER/BORROWER** | 496.01 | |
| | | |
| **TOTALS** | 7,168,272.14 | 7,168,272.14 |

**Certified to be a True and Exact**
**Copy of the Original Hereof.**

THIS IS A SUMMARY OF THE FINAL CLOSING TRANSACTION PREPARED BY PROMINENT ESCROW SERVICES, INC.  THIS IS
NOT AN OFFICIAL GOVERNMENTAL DISCLOSURE.          EXHIBIT 2                    Page 3 of 7

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

**$18.00**

\* $ R 0 0 1 5 6 4 2 2 6 5 $ \*

**2025000174618 02:09 pm 06/18/25**

7 D-ENTRY-SUP G02 3 07

3870.63 3870.62 0.00 0.00 6.00 0.00 0.00 0.00 0.00 0.00

**RECORDING REQUESTED BY:**
California Best Title
Order No. **CBT-25005067-20**
Escrow No. **06-20017-SR**

**MAIL TAX STATEMENTS AND WHEN
RECORDED MAIL TO:**

SERENADE NEWPORT, LLC
3 LONGBOAT
NEWPORT COAST, CA 92657

Parcel No. **050-282-16**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S) THAT DOCUMENTARY TRANSFER TAX IS **$7,741.25**
☒ computed on full value of property conveyed, or
☐ computed on full value less liens or encumbrances remaining at the time of sale.
☐ unincorporated area:   ☒ City of **NEWPORT BEACH**, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **Mordechai H. Ferder and
Edit F. Ferder, as Trustees of The Haim Family Trust, u/d/t February 24, 2009**

hereby GRANT(S) to   **Serenade Newport, LLC, a California Limited Liability Company**

the following described real property in the County of **Orange**, State of **CA**:

See Exhibit "A" attached hereto and make a part hereof.

More commonly known as: **1501 Serenade Terrace, ( Corona Del Mar Area), Newport Beach, CA  92625**

EXHIBIT 2                    Page 4 of 7

Date    06/17/2025

The Haim Family Trust, u/d/t February 24, 2009

*Mordechai H. Ferder*
By: Mordechai H. Ferder, Trustee

*Edit F. Ferder*
By: Edit F. Ferder, Trustee

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF    Texas
COUNTY OF   Tarrant          } S.S.

On  06/17/2025                  , before me,  Norma Ondarza                          Notary Public,
Personally appeared <u>Mordechai H. Ferder and Edit F. Ferder,</u>  who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of  Texas                          that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature  *Norma Ondarza*                  (Seal)

**Norma Ondarza**

ID NUMBER
13437509-5
COMMISSION EXPIRES
**May 23, 2027**

Electronically signed and notarized online using the Proof platform.

EXHIBIT 2                                                    Page 5 of 7

**EXHIBIT A**

Legal Description

The land hereinafter referred to is situated in the City of Newport Beach, County of Orange, State of CA, and is described as follows:

Lot 39 in Tract No. 1701, in the City of Newport Beach, County of Orange, State of California, as shown on a Map recorded in Book 52, Pages 9 and 10, inclusive of Miscellaneous Maps, in the Office of the County Recorder of said County.

Excepting therefrom all oil, gas casinghead gas, asphaltum and other hydrocarbons and all chemical gas now or hereafter found, situated or located in all or any part or portion of the land herein described lying more than 500 feet below the surface thereof, together with the right to slant drill for and remove all or any of said oil, gas, casinghead gas, asphaltum and other hydrocarbon, and chemical gas lying below a depth of more than 500 feet below the surface of but without any right whatsoever to enter upon the surface of said land or upon any land or upon any part or said lands within 500 feet vertical distance below the surface thereof, as reserved in the deed by The Irvine Company, recorded March 28, 1984 as Instrument No. 84-126815 of Official Records.

APN: 050-282-16

EXHIBIT 2                                                    Page 6 of 7



**Home Protection Plan Inv...**

510 Madera Ave
San Jose CA 95112
United States
(866) 993-2302
www.hghw.com

**Policy Address**
1501 Serenade
Corona del Mar CA 92625
United States

| | |
|---|---|
| **Date** | 6/18/2025 |
| **Policy #** | HWCA242969 |
| **Escrow Agent Name** | Stephanie Rezaei |
| **Escrow Office** | Prominent Escrow Ser... |
| **Escrow #** | |
| **RE Agent** | Jacob Wolf |
| **Subsidiary** | HGHW California |
| **RE Office** | Luxe Real Estate (East |
| **Agent Phone #** | (714) 865-5969 |
| **Start Date** | |
| **End Date** | |
| **Sales Rep** | Dawn Neary |
| **Buyer's Name** | |

**Billing Address**
170 Newport Center Drive, Suite 150
Newport Beach CA 92660

| Item | Quantity | Description | Unit Price | Amount |
|---|---|---|---|---|
| CA Advantage SFH 2-Year | 1 | 2-Year Basic Coverage. $90 Trade Service Request Fee. Coverage includes: Ceiling Fans, Attic Fans, Whole House Fan, and Exhaust Fans, Central Vacuum System, Dishwasher, Doorbells, Electrical System, Garage Door Opener, Garbage Disposal, Heating System (Primary gas, oil or electric), Instant Hot Water Dispenser, Microwave Oven, Pest Control, Plumbing System and Stoppages, Range/Oven/Cooktop, Re-Key, Limited Roof Leak, Smoke Detectors, Subterranean Termite Treatment, Telephone Wiring, Trash Compactor, Water Heater. See contract for full details.<br><br>Advantage Plan Coverage includes: Air Conditioning, Carbon Monoxide Detectors, Crane, Dishwasher upgrade, Disposal, Garage Door Openers upgrade, Heating upgrade, Ice-makers, Improper Installations/Repairs, Lack of Maintenance, Limited Code Upgrade/Modifications, Manufacturer Warranty Labor, Microwave Oven upgrade, Mismatched Systems, Oven/Range/Cooktop Upgrade, Permits, Plumbing upgrade, Refrigerant Recapture, Reclaim, and Disposal, Trash Compactor upgrade, Water Heater upgrade. See contract for full details.<br>*Limited Roof Leak Coverage not applicable on homes over 5,000 sq. ft. | 1,060.00 | 1,060.00 |
| CA Option: $250 Increased Limit 2-Year | 1 | Covered Items: Any maximum limit for repairs covered under this warranty is increased by $250 aggregate per contract term. | 100.00 | 100.00 |

A copy of the invoice has been sent to escrow. Thank you for your business.     **Total**     $1,160.00

Please reference contract/brochure for additional coverage information. I.e., pest control and limited roof leak coverage are not available on renewal contracts. Policies sold outside of escrow or outside a Real Estate transaction are subject to a 30-day waiting period after policy is paid.

EXHIBIT 2                    Page 7 of 7

# EXHIBIT 3

# EXHIBIT 3



500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953
## PRELIMINARY REPORT

Prominent Escrow
170 Newport Center Dr, Ste 150
Newport Beach, CA 92660
Attn:  Stephanie Chew Rezaei

Our Order Number: CBT-25005067
Your Reference: 06-20017-SR
**When Replying Please Contact:**
California Best Title Company, Inc.
500 S Kraemer Blvd, Suite 300
Brea, CA 92821
License #:  6267-9
Attn:  Scott Enda
(949)385-1953

Todays Date:          May 31, 2025

**Property Address:     1501 Serenade Terrace, (Corona Del Mar Area), Newport Beach, CA 92625-1753**

In response to the application for a Policy of Title Insurance, California Best Title Company, Inc. hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein and/or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies of Title Insurance are set forth in Exhibit B attached.  The policy to be issued may contain an arbitration clause.  When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit B.  Copies of the Policy forms should be read.  They are available from the office which issued this report.

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Exhibit B of this report carefully.  The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the Policy or Policies of Title Insurance and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a Policy or Policies of Title Insurance and no liability is assumed hereby.  If it is desired that liability be assumed prior to the issuance of a Policy or Policies of Title Insurance, a Binder or Commitment should be requested.

**Effective Date: May 23, 2025, at 07:30 AM.**

Scott Enda
Sr. Title Officer
Phone: (949)385-1953
Email: tu20@calbesttitle.com

**The form of policy of title insurance contemplated by this report is:**
ALTA Owner's Policy of Title Insurance (6-17-06) with coverage amount $7,100,000.00, Underwritten by: **First American Title Insurance Company**

# SCHEDULE A

The estate or interest in the land hereinafter described or referred to covered by this Report is:

Fee Simple.

Title to said estate or interest at the date hereof is vested in:

Mordechai H. Ferder and Edit F. Ferder, as Trustees of The Haim Family Trust, u/d/t February 24,2009

The land hereinafter referred to is situated in the City of Newport Beach, County of Orange, State of CA, and is described as follows:

Lot 39 in Tract No. 1701, in the City of Newport Beach, County of Orange, State of California, as shown on a Map recorded in Book 52, Pages 9 and 10, inclusive of Miscellaneous Maps, in the Office of the County Recorder of said County.

Excepting therefrom all oil, gas casinghead gas, asphaltum and other hydrocarbons and all chemical gas now or hereafter found, situated or located in all or any part or portion of the land herein described lying more than 500 feet below the surface thereof, together with the right to slant drill for and remove all or any of said oil, gas, casinghead gas, asphaltum and other hydrocarbon, and chemical gas lying below a depth of more than 500 feet below the surface of but without any right whatsoever to enter upon the surface of said land or upon any land or upon any part or said lands within 500 feet vertical distance below the surface thereof, as reserved in the deed by The Irvine Company, recorded March 28, 1984 as Instrument No. 84-126815 of Official Records.

APN: 050-282-16

**EXHIBIT A**

Legal Description

The land hereinafter referred to is situated in the City of Newport Beach, County of Orange, State of CA, and is described as follows:

Lot 39 in Tract No. 1701, in the City of Newport Beach, County of Orange, State of California, as shown on a Map recorded in Book 52, Pages 9 and 10, inclusive of Miscellaneous Maps, in the Office of the County Recorder of said County.

Excepting therefrom all oil, gas casinghead gas, asphaltum and other hydrocarbons and all chemical gas now or hereafter found, situated or located in all or any part or portion of the land herein described lying more than 500 feet below the surface thereof, together with the right to slant drill for and remove all or any of said oil, gas, casinghead gas, asphaltum and other hydrocarbon, and chemical gas lying below a depth of more than 500 feet below the surface of but without any right whatsoever to enter upon the surface of said land or upon any land or upon any part or said lands within 500 feet vertical distance below the surface thereof, as reserved in the deed by The Irvine Company, recorded March 28, 1984 as Instrument No. 84-126815 of Official Records.

APN: 050-282-16

## SCHEDULE B

At the date hereof, Exceptions to coverage, in addition to the printed Exception and Exclusions contained in said policy form would be as follows:

1.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2025-2026 which are a lien not yet payable.

2.  Property taxes for the fiscal year shown below are paid.  For proration purposes the amounts are:

    Fiscal year:       2024-2025
    1st Installment: $31,394.84
    2nd Installment: $31,394.84
    Exemption:       $0.00
    Land:            $4,592,147.00
    Improvements:  $1,337,883.00
    Total Value:     $5,930,030.00
    Code Area:       07-001
    Assessment No:  050-282-16

3.  Assessments, if any, for community facility districts affecting said land which may exist by virtue of assessment maps or notices filed by said districts.  Said assessments are collected with the County Taxes.

4.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the revenue and taxation code of the State of California.

5.  Water rights, claims or title to water in or under said land, whether or not shown by the public records.

6.  That certain  easement for public utilities and incidental use as shown on the map or plat of Tract No. 1701, as per map recorded in Book 52 Pages 9 and 10.

7.  An easement for the purpose shown below and rights incidental thereto as set forth in a document:
    Purpose:              underground electric lines
    Recorded:        December 8, 1954 as Book 2891 Page 119, of Official Records.
    Affects:          said land

    The effect of a document entitled "Partial Quitclaim of Easement", recorded July 13, 1995 as Instrument No. 95-0298244 of Official Records.

8.  An easement for the purpose shown below and rights incidental thereto as set forth in a document:
    Purpose:              pole lines conduits
    Recorded:        as Book 2893 Page 473, of Official Records.
    Affects:          said land

9.  Covenants, Conditions, Restrictions and easements in the document recorded  as Book 9752 Page 373 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws.  Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

10.    Covenants, Conditions, Restrictions and easements in the document recorded  as Book 9808 Page 888 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws.  Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Amendment to said Covenants recorded  in Book 11748 Page 1027 of Official Records.

11.    Easements, Covenants and Conditions contained in the deed from Trust Services of America, Inc., a California Corporation, as Trustee Under Trust No. 71-1923-00-3, Successor to Title Insurance and Trust Company, a California Corporation, as Trustee Under Trust No. 1R-1923-00-2, and The Irvine Company, a Michigan Corporation, as Grantor, to George C. Messenger and Priscilla B. Messenger, husband and wife, as joint tenants, as Grantee, recorded March 28, 1984 as Instrument No. 84-126815 of Official Records. Reference being made to the document for full particulars, but deleting any covenant, condition, or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, sexual orientation, familial status, disability, handicap, national origin, genetic information, gender, gender identity, gender expression, source of income (as defined in California Government Code § 12955(p)) or ancestry, to the extent such covenants, conditions or restrictions violation 42 U.S.C. § 3604(c) or California Government Code § 12955. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

12.    Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

Amount:  $4,830,000.00
Dated:  December 14, 2021
Trustor:  Mordechai H. Ferder and Edit F. Ferder, as Trustees of The Haim Family Trust, u/d/t February 24, 2009
Trustee   Old Republic Title Company.
Beneficiary:  Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Citibank, N.A.
Recorded:  December 20, 2021 as Instrument Number 2021000758780 of Official Records.
MIN#:  100011547889838095

13.    Matters Which May Be Disclosed By Inspection or Survey or Both Matters which may be disclosed by an inspection or by a survey of said land satisfactory to this Company, or by inquiry of the parties in possession thereof.

14.    An inspection of said land has been ordered; upon its completion we will advise you of our findings.

15.    Proof of payment of all currently due and payable Homeowners Association and/or maintenance and/or common element fees and dues must be submitted at closing.

16.    If title is to be insured in the trustee(s) of a trust or their act is to be insured, we will require a full copy of the trust agreement and any amendments thereto.  In certain situations the Company may accept a Trustee certificate pursuant to Section 18100.5 of the California Probate Code for the trust agreement.  The Company reserves the right to except additional items and/or make additional requirements after reviewing said documents.

Name of Trust: The Haim Family Trust, u/d/t February 24, 2009

17.  We will require a Statement of Information from the parties named below in order to complete this report, based on the effect of documents, proceedings, liens, decrees, or other matter which do not specifically describe said land, but which, if any do exist, may affect the title or impose liens or encumbrances thereon.

Parties:  All Parties

(Note:  The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact another party with the same or similar name.  Be assured that the Statement of Information is essential and will be kept strictly confidential to this file).

18.  ID may be required if we have no way to verify the Seller or Borrowers Signature

Documents must be notarized by a Notary personally known to escrow or approved by California Best Title

Hard Money Loans. Require 2 forms of ID

**END OF SCHEDULE B**

# CBT | CALIFORNIA BEST TITLE

500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

Attn:

**Borrower:  Sahand Zargari**

**Lenders Supplemental Report**

The above numbered report (including any supplements or amendments thereto) is hereby modified and/or supplemented in order to reflect the following additional items relating to the issuance of an American Land Title Association loan policy form as follows:

A.      This report is preparatory to this issuance of an American Land Title Association loan policy of title insurance. This report discloses nothing, which would preclude the issuance of said American Land Title Association loan policy of title insurance with endorsement No. 100 attached thereto.

B.      The improvements on said land are designated as:

PUD   (Residential)
1501 Serenade Terrace, (Corona Del Mar Area), in the City of Newport Beach, County of Orange, State of California.

C.      Pursuant to information provided to California Best Title Company, Inc. as of the date hereinabove, the proposed insured loan amount is $0.00 with the proposed insured lender being .

D.      The only conveyance(s) affecting said land recorded with 24 months of the date of this report are as follows:

NONE



500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

### Notes and Requirements Section

Note 1:  On July 1, 1985, Assembly Bill 3132 became effective.  Assembly Bill 3132 adds and repeals portions of Sections 480.3 and 480.4 of the Revenue and Taxation Code of the State of California.

The act requires the County Assessor and/or Recorder to make available a statutorily prescribed form entitled "Preliminary Change of Ownership Report".  Said report must be completed by the buyer and filed concurrently with the recordation of the documents evidencing the change of ownership.  Failure to present the Change of Ownership Report at the time of recordation will cause the County Recorder to charge an additional $20.00 penalty recording fee.  The fee cannot be charged if the transfer document is accompanied by the affidavit stating that the buyer/transferee is not a resident of the State of California.  This report is for official use only and is not open to public inspection.

For further information, contact the Change of Ownership Section in the Assessor's Office located in the County of said property or the County Recorder's Office located in the County of said property.

Note 2:  Attached are Privacy Policy Notices in compliance with the Gramm-Leach-Bliley Act (GLBA) effective July 1, 2001.  Please review said Notices regarding personal information.

Note 3:  The map attached hereto may or may not be a survey of the land depicted thereon.  You should not rely upon it for any purpose other than orientation to the general location of the parcel or parcels depicted.  This company expressly disclaims any liability for alleged loss or damage which may result from reliance upon this map.

Note 4:  Part of the RESPA Rule to simply and improve the process of obtaining mortgages and reduce consumer settlement costs requires the settlement agent to disclose the agent and underwriter split of title premiums, including endorsements as follows:

California Best Title Company, Inc. retains 88% of the total premium and endorsements.

First American Title Insurance Company retains 12% of the total premium and endorsements.



500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

**Notice Regarding Your Deposit of Funds**

California Insurance Code Sections 12413 *et. Seq.* Regulates the disbursement of escrow and sub-escrow funds by title companies. The law requires that funds be deposited in the title company escrow and sub-escrow accounts and be available for withdrawal prior to disbursement.  Funds deposited with the Company by wire transfer may be disbursed upon receipt.  Funds deposited with the Company via cashier's checks drawn on a California based bank may be disbursed the next business day after the day of deposit.  If funds are deposited with by other methods, recording or disbursement may be delayed.  All escrow and sub-escrow funds received by the Company will be deposited with other funds in one or more non-interest bearing escrow accounts of the Company in a financial institution selected by the Company.  The Company and/or its parent company may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with the financial institution, and the Company shall have no obligation to account to the depositing party in any manner for the value of, or to pay such party, any benefit received by the Company and/or its parent Company.  Those benefits may include, without limitation, credits allowed by such financial institution on loans to the Company and/or its parent company and earnings on investments made on the proceeds of such loans, accounting, reporting and other services and products of such financial institution.  Such benefits shall be deemed additional compensation of the Company for its services in connection with the escrow or sub-escrow.  If funds are to be deposited with **California Best Title Company, Inc.** by wire transfer, they should be wired to the following bank/account:

**Wiring Instructions for this Office**

| | |
|---|---|
| Wire To: | **PCB Bank** |
| | **3701 Wilshire Blvd. Ste. 100** |
| | **Los Angeles, CA 90010** |
| | **Attn:  Wire Department** |
| ABA/Routing No.: | **122043602** |
| Bank Account: | **01435700** |
| Account Name: | **California Best Title Company, Inc.** |
| Reference Order No.: | **CBT-25005067** |
| Property Address: | **1501 Serenade Terrace, (Corona Del Mar Area)** |
| | **Newport Beach, CA 92625-1753** |
| Attention: | **Scott Enda** |

## EXHIBIT B (REVISED 04-30-19)

### CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990 EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.  (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters: (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy; or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. (a) Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims;  (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;  (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c)  are shown by the public records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13) ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning: a. building; b. zoning; c. land use; d. improvements on the Land; e. land division; and f. environmental protection. This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes.  This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4. Risks: a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records; b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date; c. that result in no loss to You; or d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5. Failure to pay value for Your Title.

6. Lack of a right: a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and b.  in streets, alleys, or waterways that touch the Land.  This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
• For Covered Risk 16, 18, 19 and 21, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|
| **Covered Risk 16: 1% of Policy Amount shown in Schedule A  or $2,500 (whichever is less)** | **$10,000** |
| **Covered Risk 18: 1% of Policy Amount shown in Schedule A  or $5,000 (whichever is less)** | **$25,000** |
| **Covered Risk 19: 1% of Policy Amount shown in Schedule A  or $5,000 (whichever is less)** | **$25,000** |
| **Covered Risk 21: 1% of Policy Amount shown in Schedule A  or $2,500 (whichever is less)** | **$5,000** |

### 2006 ALTA LOAN POLICY (06-17-06) EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to; (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement erected on the Land; (iii) the subdivision of land; or (iv) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.  (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters: (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;(c) resulting in no loss or damage to the Insured Claimant; (d) attaching or create subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14;) or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is: (a) a fraudulent conveyance or fraudulent transfer, or (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c)  are shown by the Public Records.

6.  Any lien or right to a lien for services, labor or material not shown by the public records.

## 2006 ALTA OWNER'S POLICY (06-17-06) EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to (i) the occupancy, use, or enjoyment of the Land; (ii)  the character, dimensions, or location of any improvement erected on the Land; (iii) the subdivision of land;  or (iv) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a)does not modify or limit the coverage provided under Covered Risk 5. (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is (a) a fraudulent conveyance or fraudulent transfer; or (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.  The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c)  are shown by the Public Records.

6.  Any lien or right to a lien for services, labor or material not shown by the public records.

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (12-02-13) EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement erected on the Land; (iii) the subdivision of land; or (iv) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.  (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law.  This Exclusion does not modify or limit the coverage provided in Covered Risk 26.

6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy.  This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy.  This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is (a) a fraudulent conveyance or fraudulent transfer, or (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

# CBT | CALIFORNIA BEST TITLE

500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

## Privacy Policy Notice

We are committed to safeguarding customer information.

When we request information from you or about you, it is for our own legitimate business purposes and not for the benefit of any unaffiliated party.

We use personal consumer information only for legitimate business purposes in a manner consistent with title insurance and escrow practices in compliance with applicable laws and regulations.

We will obey the laws governing the collection, use, and dissemination of personal data; and

We will endeavor to educate our employees on the responsible collection and use of personal information.

## PURPOSE OF THIS NOTICE

Title V of the Gramm-Leach-Bliley Act ("GLBA") generally requires a financial institution (which term includes title insurers, underwritten title companies and those providing real estate settlement services) to disclose to all its customers the privacy policies and practices with respect to information sharing of consumer nonpublic personal information with both affiliates and non-affiliated third parties. In compliance with GLBA, we are providing you with this document, which notifies you of the privacy policies and practices of California Best Title. This disclosure does not apply to business, commercial or agricultural transactions.

We may collect nonpublic personal information about you from the following sources:

1. Information we receive from you, such as on applications or other forms.
2. Information about your transactions we secure from our files, or from our affiliates or others.
3. Information we receive from a consumer-reporting agency.
4. Information we receive from others involved in your transaction, such as the real estate agent, lender, surveyor or appraiser.

Unless it is specifically stated otherwise in an amended Privacy Policy Notice, no additional nonpublic personal information will be collected about you.

We may disclose any of the above information that we collect about our customers or former customers to our affiliates or to non-affiliated third parties as permitted by law. This includes, but is not limited to, financial service providers (e.g., banks, consumer finance lenders, securities and insurance companies, etc.), non-financial companies (e.g., settlement or fulfillment service providers, or title plant operated by a third-party vendor):

WE DO NOT DISCLOSE ANY NONPUBLIC PERSONAL INFORMATION ABOUT YOU WITH ANYONE FOR ANY PURPOSE THAT IS NOT SPECIFICALLY PERMITTED BY LAW.

*First American Title*™

**Privacy Notice**

**Last Updated and Effective Date**: December 1, 2024

First American Financial Corporation and its subsidiaries and affiliates (collectively, "First American," "we," "us," or "our") describe in our full privacy notice ("Notice"), which can be found at https://www.firstam.com/privacy-policy/, how we collect, use, store, sell or share your personal information when: (1) you access or use our websites, mobile applications, web-based applications, or other digital platforms where the Notice is posted ("Sites"); (2) you use our products and services ("Services"); (3) you communicate with us in any manner, including by e-mail, in-person, telephone, or other communication method ("Communications"); (4) we obtain your information from third parties, including service providers, business partners, and governmental departments and agencies ("Third Parties"); and (5) you interact with us to conduct business dealings, such as the personal information we obtain from business partners and service providers and contractors who provide us certain business services ("B2B"). This shortened form of the Notice describes some of the terms contained in the full Privacy Notice. Personal information is sometimes also referred to as personal data, personally identifiable information or other like terms to mean any information that directly or indirectly identifies you or is reasonably capable of being associated with you or your household. However, certain types of information are not personal information and thus, not within the scope of our Notice, such as: (1) publicly available information; and (2) de-identified and aggregated data that is not capable of identifying you. If we use de-identified or aggregated data, we commit to maintain and use the information in a non-identifiable form and not attempt to reidentify the information, unless required or permitted by law.

This Notice applies wherever it is posted. To the extent a First American subsidiary or affiliate has different privacy practices, such entity shall have their own privacy statement posted as applicable.

Please note that this Notice does not apply to any information we collect from job candidates and employees. Our employee and job candidate privacy notice can be found here.

**What Type Of Personal Information Do We Collect About You?** We collect a variety of categories of personal information about you. To learn more about the categories of personal information we collect, please visit https://www.firstam.com/privacy-policy/.

**How Do We Collect Your Personal Information?** We collect your personal information: (1) directly from you; (2) automatically when you interact with us; and (3) from other parties, including business parties and affiliates.

**How Do We Use Your Personal Information?** We may use your personal information in a variety of ways, including but not limited to providing the services you have requested, fulfilling your transactions, complying with relevant laws and our policies, and handling a claim. To learn more about how we may use your personal information, please visit https://www.firstam.com/privacy-policy/.

**How Do We Disclose Your Personal Information?** We may disclose your personal information, including to subsidiaries, affiliates, and to unaffiliated parties, such as service providers and contractors: (1) with your consent; (2) in a business transfer; and (3) for legal process and protection. Although we do not "sell" your information in the traditional sense, the definition of "sale" is broad under the CCPA that some disclosures of your information to third parties may be considered a "sale" or "sharing" for targeted advertising. To learn more about how we disclose your personal information, please visit https://www.firstam.com/privacy-policy/.

**How Do We Store and Protect Your Personal Information?** The security of your personal information is important to us. We take all commercially reasonable steps to make sure your personal information is protected. We use our best efforts to maintain commercially reasonable technical, organizational, and physical safeguards, consistent with applicable law, to protect your personal information.

**How Long Do We Keep Your Personal Information?** We keep your personal information for as long as necessary in accordance with the purpose for which it was collected, our business needs, and our legal and regulatory obligations.

© 2025 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE:FAF

Form 10-PRIVACY25 (12-17-24)          Page 1 of 2          Privacy Notice (2025 First American Financial Corporation)
English Adopted (1-1-25)

EXHIBIT 3                                  Page 13 of 20    0820 25005067



**Your Choices** We provide you the ability to exercise certain controls and choices regarding our collection, use, storage, and disclosure of your personal information. You can learn more about your choices by visiting https://www.firstam.com/privacy-policy/.

**International Jurisdictions**: Our Services are offered in the United States of America (US), and are subject to US federal, state, and local law. If you are accessing the Services from another country, please be advised that you may be transferring your information to us in the US, and you consent to that transfer and use of your information in accordance with the Notice. You also agree to abide by the applicable laws of applicable US federal, state, and local laws concerning your use of the Services, and your agreements with us.

**Changes to Our Policy**: We may change the Notice from time to time. Any and all changes to the Notice will be reflected on this page and in the full Notice, and where appropriate provided in person or by another electronic method.

**YOUR CONTINUED USE, ACCESS, OR INTERACTION WITH OUR SERVICES OR YOUR CONTINUED COMMUNICATIONS WITH US AFTER THIS NOTICE HAS BEEN PROVIDED TO YOU WILL REPRESENT THAT YOU HAVE READ AND UNDERSTOOD THE NOTICE.**

**For California Residents** If you are a California resident, you may have certain rights under California law, including but not limited to the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act and its implementing regulations. To learn more, please visit https://www.firstam.com/privacy-policy/.

**Contact Us**: dataprivacy@firstam.com or toll free at 1-866-718-0097.

© 2025 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE:FAF

Form 10-PRIVACY25 (12-17-24)          Page 2 of 2                    Privacy Notice (2024 First American Financial Corporation)
                                                                                              English Adopted (1-1-25)

EXHIBIT 3                                      Page 14 of 20
CBP25005067

EXHIBIT 3                                                      Page 15 of 20



500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

Title Company:     California Best Title Company, Inc.
Title Order No.:    CBT-25005067
Escrow Holder:     Prominent Escrow
Escrow No.:        CBT-25005067

## CERTIFICATION OF TRUSTEES UNDER TRUST
### (California Probate Code Section 18100.5)

1.    Declarant(s), the currently acting Trustee(s) of the Trust, certify the existence of the following described Trust and facts regarding said Trust:

Name of Trust: _____

Made Under the Laws of the State of _____

Date of Execution of Trust: _____

The name of the Trustee(s) now qualified to act under the Trust instrument and who are the only qualified Trustee(s): _____

Settlor(s): _____

Social Security No. or Employer Identification No. _____

2.    Declarant(s) certify that if fewer than all currently acting Trustees are required to sign, the Trustee(s) named below are all those necessary to execute documents on behalf of the Trust:

Trustee(s) _____

_____

3.    Declarant(s) certify that the Trust is in full force and effect and has not been revoked, terminated, or otherwise amended in any manner which would cause the representation in this Certification to be incorrect, except as follows:

_____

_____

4.    The Trust is ☐ irrevocable ☐ revocable and the person(s) holding the power to revoke is/are:

_____

5.    The manner in which title to Trust assets is to be taken is:

_____

6.    Declarant(s) state that the above named trustee(s) is/are fully empowered to act for said trust and is/are properly exercising his/her/their authority under said Trust in negotiating for, contracting for, and executing these document(s).

_____

_____

7.    Declarant(s) state(s) that to the best of his/her/their knowledge, there are no claims, challenges of any kind or causes of action alleged, contesting or questioning the validity of the Trust or the trustee's authority to act for the trust.

EXHIBIT 3                                      Page 16 of 20    CBT-25005067

I declare that the statements contained herein are true and correct and are made under penalty of perjury,
this _____ day of _____, 20_____.

_____

Signature                                                    Address

_____

Name (Type or Print)

_____

Signature                                                    Address

_____

Name (Type or Print)

Subscribed and sworn (or affirmed) before me on this _____ day of _____,20_____,
by _____, proved to me on the basis of satisfactory evidence to be
the person(s) who appeared before me.

Notary Signature: _____

Space below reserved for notary seal.

EXHIBIT 3                                                    Page 17 of 20

C20225005067

# Statement of Information (Confidential)

Note:  This form is needed in order to eliminate judgments and liens against people with similar names

The street address of the property in this transaction is:    (if none, leave blank)

Address _____    City _____

Occupied by:    ☐ Owner    ☐ Tenants    ☐ Lessee        ☐ Single Residence    ☐ Multiple Residence    ☐ Commercial    ☐ Vacant Land

Any construction/improvements in last 6 months?    ☐ Yes    ☐ No    Is any portion of new loan to be used for improvements?    ☐ Yes    ☐ No

If yes, state nature of work done or contemplated _____

| *Party 1* | | | *Party 2* | | |
|---|---|---|---|---|---|
| First | Middle | Last | First | Middle | Last |
| Former last name(s), if any | | | Former last name(s), if any | | |
| Birthplace | | Birth Date | Birthplace | | Birth Date |
| Social  Security No. | | Driver's License No. | Social  Security No. | | Driver's License No. |

I  ☐ am single    ☐ am married    ☐ Have a domestic partner          I  ☐ am single    ☐ am married    ☐ Have a domestic partner

Name of current spouse or domestic partner (if other than Party 2)       Name of current spouse or domestic partner (if other than Party 1)

Name of former spouse/domestic partner (if none, write "none")       Name of former spouse/domestic partner (if none, write "none")

### Marriage or Domestic Partnership Between Parties 1 and 2

Are Parties 1 & 2:    Married? ☐        Domestic Partners? ☐        Date of Marriage/Domestic Partnership:_____

### Party 1 – Occupations for Last 10 Years

| Present Occupation | Firm Name | Address | No. of Years |
|---|---|---|---|
| Prior Occupation | Firm Name | Address | No. of Years |

### Party 1 – Residences for Last 10 Years

| Number and Street | City and State | From | To |
|---|---|---|---|
| | | | |
| | | | |

### Party 2 – Occupations for Last 10 Years

| Present Occupation | Firm Name | Address | No. of Years |
|---|---|---|---|
| Prior Occupation | Firm Name | Address | No. of Years |

### Party 2 – Residences for Last 10 Years

| Number and Street | City and State | From | To |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Have any of the above parties owned or operated a business?    ☐ Yes    ☐ No    If so, please list names

I have never been adjudged, bankrupt nor are there any unsatisfied judgments or other matters pending against me which might affect my title to this property, except as follows:

The undersigned declare under penalty of perjury that the above information is true and correct.        (all parties must sign)

_____
Date

Signature _____    Signature _____

Home Phone _____  Work Phone _____    Home Phone _____  Work Phone _____

Email Address _____    Email Address _____

EXHIBIT 3                    Page 18 of 20    C12025005067

# Statement of Information (Confidential)

Note:  This form is needed in order to eliminate judgments and liens against people with similar names

The street address of the property in this transaction is:   (if none, leave blank)

Address _____  City _____

Occupied by:   ☐ Owner  ☐ Tenants  ☐ Lessee        ☐ Single Residence  ☐ Multiple Residence  ☐ Commercial  ☐ Vacant Land

Any construction/improvements in last 6 months?  ☐ Yes  ☐ No    Is any portion of new loan to be used for improvements?  ☐ Yes  ☐ No

If yes, state nature of work done or contemplated _____

| *Party 1* | *Party 2* |
|---|---|
| | |

First _____ Middle _____ Last _____     First _____ Middle _____ Last _____

Former last name(s), if any _____     Former last name(s), if any _____

Birthplace _____ Birth Date _____     Birthplace _____ Birth Date _____

Social  Security No. _____ Driver's License No. _____     Social  Security No. _____ Driver's License No. _____

I ☐ am single  ☐ am married  ☐ Have a domestic partner     I ☐ am single  ☐ am married  ☐ Have a domestic partner

Name of <u>current</u> spouse or domestic partner (if other than Party 2) _____     Name of <u>current</u> spouse or domestic partner (if other than Party 1) _____

Name of <u>former</u> spouse/domestic partner (if none, write "none") _____     Name of <u>former</u> spouse/domestic partner (if none, write "none") _____

## Marriage or Domestic Partnership Between Parties 1 and 2

Are Parties 1 & 2:    Married? ☐        Domestic Partners? ☐        Date of Marriage/Domestic Partnership: _____

## Party 1 – Occupations for Last 10 Years

| Present Occupation | Firm Name | Address | No. of Years |
|---|---|---|---|
| Prior Occupation | Firm Name | Address | No. of Years |

### Party 1 – Residences for Last 10 Years

| Number and Street | City and State | From | To |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## Party 2 – Occupations for Last 10 Years

| Present Occupation | Firm Name | Address | No. of Years |
|---|---|---|---|
| Prior Occupation | Firm Name | Address | No. of Years |

### Party 2 – Residences for Last 10 Years

| Number and Street | City and State | From | To |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Have any of the above parties owned or operated a business?  ☐ Yes  ☐ No    If so, please list names

I have never been adjudged, bankrupt nor are there any unsatisfied judgments or other matters pending against me which might affect my title to this property, except as follows:

The undersigned declare under penalty of perjury that the above information is true and correct.        (all parties must sign)

Date _____     Signature _____     Signature _____

Home Phone _____ Work Phone _____     Home Phone _____ Work Phone _____

Email Address _____     Email Address _____

EXHIBIT 3                                                Page 19 of 20

C20250005067

EXHIBIT 3

# EXHIBIT 4

# EXHIBIT 4

# LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (this "Agreement") dated as of June 17, 2025, is entered into by Serenade Newport, LLC, a California limited liability company ("Borrower"), for the benefit of PPRF REIT, LLC, a California limited liability company (CFL License No. 60DBO-176790) ("Lender").

In consideration of the covenants, conditions, representations, and warranties contained in this Agreement, the parties agree as follows:

1. **DEFINITIONS.** As used herein, the following terms shall have the following meanings (all terms defined in this Section or in any other provision of this Agreement in the singular are to have the plural meanings when used in the plural and vice versa, and whenever the context requires, each gender shall include any other gender):

1.1. **"Agreement"** shall mean this Loan and Security Agreement together with all schedules and exhibits hereto, as amended, supplemented or otherwise modified from time to time.

1.2. **"Applicable Law"** shall mean: (a) with respect to matters relating to the creation, perfection and procedures relating to the enforcement of the liens created pursuant to a Security Instrument (including specifically, without limitation, the manner of establishing the amount of any deficiency for which Borrower is liable after any foreclosure of any Real Property Collateral), the laws of the state where the Real Property Collateral subject to such Security Instrument is located; or (b) with respect to any other Loan Document (including but not limited to the Note and this Agreement) the laws of the State of California (or any other jurisdiction whose laws are mandatorily applicable notwithstanding the parties' choice of California law). In either case, Applicable Law shall refer to such laws, as such laws now exist, or may be changed or amended or come into effect in the future.

1.3. **"Attorneys' Fees."** Any and all attorney fees (including the allocated cost of in-house counsel), paralegal, and law clerk fees, including, without limitation, fees for advice, negotiation, consultation, arbitration, and litigation at the pretrial, trial, and appellate levels, and in any bankruptcy proceedings, and attorney costs and expenses incurred or paid by Lender as provided in the Loan Documents.

1.4. **"Bankruptcy Code"** shall mean the provisions of Title 11 of the United States Code, as amended; 11 U.S.C. §§ 101-1532 or any bankruptcy, insolvency, state or federal debtor relief statute.

1.5. **"Collateral"** shall mean the collateral described in Section 2 below.

1.6. **"Environmental Laws"** shall mean any Governmental Requirements pertaining to health, industrial hygiene, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) as amended (42 United States Code ("U.S.C.") §§ 9601-9675); the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. §§ 6901-6992k); the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101-5127); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251-1376); the Clean Air Act (42 U.S.C. §§ 7401-7671q); the Toxic Substances Control Act (15 U.S.C. §§ 2601-2692); the Refuse Act (33 U.S.C. §§ 407-426p); the Emergency Planning and Community Right-To-Know Act (42 U.S.C. §§ 11001-11050); the Safe Drinking Water Act (42 U.S.C. §§ 300f-300j), and all present or future environmental quality or protection laws, statutes or codes or other requirements of any federal or state governmental unit, or of any regional or local governmental unit with jurisdiction over the Collateral.

1.7. **"Event of Default"** shall mean any event specified in the Event of Default heading below.

1.8. **"Governmental Authority"** shall mean any and all courts, boards, agencies, commissions, offices, or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, or otherwise) whether now or later in existence.

1.9. **"Governmental Requirements"** shall mean any and all laws, statutes, codes, ordinances, regulations, enactments, decrees, judgments, and orders of any Governmental Authority.

---

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8159
v194

Borrower's Initials: _SC_

EXHIBIT 4        Page 1 of 24

**1.10.** **"Guarantor"** shall mean Sahand Zargari; and Michael John Gerro, and any other guarantor of any Indebtedness evidenced by a Loan Document between Lender and any other guarantor.

**1.11.** **"Guaranty"** shall mean each Guaranty, Limited Guaranty, Springing Guaranty, or Guaranty of Completion of even date herewith executed by a Guarantor.

**1.12.** **"Hazardous Materials"** means any and all (a) substances defined as "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act (49 United States Code §§5101-5127), and in the regulations promulgated under those laws; (b) substances defined as "hazardous wastes" under Environmental Laws and in the regulations promulgated under that law in the State where the Real Property Collateral is located and in the regulations promulgated under that law; (c) substances defined as "hazardous substances" under Environmental Laws in the State where the Real Property Collateral is located; (d) substances listed in the United States Department of Transportation Table (49 Code of Federal Regulations § 172.101 and amendments); (e) substances defined as "medical wastes" under Environmental Laws in the State where the Real Property Collateral is located; (f) asbestos-containing materials; (g) polychlorinated biphenyl; (h) underground storage tanks, whether empty, filled, or partially filled with any substance; (i) petroleum and petroleum products, including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any such mixture; and (j) such other substances, materials, and wastes that are or become regulated under applicable local, state, or federal law, or that are classified as hazardous or toxic under any Governmental Requirements or that, even if not so regulated, are known to pose a hazard to the health and safety of the occupants of the Real Property Collateral or of real property adjacent to it.

**1.13.** **"Indebtedness"** means the principal of, interest on, and all other amounts and payments due under or evidenced by the following:

    **1.13.1.** The Note (including, without limitation, any prepayment premium, late payment, and other charges payable under the Note);

    **1.13.2.** This Agreement;

    **1.13.3.** The Security Instrument and all other Loan Documents;

    **1.13.4.** All funds later advanced by Lender to or for the benefit of Borrower under any provision of any of the Loan Documents;

    **1.13.5.** Any future loans or amounts advanced by Lender to Borrower when evidenced by a written instrument or document that specifically recites that the Secured Obligations evidenced by such document are secured by the terms of the Security Agreement, including, but not limited to, funds advanced to protect the security or priority of the Security Agreement; and

    **1.13.6.** Any amendment, modification, extension, rearrangement, restatement, renewal, substitution, or replacement of any of the foregoing.

**1.14.** **"Insurance Rating Requirements"** means the requirements for a property insurance policy issued by an insurer having a claims-paying or financial strength rating of any one of the following: (A) at least "A-:VIII" from A.M. Best Company, (B) at least "A3" (or the equivalent) from Moody's Investors Service, Inc. or (C) at least "A-" from Standard & Poor's Ratings Service.

**1.15.** **"Lender Retained Funds"** shall mean all of Borrower's right, title and interest in and to any funds retained by the Lender or its agents including but not limited to any Appraisal Reserves, Debt Service Reserves, Default Reserves, Impounds, Construction Reserves, Rehabilitation Reserves, Tax Reserves, Capital Expenditure Reserves and Insurance Reserves.

**1.16.** **"Loan"** shall mean the loan and financial accommodations made by the Lender to the Borrower in accordance with the terms of this Agreement and the Loan Documents.

**1.17.** **"Loan Amount"** shall mean Five Million Two Hundred Seventy-Eight Thousand One Hundred Twenty-Five and 00/100 Dollars ($5,278,125.00).

**1.18.** **"Loan Document(s)"** means this Agreement, the Note, Security Agreement, and any other agreement executed in connection therewith, all other documents evidencing, securing or otherwise

2

governing the Loan between Lender, Borrower, any guarantor, pledgor, or debtor, whether now existing or made in the future, and all amendments, modifications, and supplements thereto. Notwithstanding the foregoing, when used in the definitions of Indebtedness, Secured Obligations, and Obligations, and in relation to the discussion of the Secured Obligations, Obligations and Indebtedness that are secured by any Security Agreement, the term "Loan Documents" specifically excludes any Guaranty and Environmental Indemnity Agreement, each of which are not secured by any Security Agreement unless specifically identified therein.

**1.19.** "**Maturity Date**" shall mean July 1, 2026.

**1.20.** "**Note(s)**" means any and all promissory notes payable by Borrower, as maker to the order of Lender or order, executed concurrently herewith or subsequent to the execution of this Agreement, evidencing a loan from Lender to Borrower, together with any interest thereon at the rate provided in such promissory note and any modifications, extensions or renewals thereof, whether or not any such modification, extension is evidenced by a new or additional promissory note or notes. Note shall include the Secured Note of even date herewith payable by Borrower to the order of Lender in the amount of Five Million Two Hundred Seventy-Eight Thousand One Hundred Twenty-Five and 00/100 Dollars ($5,278,125.00), which matures on the Maturity Date, evidencing the Loan, in such form as is acceptable to Lender, together with any and all rearrangements, extensions, renewals, substitutions, replacements, modifications, restatements, and amendments to the Secured Note.

**1.21.** "**Person**" means any natural person, business, corporation, company, and or association, limited liability company, partnership, limited partnership, limited liability partnership, joint venture, business enterprise, trust, government authority or other legal entity.

**1.22.** "**Personal Property Collateral**" shall mean any property pledged to secure the Note that is not Real Property Collateral.

**1.23.** "**Real Property Collateral**" shall mean all Mortgaged Property described in the Security Instrument(s), commonly known as 1501 Serenade Terrace, (Corona Del Mar Area), Newport Beach, California 92625.

**1.24.** "**Secured Obligations**" shall have the meaning defined in Section 2 below and shall include all Indebtedness, obligations, and liabilities of the Borrower under the Loan Documents, whether on account of principal, interest, indemnities, fees (including, without limitation, Attorneys' Fees, remarketing fees, origination fees, collection fees, and all other professional fees), costs, expenses, taxes, or otherwise.

**1.25.** "**Security Agreement**" shall mean any and all agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract or otherwise creating, evidencing, governing or representing a security interest of Lender in the Collateral securing the Secured Obligations, including, but not limited to any Collateral Security Agreement, Security Instrument, or Ownership Interest Pledge Agreement, as applicable. The term shall refer to all Security Agreements both individually and collectively.

**1.26.** "**Security Instrument(s)**" shall mean any and all agreements of even date herewith that secure the Real Property Collateral, including but not limited to any (i) Deeds of Trust, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (ii) Mortgages, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (iii) Deeds to Secure Debt, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (iv) Security Deeds, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, and (v) Mortgages.

**1.27.** "**Tenant Affiliate**" shall mean any occupant of the Real Property Collateral, other than Borrower, that is directly or indirectly controlling, controlled by or under common control with, the Borrower.

Capitalized terms not otherwise defined shall have their respective meanings as defined in the Loan Documents.

---

3

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8159

y194

Borrower's Initials: _S Z_

EXHIBIT 4                                                    Page 3 of 24

## 2.  GENERAL.

**2.1.  Amount and Purpose.**  In reliance on Borrower's representations and warranties, and subject to the terms and conditions in this Agreement and in the Loan Documents, Lender agrees to make the Loan to Borrower on the terms and conditions set forth in the Note, this Agreement and the other Loan Documents.

**2.2.  Payment.**  Borrower shall repay the Loan in accordance with the provisions of the Note.  The principal balance outstanding under the Note shall be due and payable in full on the Maturity Date.

**2.3.  Loan Documentation and Security.**  Borrower shall execute and acknowledge, or obtain the execution and acknowledgment of, and deliver concurrently with this Agreement, the Loan Documents and other documents signed in connection with this Agreement.  Any reference to the Loan Documents shall refer to such documents as they may be amended, renewed, or extended from time to time with the written approval of Lender.  All of the Loan Documents shall be in form and substance satisfactory to Lender and shall include such consents from third parties as Lender deems necessary or appropriate.

**2.4.  Creation of Security Interest; Collateral.**  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and for the purpose of securing the full and timely payment and performance of the Secured Obligations for the benefit of Lender, Borrower hereby irrevocably and unconditionally grants, transfers, bargains, conveys and assigns to the Lender a continuing general, lien on, and security interest in, all the Borrower's estate, right, title, and interest that the Borrower now has or may later acquire in and to the following, which shall be collectively referred to as the "Collateral":

**2.4.1.  Real Property Collateral.**  All Real Property Collateral.

**2.4.2.  Personal Property Collateral.**  All Personal Property Collateral.

**2.4.3.  Borrower Funds.**  All of Borrower's interest in and to the proceeds of the Secured Obligations, whether disbursed or not; all present and future monetary deposits given by Borrower to any public or private utility with respect to utility services furnished to the Real Property Collateral; all Lender Retained Funds; and all accounts maintained by the Borrower with Lender or any subsidiary or affiliate of Lender, including, without limitation, any accounts established in connection with the Secured Obligations regardless of whether or not such accounts are with Lender;

**2.4.4.  Lender Retained Funds.**  The Lender Retained Funds shall be subject to the sole and absolute control of Lender during the term of this Agreement.  Borrower shall execute such documents and take such other action as may be requested by Lender to ensure in Lender such sole and absolute control.  Borrower shall have no right to the Lender Retained Funds except as provided in this Agreement and the Note.  Upon the maturity of the Note, any remaining funds in the Lender Retained Funds shall be credited against amounts due under the Note.  Upon the occurrence of an Event of Default hereunder, Lender shall have (i) the right to withdraw all or any portion of the Lender Retained Funds and apply the Lender Retained Funds against the amounts owing under the Note, or any other Loan Document in such order of priority as Lender may determine; (ii) all rights and remedies of a secured party under the Uniform Commercial Code; or (iii) the right to exercise all remedies under the Loan Documents or otherwise available in law or in equity.  Unless an agreement is made in writing or applicable law requires interest to be paid on the Lender Retained Funds, Lender shall not be required to pay Borrower any interest or earnings on the Lender Retained Funds.

**2.4.5.  Additional Property.**  Any additional personal property otherwise set forth in the Loan Documents;

**2.4.6.  Proceeds.**  All proceeds of, supporting obligations for, additions and accretions to, substitutions and replacements for, and changes in any of the Collateral described in this Agreement.

**2.5.  Secured Obligations.**  Borrower grants a security interest in the Collateral for the purpose of securing the following Secured Obligations:

**2.5.1.  Notes.**  Payment of all obligations at any time under any and all Notes.

---

© Lightning Docs™; All Rights Reserved.                                               v194
Loan and Security Agreement        Loan No. 8159

Borrower's Initials: _____

EXHIBIT 4                                              Page 4 of 24

**2.5.2.  Loan Documents.**  Payment and/or performance of each and every other obligation of Borrower under the Loan Documents;

**2.5.3.  Related Loan Documents.**  Payment and/or performance of each covenant and obligation on the part of Borrower or its affiliates to be performed pursuant to any and all Loan Documents that have been or may be executed by Borrower or its affiliates evidencing or securing one or more present or future loans by Lender or its affiliates to Borrower or its affiliates (each a "Related Loan," and collectively, the "Related Loans"), whether now existing or made in the future, together with any and all modifications, extensions and renewals thereof; provided, however, that nothing contained herein shall be construed as imposing an obligation upon Lender, or as evidencing Lender's intention, to make any Related Loan to Borrower or its affiliates;

**2.5.4.  Future Obligations.**  Payment to Lender of all future advances, Indebtedness and further sums and/or performance of such further obligations as Borrower may undertake to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Lender, its successors and assigns, (it being contemplated by Borrower and Lender that Borrower may hereafter become indebted to Lender in such further sum or sums), when such borrower and/or obligations are evidenced by a written instrument reciting that it or they are secured by this Agreement and a related Security Instrument or Security Agreement; and

**2.5.5.  Modifications and Payments.**  Payment and performance of all modifications, amendments, extensions, and renewals, however evidenced, of any of the Secured Obligations.

**2.6.  Application of Payments.**  Except as otherwise expressly provided by Governmental Requirements or any other provision of the Loan Documents, all payments received by Lender from Borrower under the Loan Documents shall be applied by Lender in the following order: (a) costs, fees, charges, and advances paid or incurred by Lender or payable to Lender and interest thereon under any provision of this Agreement, the Note, the Security Agreement, or any other Loan Documents, in such order as Lender, in its sole and absolute discretion, elects, (b) interest payable under the Note, and (c) principal under the Note.

**2.7.  Termination.**  This Agreement shall terminate following the repayment in full of all amounts due under the Note, this Agreement and any other documents evidencing the Loan, so long as no written claim has been made hereunder prior to such expiration date.

**3.    BORROWER'S REPRESENTATIONS AND WARRANTIES.**  To induce Lender to make the Loan, Borrower represents and warrants as follows, which representations and warranties shall be true and correct as of the execution of this Agreement and shall survive the execution and delivery of the Loan Documents:

**3.1.  Capacity.**  Borrower and the individuals executing Loan Documents on Borrower's behalf have the full power, authority, and legal right to execute and deliver, and to perform and observe the provisions of this Agreement, the other Loan Documents, and any other document, agreement, certificate, or instrument executed in connection with the Loan, and to carry out the contemplated transactions.  All signatures of Borrower and Guarantor, and the individuals executing Loan Documents on their respective behalf, are genuine.

**3.2.  Authority and Enforceability.**  Borrower's execution, delivery, and performance of this Agreement, the other Loan Documents, and any other document, agreement, certificate, or instrument executed in connection with the Loan, have been duly authorized by all necessary corporate or other business entity action and do not and shall not require any registration with, consent, or approval of, notice to, or any action by any Person or Governmental Authority.  Borrower has obtained or will obtain all approvals necessary for Borrower to comply with the Loan Documents. This Agreement, the Note, and the other Loan Documents executed in connection with the Loan, when executed and delivered by Borrower, shall constitute the legal, valid, binding, and joint and several obligations of Borrower enforceable in

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8159

Borrower's Initials: _____

EXHIBIT 4                                    Page 5 of 24

accordance with their respective terms. Borrower (a) is duly formed and/or organized and validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the state where the Real Property Collateral is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Collateral and carry on its business as now conducted and proposed to be conducted. Borrower now has and shall continue to have the full right, power and authority to operate and lease the Property, to encumber the Collateral as provided herein and to perform all of the other obligations to be performed by Borrower under the Note, the Security Instrument, this Agreement and the other Loan Documents. Borrower has full power, authority and legal right to mortgage, grant, bargain, sell, encumber, pledge, assign, warrant, transfer and convey the Collateral pursuant to the terms hereof and to keep and observe all of the terms of this Agreement.

**3.3.    Compliance with Other Instruments.**  The execution and delivery of this Agreement and the other Loan Documents, and compliance with their respective terms, and the issuance of the Note and other Loan Documents as contemplated in this Agreement, shall not result in a breach of any of the terms or conditions of, or result in the imposition of, any lien, charge, or encumbrance (except as created by this Agreement, the Security Agreement and the other Loan Documents) on any Collateral, or constitute a default (with due notice or lapse of time or both) or result in an occurrence of an event for which any holder or holders of indebtedness may declare the same due and payable under, any indenture, agreement, order, judgment, or instrument to which Borrower is a party or by which Borrower or its properties may be bound or affected.

**3.4.    Compliance with Law.**  The execution and delivery of this Agreement, the Note, and the other Loan Documents, or any other document, agreement, certificate, or instrument to which Borrower is bound in connection with the Loan, do not conflict with, result in a breach or default under, or create any lien or charge under any provision of any Governmental Requirements to which it is subject and shall not violate any of the Governmental Requirements.

**3.5.    Adverse Events.**  Since the date of the financial statements delivered to Lender before execution of this Agreement, neither the condition (financial or otherwise) nor the business of Borrower and the Collateral have been materially adversely affected in any way.

**3.6.    Litigation.**  There are no actions, suits, investigations, or proceedings pending or, to Borrower's knowledge after due inquiry and investigation, threatened against or affecting Borrower at law or in equity, before or by any Person or Governmental Authority, that, if adversely determined, would have a material adverse effect on the business, properties, or condition (financial or otherwise) of Borrower, the Collateral, or on the validity or enforceability of this Agreement, any of the other Loan Documents, or the ability of Borrower to perform under any of the Loan Documents.

**3.7.    No Untrue Statements.**  All statements, representations, and warranties made by Borrower in this Agreement or any other Loan Document and any other agreement, document, certificate, or instrument previously furnished or to be furnished by Borrower to Lender under the Loan Documents (a) are and shall be true, correct, and complete in all material respects at the time they were made and as of the execution of this Agreement, (b) do not and shall not contain any untrue statement of a material fact, and (c) do not and shall not omit to state a material fact necessary to make the information in them neither misleading nor incomplete. Borrower understands that all such statements, representations, and warranties shall be deemed to have been relied on by Lender as a material inducement to make the Loan.

**3.8.    Policies of Insurance.**  Each copy of the insurance policies relating to the Collateral delivered to Lender by Borrower (a) is a true, correct, and complete copy of the respective original policy in effect on the date of this Agreement, and no amendments or modifications of said documents or instruments not included in such copies have been made, and (b) has not been terminated and is in full force and effect. Borrower is not in default in the observance or performance of its material obligations under said documents or instruments and Borrower has done all things required to be done as of the date of this Agreement to keep unimpaired its rights thereunder.

---

6

**3.9.    Financial Statements.**  All financial statements furnished to Lender are true and correct in all material respects, are prepared in accordance with generally accepted accounting principles, and do not omit any material fact the omission of which makes such statement or statements misleading.  There are no facts that have not been disclosed to Lender by Borrower in writing that materially or adversely affect or could potentially in the future affect the Collateral or the business prospects, profits, or condition (financial or otherwise) of Borrower or any Guarantor or Borrower's abilities to perform the Secured Obligations and pay the Indebtedness.

**3.10.    Taxes.**  Borrower has filed or caused to be filed all tax returns that are required to be filed by Borrower under the Governmental Requirements of each Governmental Authority with taxing power over Borrower, and Borrower has paid, or made provision for the payment of, all taxes, assessments, fees, Impositions (as defined in the Security Instrument), and other governmental charges that have or may have become due under said returns, or otherwise, or under any assessment received by Borrower except that such taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with generally accepted accounting principles) have been provided.

**3.11.    Further Acts.**  Borrower shall, at its sole cost and expense, and without expense to Lender, do, execute, acknowledge, and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers, and assurances as Lender shall from time to time require, for the purpose of better assuring, conveying, assigning, transferring, pledging, mortgaging, warranting, and confirming to Lender the Collateral and rights, and as to Lender the security interest, conveyed or assigned by this Agreement or intended now or later so to be, or for carrying out the intention or facilitating the performance of the terms of this Agreement, or for filing, registering, or recording this Agreement and, on demand, shall execute and deliver, and authorizes Lender to execute in the name of Borrower, to the extent it may lawfully do so, one or more financing statements, chattel mortgages, or comparable security instruments, to evidence more effectively the lien of Lender on the Collateral.

**3.12.    Filing Fees.**  Borrower shall pay all filing, registration, or recording fees, all Governmental Authority stamp taxes and other fees, taxes, duties, imposts, assessments, and all other charges incident to, arising from, or in connection with the preparation, execution, delivery, and enforcement of the Note, this Agreement, the other Loan Documents, or any instrument of further assurance.

**3.13.    Entity Compliance.**  As long as any part of the Secured Obligation is owed by Borrower, Borrower, if a corporation, limited liability company, partnership, or trust shall do all things necessary to preserve and keep in full force and effect its existence, franchises, rights, and privileges as such entity under the laws of the state of its incorporation or formation, and shall comply with all Governmental Requirements of any Governmental Authority applicable to Borrower or to any Collateral or any part of it, and Borrower shall qualify and remain in good standing in each jurisdiction where it is required to be so under any applicable Governmental Requirement.

**3.14.    Improper Financial Transactions.**

**3.14.1.**  Borrower is, and shall remain at all times, in full compliance with all applicable laws and regulations of the United States of America that prohibit, regulate or restrict financial transactions, and any amendments or successors thereto and any applicable regulations promulgated thereunder (collectively, the "Financial Control Laws"), including but not limited to those related to money laundering offenses and related compliance and reporting requirements (including any money laundering offenses prohibited under the Money Laundering Control Act, 18 U.S.C. Section 1956 and 1957 and the Bank Secrecy Act, 31 U.S.C. Sections 5311 et seq.) and the Foreign Assets Control Regulations, 31 C.F.R. Section 500 et seq.

**3.14.2.**  Borrower represents and warrants that: Borrower is not a Barred Person (hereinafter defined); Borrower is not owned or controlled, directly or indirectly, by any Barred Person; and Borrower is not acting, directly or indirectly, for or on behalf of any Barred Person.

**3.14.3.**  Borrower represents and warrants that it understands and has been advised by legal counsel on the requirements of the Financial Control Laws.

---

7

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8159

v194

Borrower's Initials:

EXHIBIT 4                                    Page 7 of 24

**3.14.4.** Under any provision of the Loan Documents where Lender shall have the right to approve or consent to any particular action, including, without limitation any (A) sale, transfer, assignment of any Collateral, or any direct or indirect ownership interest in Borrower, (B) leasing of any Collateral, or any portion thereof, or (C) incurring any additional financing secured by the Collateral, or any portion thereof, or by any direct or indirect ownership interest in Borrower, Lender shall have the right to withhold such approval or consent, in its sole discretion.

**3.14.5.** Borrower covenants and agrees that it will upon request provide Lender with (or cooperate with Lender in obtaining) information required by Lender for purposes of complying with any Financial Control Laws. As used in this Agreement, the term "Barred Person" shall mean (A) any person, group or entity named as a "Specially Designated National and Blocked Person" or as a person who commits, threatens to commit, supports, or is associated with terrorism as designated by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), (B) any person, group or entity named in the lists maintained by the United States Department of Commerce (Denied Persons and Entities), (C) any government or citizen of any country that is subject to a United States Embargo identified in regulations promulgated by OFAC, and (D) any person, group or entity named as a denied or blocked person or terrorist in any other list maintained by any agency of the United States government.

**3.15.    Representation on Use of Proceeds.**  Borrower represents and warrants to Lender that the proceeds of the Loan will be used solely for business, commercial investment, or similar purposes, and that no portion of it will be used for personal, family, or household purposes.

**3.16.    Made or Arranged by a Real Estate Broker.**  Borrower acknowledges that this Loan was made or arranged by a licensed California Real Estate Broker and that the licensee's participation was a material factor in consummating this Loan.

**3.17.    Made or Arranged by a California Finance Lender.**  Borrower acknowledges that this Loan was made or arranged by a licensed California Finance Lender and that the licensee's participation was a material factor in consummating this Loan.

**3.18.    Brokerage Fees.**  Borrower represents and warrants to Lender that Borrower has not dealt with any Person, other than the parties identified in the final settlement statement, who are or may be entitled to any finder's fee, brokerage commission, loan commission, or other sum in connection with the execution of the Loan Documents, the consummation of the transactions contemplated by the Loan Documents, or the making of the Loan by Lender to Borrower, and Borrower indemnifies and agrees to hold Lender harmless from and against any and all loss, liability, or expense, including court costs and Attorneys' Fees, that Lender may suffer or sustain if such warranty or representation proves inaccurate in whole or in part. The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**3.19.    Perfection and Priority of Security Interest.**  Borrower represents and warrants that unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any security agreements, or permitted the filing or attachment of any security interests on or affecting any of the Collateral directly or indirectly securing repayment of the Loan, that would be prior or that may in any way be superior to Lender's security interests and rights in and to the Collateral.

**3.20.    Title to Property.**  Borrower represents and warrants that Borrower is the sole owner of and has good marketable title to the fee interest in the Collateral, free from any lien or encumbrance of any kind whatsoever.

**3.21.    Occupancy.**  Neither Borrower nor any Guarantor, nor any of its principals, affiliates, relatives, agents, or employees shall reside at the Real Property Collateral.

**3.22.    Legal Use.**  No portion of the Collateral has been or will be purchased, utilized, improved, equipped or furnished with proceeds of any illegal activity nor is any illegal activity occurring and there has not been and shall never be committed by Borrower or any other person in occupancy of or involved with the operation or use of the Collateral any act or omission affording the federal government or any state or local government the right of forfeiture. The Collateral at all times will be utilized in accordance with the

---

8

certificate of occupancy, certificate of completion, permit and any other law, code or ordinance affecting or governing the Collateral. Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Collateral and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification. The Collateral and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws, Applicable Laws and other similar laws.

**3.23.** **Leases and Rents.** To the extent applicable, and except as disclosed in the certified rent roll delivered to and approved by Lender in writing prior to the date hereof, (a) Borrower is the sole owner of the entire lessor's interest in any leases; (b) the leases are valid and enforceable and in full force and effect; (c) all leases are arms-length agreements with bona fide, independent third parties; (d) no party under any lease is in default; (e) all rents due have been paid in full and no tenant is in arrears in its payment of rents; (f) the terms of all alterations, modifications and amendments to the leases are reflected in the certified rent roll delivered to and approved by Lender; (g) none of the rents reserved in any leases have been assigned or otherwise pledged or hypothecated; (h) none of the rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (i) the premises demised under the leases have been completed and the tenants under any leases have accepted the same and have taken possession of the same on a rent-paying basis; (j) there exist no offsets or defenses to the payment of any portion of the rents and Borrower has no monetary obligation to any tenant under any lease; (k) Borrower has received no notice from any tenant challenging the validity or enforceability of any lease; (l) there are no agreements with the tenants under the leases other than expressly set forth in each lease; (m) the leases are valid and enforceable against Borrower and the tenants set forth therein; (n) no lease contains an option to purchase, right of first refusal to purchase, or any other similar provision; (o) no one has any possessory interest in, or right to occupy, the Real Property Collateral except under and pursuant to a lease; (p) each lease is subordinate to the Security Instrument, either pursuant to its terms or a recordable subordination agreement; (q) no lease has the benefit of a non-disturbance agreement that would be considered unacceptable to prudent institutional lenders; (r) all security deposits relating to the leases reflected on the certified rent roll delivered to Lender have been collected by Borrower and are being held in accordance with Applicable Laws; (s) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any tenant have already been received such tenant; and (t) no brokerage commissions or finders fees are due and payable regarding any lease.

**4.** **INSURANCE.** Lender's obligation to make the Loan and perform its duties under this Agreement shall be subject to the full and complete satisfaction of the following conditions precedent:

**4.1.** **Casualty Insurance.** Borrower shall at all times keep the Collateral insured for the benefit of Lender as follows, despite Governmental Requirements that may detrimentally affect Borrower's ability to obtain or may materially increase the cost of such insurance coverage:

**4.1.1.** Against damage or loss by fire and such other hazards (including lightning, windstorm, hail, explosion, riot, acts of striking employees, civil commotion, vandalism, malicious mischief, aircraft, vehicle, and smoke) as are covered by the broadest form of extended coverage endorsement available from time to time, in an amount not less than the Full Insurable Value (as defined below) of the Collateral, with a deductible amount not to exceed an amount satisfactory to Lender; windstorm coverage is included under the extended coverage endorsement of most hazard policies, but in some states it may be excluded. If the hazard policy excludes the windstorm/hail endorsement a separate windstorm policy must be provided. The coverage amounts must equal that of the hazard policy;

9

**4.1.2.** Rent loss or business interruption or use and occupancy insurance on such basis and in such amounts and with such deductibles as are satisfactory to Lender;

**4.1.3.** Against damage or loss by flood if the Collateral is located in an area identified by the Secretary of Housing and Urban Development or any successor or other appropriate authority (governmental or private) as an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, modified, supplemented, or replaced from time to time, on such basis and in such amounts as Lender may require;

**4.1.4.** Against damage or loss from (a) sprinkler system leakage and (b) boilers, boiler tanks, heating and air conditioning equipment, pressure vessels, auxiliary piping, and similar apparatus, on such basis and in such amounts as Lender may require;

**4.1.5.** During any alteration, construction, or replacement of Improvements, or any substantial portion of it, a Builder's All Risk policy with extended coverage with course of construction and completed value endorsements and such other endorsements as may be required by Lender, including stipulations that coverage will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender, for an amount at least equal to the Full Insurable Value of the Improvements, and workers' compensation, in statutory amounts, with provision for replacement with the coverage described herein, without gaps or lapsed coverage, for any completed portion of the Improvements; and

**4.1.6.** If applicable, against damage or loss by earthquake, in an amount and with a deductible satisfactory to Lender, if such insurance is required by Lender in the exercise of its business judgment in light of the commercial real estate practices existing at the time the insurance is issued and in the County where the Collateral is located.

**4.2.    Liability Insurance.** Borrower shall procure and maintain workers' compensation insurance for Borrower's employees, public liability and comprehensive general liability insurance (owner's and if required by Lender, general contractor's) covering Borrower, and Lender against claims for bodily injury or death or for damage occurring in, on, about, or resulting from the Real Property Collateral, or any street, drive, sidewalk, curb, or passageway adjacent to it, in standard form and with such insurance company or companies and in an amount of at least as Lender may require, which insurance shall include completed operations, product liability, and blanket contractual liability coverage that insures contractual liability under the indemnifications set forth in this Agreement and the Loan Documents (but such coverage or its amount shall in no way limit such indemnification).

**4.3.    Other Insurance.** Borrower shall procure and maintain such other insurance or such additional amounts of insurance, covering Borrower or the Collateral, as (a) may be required by the terms of any construction contract for construction on the Collateral or by any Governmental Authority, (b) may be specified in any other Loan Documents, or (c) may be required by Lender from time to time.

**4.4.    Form of Policies.** All insurance policies required under this Section shall be fully paid for and nonassessable. The policies shall contain such provisions, endorsements, and expiration dates as Lender from time to time reasonably requests and shall be in such form and amounts, and be issued by such insurance companies doing business in the State where the Collateral is located, as Lender shall approve in Lender's sole and absolute discretion. Unless otherwise expressly approved in writing by Lender, each insurer shall have a claims-paying or financial strength rating that satisfies the Insurance Rating Requirements. (All policies shall (a) contain a waiver of subrogation endorsement; (b) provide that the policy will not lapse or be canceled, amended, or materially altered (including by reduction in the scope or limits of coverage) without at least 30 days prior written notice to Lender; (c) with the exception of the comprehensive general liability policy, contain a lender's endorsement (438 BFU Endorsement or equivalent), and name Lender as insured; and (d) include such deductibles as Lender may approve. If a policy required under this Section contains a co-insurance or overage clause, the policy shall include a stipulated value or agreed amount endorsement acceptable to Lender.

---

10

**4.5.    Duplicate Originals or Certificates.** Duplicate original policies evidencing the insurance required herein and any additional insurance that may be purchased on the Collateral by or on behalf of Borrower shall be deposited with and held by Lender and, in addition, Borrower shall deliver to Lender (a) receipts evidencing payment of all premiums on the policies and (b) duplicate original renewal policies or a binder with evidence satisfactory to Lender of payment of all premiums at least 30 days before the policy expires. In lieu of the duplicate original policies to be delivered to Lender provided for herein, Borrower may deliver an underlier of any blanket policy, and Borrower may also deliver original certificates from the issuing insurance company, evidencing that such policies are in full force and effect and containing information that, in Lender's reasonable judgment, is sufficient to allow Lender to ascertain whether such policies comply with the requirements herein.

**4.6.    Increased Coverage.** If Lender determines that the limits of any insurance carried by Borrower are inadequate or that additional coverage is required, Borrower shall, within 10 days after written notice from Lender, procure such additional coverage as Lender may require in Lender's sole and absolute discretion.

**4.7.    No Separate Insurance.** Borrower shall not carry separate or additional insurance concurrent in form or contributing in the event of loss with that required herein unless endorsed in favor of Lender as required by this Section and otherwise approved by Lender in all respects.

**4.8.    Transfer of Title.** In the event of foreclosure of any Collateral or other transfer of title or assignment of any Collateral in extinguishment, in whole or in part, of the Secured Obligations and the Indebtedness, all right, title, and interest of Borrower in and to all insurance policies required herein or otherwise then in force with respect to the Collateral and all proceeds payable under, and unearned premiums on, such policies shall immediately vest in the purchaser or other transferee of the Collateral.

**4.9.    Replacement Cost.** For purposes of this Agreement, the term "Full Insurable Value" means the actual cost of replacing the Collateral in question, without allowance for depreciation, as calculated from time to time (but not more often than once every calendar year) by the insurance company or companies holding such insurance or, at Lender's request, by appraisal made by an appraiser, engineer, architect, or contractor proposed by Borrower and approved by said insurance company or companies and Lender. Borrower shall pay the cost of such appraisal.

**4.10.    No Warranty.** No approval by Lender of any insurer may be construed to be a representation, certification, or warranty of its solvency and no approval by Lender as to the amount, type, or form of any insurance may be construed to be a representation, certification, or warranty of its sufficiency.

**4.11.    Lender's Right to Obtain.** Borrower shall deliver to Lender original policies or certificates evidencing such insurance at least 30 days before the existing policies expire. If any such policy is not so delivered to Lender or if any such policy is canceled, whether or not Lender has the policy in its possession, and no reinstatement or replacement policy is received before termination of insurance, Lender, without notice to or demand on Borrower, may (but is not obligated to) obtain such insurance insuring only Lender with such company as Lender may deem satisfactory, and pay the premium for such policies, and the amount of any premium so paid shall be charged to and promptly paid by Borrower or, at Lender's option, may be added to the Indebtedness. Borrower acknowledges that, if Lender obtains insurance, it is for the sole benefit of Lender, and Borrower shall not rely on any insurance obtained by Lender to protect Borrower in any way.

**4.12.    Duty to Restore After Casualty.** If any act or occurrence of any kind or nature (including any casualty for which insurance was not obtained or obtainable) results in damage to or loss or destruction of the Collateral, Borrower shall immediately give notice of such loss or damage to Lender and, if Lender so instructs, shall promptly, at Borrower's sole cost and expense, regardless of whether any insurance proceeds will be sufficient for the purpose, commence and continue diligently to completion to restore, repair, replace, and rebuild the Collateral as nearly as possible to its value, condition, and character immediately before the damage, loss, or destruction.

---

11

## 5.    BORROWER COVENANTS AND REPORTING REQUIREMENTS.

### 5.1.    Financial Statements.

**5.1.1.    Borrower's Financial Statements.** Borrower shall furnish to Lender the following on receipt of Lender's written request and without expense to Lender: (a) an annual statement of the operation of the Real Property Collateral prepared and certified by Borrower and any Tenant Affiliate, showing in reasonable detail satisfactory to Lender total Rents (as defined in the Security Instrument) received and total expenses together with an annual balance sheet and profit and loss statement, within 90 days after the close of each fiscal year of Borrower and any Tenant Affiliate, beginning with the fiscal year first ending after the date of recordation of the Security Instrument; (b) within 30 days after the end of each calendar quarter (March 31, June 30, September 30, December 31) interim statements of the operation of the Real Property Collateral showing in reasonable detail satisfactory to Lender total Rents and other income and receipts received and total expenses for the previous quarter, certified by Borrower; and (c) copies of Borrower's and any Tenant Affiliate's annual state and federal income tax returns within 30 days after filing them. Borrower shall keep accurate books and records, and allow Lender, its representatives and agents, on notice, at any time during normal business hours, access to such books and records regarding acquisition, construction, development, and operations of the Real Property Collateral, including any supporting or related vouchers or papers, shall allow Lender to make extracts or copies of any such papers, and shall furnish to Lender and its agents convenient facilities for the audit of any such statements, books, and records.

**5.1.2.    Recordkeeping.** Borrower shall keep adequate records and books of account in accordance with generally accepted accounting principles and practices applied consistently throughout the period reported and shall permit Lender, by its agents, accountants, and attorneys, to examine Borrower's records and books of account and to discuss the affairs, finances, and accounts of Borrower with the officers of Borrower, at such reasonable times as Lender may request.

**5.1.3.    Additional Financial Statements.** Except to the extent already required herein, Borrower, its controlling shareholders, all Tenant Affiliates and all Guarantors of the Indebtedness, if any, shall deliver to Lender with reasonable promptness after the close of their respective fiscal years a balance sheet and profit and loss statement, prepared by the principal of the Borrower or an independent certified public accountant satisfactory to Lender, setting forth in each case, in comparative form, figures for the preceding year, which statements shall be accompanied by the unqualified opinion of the principal of the Borrower or such accountant as to their accuracy. Throughout the term of the Loan, Borrower, any Tenant Affiliate and any Guarantor shall deliver, with reasonable promptness, to Lender such other information with respect to Borrower, Tenant Affiliate or Guarantor as Lender may from time to time request. All financial statements of Borrower, Tenant Affiliate or Guarantor shall be prepared using reasonably accepted accounting practices applied on a consistent basis and shall be delivered in duplicate. Documents and information submitted by Borrower to Lender are submitted confidentially, and Lender shall not disclose them to third parties and shall limit access to them to what is necessary to service the Loan, accomplish the normal administrative, accounting, tax-reporting, and other necessary functions, to sell all or any part of the Loan and to report such information as required to the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Internal Revenue Service, and similar entities.

**5.1.4.    No Waiver of Default or Rights.** Lender's exercise of any right or remedy provided for herein shall not constitute a waiver of, or operate to cure, any default by Borrower under this Agreement, or preclude any other right or remedy that is otherwise available to Lender under this Agreement or Governmental Requirements.

### 5.2.    Borrower's Obligation to Notify Lender.

**5.2.1.    Bankruptcy, Insolvency, Transfer, or Encumbrance.** Borrower shall notify Lender in writing, at or before the time of the occurrence of any Event of Default, of such event and shall promptly furnish Lender with any and all information on such event that Lender may request.

---

12

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8159

v194

Borrower's Initials: _____

EXHIBIT 4                                Page 12 of 24

**5.2.2.  Government Notice.**  Borrower shall give immediate written notice to Lender of any notice, proceeding or inquiry by any Governmental Authority.  Borrower shall provide such notice to Lender within five (5) days of Borrower's knowledge, constructive or actual, of any such notice, proceeding or inquiry by any Government Authority.

**5.3.    Funds for Taxes, Insurance, and other Impositions.**  If Borrower is in default under this Agreement or any of the Loan Documents, regardless of whether the default has been cured, then Lender may at any subsequent time, at its option to be exercised on 30 days written notice to Borrower, require Borrower to deposit with Lender or its designee, at the time of each payment of an installment of interest or principal under the Note, an additional amount sufficient to discharge the Impositions (as defined in the Security Instrument) as they become due.  The calculation of the amount payable and of the fractional part of it to be deposited with Lender shall be made by Lender in its sole and absolute discretion.  These amounts shall be held by Lender or its designee not in trust and not as agent of Borrower and shall not bear interest, and shall be applied to the payment of any of the Impositions (as defined in the Security Instrument) under the Loan Documents in such order or priority as Lender shall determine.  If at any time within 30 days before the due date of these obligations the amounts then on deposit shall be insufficient to pay the obligations under the Note and this Agreement in full, Borrower shall deposit the amount of the deficiency with Lender within 10 days after Lender's demand.  If the amounts deposited are in excess of the actual obligations for which they were deposited, Lender may refund any such excess, or, at its option, may hold the excess in a reserve account, not in trust and not bearing interest, and reduce proportionately the required monthly deposits for the ensuing year. Nothing in this Section shall be deemed to affect any right or remedy of Lender under any other provision of this Agreement or under any statute or rule of law to pay any such amount and to add the amount so paid to the Indebtedness secured by the Security Instrument. Lender shall have no obligation to pay insurance premiums or taxes except to the extent the fund established under this Section is sufficient to pay such premiums or taxes, to obtain insurance, or to notify Borrower of any matters relative to the insurance or taxes for which the fund is established under this Section.

Lender or its designee shall hold all amounts so deposited as additional security for the sums secured by the Security Instrument.  Lender may, in its sole and absolute discretion and without regard to the adequacy of its security under the Security Instrument, apply such amounts or any portion of it to any Indebtedness secured by the Security Instrument, and such application shall not be construed to cure or waive any default or notice of default under this Agreement, or any other Loan Document.

If Lender requires deposits to be made under this Section, Borrower shall deliver to Lender all tax bills, bond and assessment statements, statements for insurance premiums, and statements for any other obligations referred to above as soon as Borrower receives such documents.

If Lender sells or assigns the Loan, Lender shall have the right to transfer all amounts deposited under this Section to the purchaser or assignee. After such a transfer, Lender shall be relieved and have no further liability under this Agreement for the application of such deposits, and Borrower shall look solely to such purchaser or assignee for such application and for all responsibility relating to such deposits.

**5.4.    Compliance with Law.**  Borrower shall: (a) maintain a yearly accounting cycle; (b) maintain in full force and effect all material licenses, permits, governmental authorizations, bonds, franchises, leases, trademarks, patents, contracts, and other rights necessary or desirable to the conduct of its business, or related to the Collateral; (c) continue in, and limit its operations to, substantially the same general lines of business as those presently conducted by it; (d) pay when due all taxes, license fees, and other charges upon the Collateral or upon Borrower's business, property or the income therefrom; and (e) comply with all Governmental Requirements.

**5.5.    Care of Collateral.**  Borrower shall: (a) keep the Collateral in good condition and repair; (b) restore and repair to the equivalent of its original condition all or any part of any Collateral that may be damaged or destroyed, whether or not insurance proceeds are available to cover any part of the cost of such restoration and repair, and regardless of whether Lender permits the use of any insurance proceeds to be used for restoration under this Agreement, Security Instrument, and Collateral Security

---

13

Agreement; (c) comply with all laws affecting the Collateral or requiring that any alterations, repairs, replacements, or improvements be made thereon; (d) not commit or permit waste on or to any Collateral, or commit, suffer, or permit any act or violation of law to occur on it; (e) not abandon any Collateral; (f) notify Lender in writing of any condition of any Collateral that may have a significant and measurable effect on its market value; (g) do all other things that the character or use of the Collateral may reasonably render necessary to maintain it in the same condition (reasonable wear and tear expected) as existed at the date of this Agreement; (h) at all times warrant and defend Borrower's ownership and possession of the Collateral; and (i) keep the Collateral free from all liens, claims, encumbrances and security interests.

**5.6.    Transfer of Collateral**. Borrower will not, without obtaining the prior written consent of Lender, transfer or permit any transfer of any Collateral or any part thereof to be made, or any interest therein to be created by way of a sale (except as expressly permitted herein), or by way of a grant of a security interest, or by way of a levy or other judicial process.

**5.7.    Indemnify Lender**. Borrower shall indemnify and hold the Lender and its successors and assigns harmless from and against any and all losses, cost, expense (including, without limitation Attorneys' Fees, consulting fees and court costs), demand, claim or lawsuit arising out of or related to or in any way connected with or arising out of Borrower's breach of the provisions of this Agreement or any of the other Loan Documents. Lender may commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement, or the Collateral, and Borrower shall pay all of Lender's reasonable costs and expenses so incurred on demand. If Borrower fails to provide such indemnity as the same accrues and as expenses are incurred, the amount not paid shall be added to the principal amount of the Note and bear interest thereon at the same rate then in effect (including any default rate in effect) and shall be secured by the same collateral as securing the Note and Loan Documents.    This Section shall survive execution, delivery, performance, and termination of this Agreement and the other Loan Documents.

**5.8.    Estoppel Certificates**. Within 10 days after Lender's request for such information, Borrower shall execute and deliver to Lender, and to any third party designated by Lender, in recordable form, a certificate of the principal financial or accounting officer of Borrower ("Estoppel Certificate"), dated within 3 days after delivery of such statements, or the date of such request, as the case may be, reciting that the Loan Documents are unmodified and in full force and effect, or that the Loan Documents are in full force and effect as modified and specifying all modifications asserted by Borrower. Such certificate shall also recite the amount of the Indebtedness and cover other matters with respect to the Indebtedness or Secured Obligations as Lender may reasonably require, the date(s) through which payments due on the Indebtedness have been paid and the amount(s) of any payments previously made on the Indebtedness. The certificate shall include a detailed statement of any right of setoff, counterclaim, or other defense that Borrower contends exists against the Indebtedness or the Secured Obligations; a statement that such Person knows of no Event of Default or prospective Event of Default that has occurred and is continuing, or, if any Event of Default or prospective Event of Default has occurred and is continuing, a statement specifying the nature and period of its existence and what action Borrower has taken or proposes to take with respect to such matter; and, except as otherwise specified, a statement that Borrower has fulfilled all Secured Obligations that are required to be fulfilled on or before the date of such certificate.

**5.8.1.    Failure to Deliver Estoppel Certificate**. If Borrower fails to execute and deliver the Estoppel Certificate within such 10-day period, (a) the Loan Documents shall, as to Borrower, conclusively be deemed to be either in full force and effect, without modification, or in full force and effect, modified in the manner and to the extent specified by Lender, whichever Lender reasonably and in good faith may represent; (b) the Indebtedness shall, as to Borrower, conclusively be deemed to be in the amount specified by Lender and no setoffs, counterclaims, or other defenses exist against the Indebtedness; and (c) Borrower shall conclusively be deemed to have irrevocably constituted and appointed Lender as Borrower's special attorney-in-fact to execute and deliver such certificate to any third party.

---

14

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement       Loan No. 8159

v194

Borrower's Initials:

EXHIBIT 4                                    Page 14 of 24

**5.8.2.  Reliance on Estoppel Certificate.**  Borrower and Lender expressly agree that any certificate executed and delivered by Borrower, or any representation in lieu of a certificate made by Lender as provided for above, may be relied on by any prospective purchaser or any prospective assignee of any interest of Lender in the Note and other Indebtedness secured by the Security Instrument or in the Real Property Collateral, and by any other Person, without independent investigation or examination, to verify the accuracy, reasonableness, or good faith of the recitals in the certificate or representation.

**5.9.  Appraisal and Inspections.**  In addition to any other right to require an appraisal or inspection of the Real Property Collateral provided in the Loan Documents, Lender may from time to time, at Borrower's expense, order an appraisal or inspection of any Real Property Collateral where:

**5.9.1.**  There has been a change in any market conditions or other circumstances that in Lender's sole and absolute discretion would make a prior appraisal no longer accurate;

**5.9.2.**  The occurrence of any fact or circumstance which in Lender's belief would alter the value or prior evaluated condition of any Real Property Collateral.

## 6.    ENVIRONMENTAL MATTERS.

**6.1.  Environmental Indemnity Agreement.**  Concurrently with the execution of this Agreement, Borrower shall execute and deliver to Lender a separate Environmental Indemnity Agreement ("Environmental Indemnity") in form and substance satisfactory to Lender, pursuant to which Borrower will indemnify, defend, and hold Lender harmless from and against any and all losses, damages, claims, costs, and expenses incurred by Lender as a result of the existence or alleged existence of hazardous or toxic substances on, under, or about the Real Property Collateral in violation of Environmental Laws as provided in the Environmental Indemnity.  The obligations of the Borrower under the Environmental Indemnity shall not be secured by the Security Instrument.

**6.2.  Borrower's Representations and Warranties.**  Borrower represents and warrants to Lender that each and every representation and warranty in the Environmental Indemnity (collectively "Environmental Representations") is true and correct.

**6.3.  Survival of Representations and Warranties.**  The Environmental Representations shall be continuing and shall be true and correct from the date of this Agreement.  The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**6.4.  Notice to Lender.**  Borrower shall give prompt written notice to Lender of:

**6.4.1.**  Any proceeding or inquiry by any Governmental Authority regarding the presence or threatened presence of any Hazardous Materials on the Real Property Collateral;

**6.4.2.**  All claims made or threatened by any third party against Borrower or the Real Property Collateral relating to any loss or injury resulting from any Hazardous Materials;

**6.4.3.**  Any notice given to Borrower under Environmental Laws; and

**6.4.4.**  Discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Real Property Collateral that could cause it or any part of it to be subject to any restrictions on the ownership, occupancy, transferability, or use of the Real Property Collateral under any Environmental Laws.

**6.5.  Lender's Right to Join Legal Actions.**  Lender shall have the right, at its option, but at Borrower's sole cost and expense, to join and participate in, as a party if it so elects, any legal proceedings or actions initiated by or against Borrower or the Real Property Collateral in connection with any Environmental Laws.

## 7.    DEFAULT AND REMEDIES.

**7.1.  Event of Default.**  The occurrence of any of the following events shall constitute an Event of Default under this Agreement:

---

15

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement      Loan No. 8159

v194

Borrower's Initials: _____

EXHIBIT 4                          Page 15 of 24

**7.1.1.  Payment of Indebtedness.**  Borrower fails to pay any installment of interest and/or principal under the Note or any other Indebtedness when due and such failure continues for more than ten (10) days after the date such payment was due and payable whether on maturity, the date stipulated in any Loan Document, by acceleration, or otherwise.

**7.1.2.  Performance of Obligations.**  The failure, refusal, or neglect to perform and discharge fully and timely any of the Secured Obligations as and when required.

**7.1.3.  Judgment.**  If any final judgment, order, or decree is rendered against Borrower or a Guarantor and is not paid or executed on, or is not stayed by perfection of an appeal or other appropriate action, such as being bonded, or is not otherwise satisfied or disposed of to Lender's satisfaction within 30 days after entry of the judgment, order, or decree.

**7.1.4.  Voluntary Bankruptcy.**  If Borrower or its affiliates, or any Guarantor or its affiliates (a) seeks entry of an order for relief as a debtor in a proceeding under the Bankruptcy Code; (b) seeks, consents to, or does not contest the appointment of a receiver or trustee for itself or for all or any part of its property and/or assets; (c) files a petition seeking relief under the bankruptcy, arrangement, reorganization, or other debtor relief laws of the United States or any state or any other competent jurisdiction; (d) makes a general assignment for the benefit of its creditors; or (e) either (i) is unable to or (ii) states in writing its inability to pay its debts as they mature.

**7.1.5.  Involuntary Bankruptcy.**  If (a) a petition is filed against Borrower or any Guarantor seeking relief under any bankruptcy, arrangement, reorganization, or other debtor relief laws of the United States or any state or other competent jurisdiction; or (b) a court of competent jurisdiction enters an order, judgment, or decree appointing, without the consent of Borrower or any Guarantor, a receiver or trustee for it, or for all or any part of its property; and (c) such petition, order, judgment, or decree is not discharged or stayed within 30 days after its entry.

**7.1.6.  Foreclosure of Other Liens.**  If the holder of any lien or security interest on the Collateral (without implying Lender's consent to the existence, placing, creating, or permitting of any lien or security interest) institutes foreclosure or other proceedings to enforce its remedies thereunder and any such proceedings are not stayed or discharged within 30 days after institution of such foreclosure proceedings.

**7.1.7.  Sale, Encumbrance, or Other Transfer.**  If Borrower (a) sells, gives an option to purchase, exchanges, assigns, conveys, encumbers (including, but not limited to PACE/HERO loans, any loans where payments are collected through property tax assessments, and super-voluntary liens which are deemed to have priority over the lien of the Security Instrument) (other than with a Permitted Encumbrance as defined in the Security Instrument), transfers possession, or alienates all or any portion of the Collateral, or any of Borrower's interest in the Collateral, or suffers its title to, or any interest in, the Collateral to be divested, whether voluntarily or involuntarily; or if there is a sale or transfer of any interests in Borrower; or if Borrower changes or permits to be changed the character or use of the Collateral, or drills or extracts or enters into any lease for the drilling or extracting of oil, gas, or other hydrocarbon substances or any mineral of any kind or character on the Real Property Collateral; or (b) if title to the Collateral becomes subject to any lien or charge, voluntary or involuntary, contractual or statutory, without Lender's prior written consent; or (c) if a junior voluntary or involuntary deed of trust or mortgage lien in favor of another lender encumbers the Real Property Collateral (other than a Permitted Encumbrance) without Lender's express prior written consent thereto, which consent may be withheld in Lender's sole and absolute discretion, then Lender, at Lender's option, may, without prior notice and subject to Applicable Law, declare all sums secured by the Security Instrument, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in the Loan Documents.

**7.1.8.  Title and Lien Priority.**  If Borrower's, or any other pledgor of Collateral, as applicable, title to any or all of the Collateral or Lender's security interest on the Collateral or the status of Lender's lien as a lien and security interest in the priority position indicated in any Security Agreement on any Collateral is endangered in any manner, and Borrower fails to cure the same on Lender's demand.

---

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8159

Borrower's Initials: ___

EXHIBIT 4                                    Page 16 of 24

**7.1.9.  Other Defaults.**  The occurrence of an Event of Default or any default, as defined or described in the other Loan Documents, or the occurrence of a default on any Indebtedness or Secured Obligations.

**7.1.10.  Levy on Assets.**  A levy on any of the assets of Borrower or any Guarantor, and such levy is not stayed or abated within 30 days after such levy.

**7.1.11.  Breach of Representations.**  The breach by Borrower, any Guarantor, or any member, general partner, principal or beneficial owner of any of the foregoing of any representation, warranty, or covenant in this Agreement or other Loan Documents or if any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made.

**7.1.12.  Default Under Prior Security Instrument, or Lien.**  The failure to pay on a timely basis, or the occurrence of any other default under any note, deed of trust, contract of sale, lien, charge, encumbrance, or security interest encumbering or affecting the Collateral and having priority over the lien of Lender.

**7.1.13.  Materially Adverse Event.**  The occurrence of any event or circumstances that in Lender's sole judgment materially adversely affects (i) the ability of Borrower or any Guarantor  to perform any of its obligations under this Agreement or under any of the Loan Documents, including, without limitation, the occurrence of any event of dissolution or termination of Borrower, of any member of Borrower, or of any Guarantor; (ii) the business or financial condition of Borrower, or of any member of Borrower, or of any Guarantor; or (iii) the operation or value of the Collateral.

**7.1.14.  Violation of Governmental Requirements.**  The failure of Borrower, any tenant, or any other occupant of the Real Property Collateral to comply with any Governmental Requirement. Any potential violation by a tenant or other occupant of the Real Property Collateral of any Governmental Requirement is an Event of Default under the terms of this Agreement; and upon the occurrence of any such violation, Lender, at Lender's option, may, without prior notice, declare all Indebtedness, regardless of the stated due date(s), immediately due and payable and may exercise all rights and remedies in this Agreement, and any other Loan Documents.

**7.2.    Remedies.**  On the occurrence of an Event of Default, Lender may, in addition to any other remedies that Lender may have under this Agreement or under the Loan Documents or by law, at its option and without prior demand or notice, take any or all of the following actions:

**7.2.1.**  The Lender may, without prejudice to any of its other rights under any Loan Document or by Applicable Law, declare all Secured Obligations to be immediately due and payable without presentment, notice of intent to accelerate, representation, demand of payment or protest, which are hereby expressly waived.

**7.2.2.**  The obligation of the Lender, if any, to make additional disbursements, advances (including Construction Disbursements), loans or financial accommodations of any kind to the Borrower shall immediately terminate upon the occurrence of an Event of Default.

**7.2.3.**  If an Event of Default shall have occurred and be continuing, the Lender may exercise any remedy provided by any or all Security Agreements.  In addition, the Lender may exercise in respect of any Collateral, in addition to other rights and remedies provided for herein (or in any Loan Document) or otherwise available to it, all the rights and remedies of a secured party under the applicable Uniform Commercial Code (the "Code") whether or not the Code applies to the affected Collateral, and also may (i) require the Borrower to, and the Borrower hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties and (ii) without notice except as specified below or by Applicable Law, sell the Collateral or any part thereof in one or more lots at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit, or for future delivery, and upon such other terms as the Lender may deem commercially reasonable. Borrower agrees that, to the extent notice of sale shall

---

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8159

v194

Borrower's Initials:

EXHIBIT 4                                                                    Page 17 of 24

be required by law, at least ten (10) days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

    **7.2.4.**  Unless otherwise required by Applicable Law, all cash proceeds received by the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, or then or at any time thereafter applied in whole or in part by the Lender against all or any part of the Secured Obligations in such order as the Lender shall elect. Any surplus of such cash or cash proceeds held by the Lender and remaining after the full, and final payment of all the Secured Obligations shall be paid over to the Borrower or to such other Person to which the Lender may be required under Applicable Law, or directed by a court of competent jurisdiction, to make payment of such surplus.

**7.3.**  <u>**Rights and Remedies Cumulative.**</u>  All rights and remedies provided for herein or in any other Loan Document are not exclusive, each shall be cumulative and in addition to any and all other rights and remedies existing at law or in equity, and all such remedies shall survive the acceleration of one or more of the Notes. Lender's exercise or partial exercise of, or failure to exercise, any remedy shall not restrict Lender from further exercise of that remedy or any other available remedy. No extension of time for payment or performance of any obligation shall operate to release discharge, modify, change or affect the original liability of Borrower for any obligations, either in whole or in part.

**7.4.**  <u>**Waiver of Marshalling.**</u>  Despite the existence of interests in the Collateral other than that created by the Security Agreements, and despite any other provision of this Agreement, if Borrower defaults in paying the Indebtedness or in performing any Secured Obligations, Lender shall have the right, in Lender's sole and absolute discretion, to establish the order in which the Collateral will be subjected to the remedies provided in this Agreement and Security Agreement and to establish the order in which all or any part of the Indebtedness secured by the Security Agreement is satisfied from the proceeds realized on the exercise of the remedies provided in the Security Agreement. Borrower and any Person who now has or later acquires any interest in the Collateral with actual or constructive notice of this Agreement and/or any Security Agreement waives any and all rights to require a marshaling of assets in connection with the exercise of any of the remedies provided in this Agreement, any Security Agreement or otherwise provided by Governmental Requirements.

**7.5.**  <u>**Limitations on Borrower During Cure Period.**</u>  For any period during which Borrower has an opportunity to cure an Event of Default in accordance with this Agreement, the Note, the Security Agreement or any other Loan Document, Borrower shall not (a) make any distributions to its members and (b) make any expenditures outside the ordinary course of business, except to cure a Default of this Agreement, the Note, the Security Agreement or any other Loan Document.

**7.6.**  <u>**Limitation of Liability.**</u>  No claim may be made by Borrower, or any other Person against Lender or its affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, and waives the damages themselves, whether or not accrued and whether or not known or suspected to exist in its favor.

## 8.    <u>GENERAL TERMS.</u>

**8.1.**  <u>**No Waiver by Lender.**</u>  No waiver by Lender of any right or remedy provided by the Loan Documents or Governmental Requirements shall be effective unless such waiver is in writing and signed

---

18

by authorized officer(s) of Lender. Waiver by Lender of any right or remedy granted to Lender under the Loan Documents or Governmental Requirements as to any transaction or occurrence shall not be deemed a waiver of any future transaction or occurrence. The acceptance of payment of any sum secured by the Collateral after its due date, or the payment by Lender of any Indebtedness or the performance by Lender of any Secured Obligations of Borrower under the Loan Documents, on Borrower's failure to do so, or the addition of any payment so made by Lender to the Indebtedness secured by the Collateral, or the exercise of Lender's right to enter the Real Property Collateral and receive and collect the Rents from it, or the assertion by Lender of any other right or remedy under the Loan Documents, shall not constitute a waiver of Lender's right to require prompt performance of all other Secured Obligations of Borrower under the Loan Documents and payment of the Indebtedness, or to exercise any other right or remedy under the Loan Documents for any failure by Borrower to timely and fully pay the Indebtedness and perform its Secured Obligations under the Loan Documents. Lender may waive any right or remedy under the Loan Documents or Governmental Requirements without notice to or consent from Borrower, any Guarantor of the Indebtedness and of the Secured Obligations under the Loan Documents, or any holder or claimant of a lien or other interest in the Collateral that is junior to the lien of Lender, and without incurring liability to Borrower or any other Person by so doing.

**8.2.    Successors and Assigns**. This Agreement is made and entered into for the sole protection and benefit of Lender and Borrower and their successors and assigns, and no other Person or Persons shall have any right of action under this Agreement. The terms of this Agreement shall inure to the benefit of the successors and assigns of the parties, provided, however, that the Borrower's interest under this Agreement cannot be assigned or otherwise transferred without the prior consent of Lender. Lender in its sole discretion may transfer this Agreement, and may sell or assign participations or other interests in all or any part of this Agreement, all without notice to or the consent of Borrower.

**8.3.    Notice.** Except for any notice required by Governmental Requirements to be given in another manner, (a) all notices required or permitted by the Loan Documents shall be in writing; (b) each notice shall be sent (i) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (ii) by certified United States mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight delivery service, marked for next-business-day delivery; and (c) all notices shall be addressed to the appropriate party at its address as follows or such other addresses as may be designated by notice given in compliance with this provision:

|  |  |
|---|---|
| Lender: | PPRF REIT, LLC<br>16236 San Dieguito Rd, Ste 4-21<br>P.O. Box 9491<br>Rancho Santa Fe, California 92067 |
|  | With a copy to: |
|  | FCI Lender Services<br>Attn: Loan Servicing Dept.<br>P.O. Box 27370<br>Anaheim Hills, California 92809-0112 |
| Borrower: | Serenade Newport, LLC, a California limited liability company<br>3 Longboat<br>Newport Beach, California 92657 |

19

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement       Loan No. 8159

v194

Borrower's Initials: _____

EXHIBIT 4                                                Page 19 of 24

Notices will be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery; or (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending.

To the extent permitted by Governmental Requirements, if there is more than one Borrower, notice to any Borrower shall constitute notice to all Borrowers. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address(es).

**8.4.    Authority to File Notices.** Borrower irrevocably appoints, designates, and authorizes Lender as its agent (this agency being coupled with an interest) to file or send to any third party any notice or documents or take any other action that Lender reasonably deems necessary or desirable to protect its interest under this Agreement, or under the Loan Documents, and will on request by Lender, execute such additional documents as Lender may require to further evidence the grant of this right to Lender.

**8.5.    Attorney-in-Fact.** Borrower irrevocably appoints Lender its true and lawful attorney-in-fact, which appointment is coupled with an interest, for purposes of accomplishing any of the foregoing. Borrower further nominates and appoints Lender as attorney-in-fact to perform all acts and execute all documents deemed necessary by Lender in furtherance of the terms of this Agreement; except, however, for receiving notice on behalf of Borrower.

**8.6.    Time.** Time is of the essence in the Loan Documents.

**8.7.    Amendments, Termination; Waiver.** No amendment, supplement, termination, or waiver of any provision of this Agreement or of any of the Loan Documents, nor consent to any departure by Borrower from the terms of this Agreement or of any of the other Loan Documents, shall be effective unless it is in writing and signed by Lender and Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**8.8.    Headings.** The article, section and paragraph headings in this Agreement are for reference only and in no way define, limit, extend, or interpret the scope of this Agreement or of any particular article or section.

**8.9.    Validity.** If any provision of this Agreement is held to be invalid, that holding shall not affect in any respect the validity of the remainder of this Agreement.

**8.10.    Cross-Default.** Any default under the terms of any loan agreement, promissory note, deed of trust, mortgage, lease, conditional sale contract or other agreement, document or instrument evidencing, governing or securing any indebtedness owing by Borrower or any guarantor or any Affiliate of Borrower and/or guarantor to Lender or any Affiliate of Lender, whether previously executed or executed hereafter; shall, at Lender's option, constitute an Event of Default and a "Cross-Default Event" under this Agreement. Notwithstanding anything contained in the Loan Documents to the contrary, any Loan sold, participated, or otherwise transferred to a third party shall not be cross-defaulted or cross-collateralized with any other loan not sold or transferred to the same third party. The following definitions shall apply to this Section:

"**Affiliate**" for the purposes of this Section, shall include but not be limited to:
- (a) Any person or entity that directly or indirectly Controls, is Controlled by, or is under common Control with the Borrower.
- (b) Any principal, partner, shareholder, officer, director, member, manager, employee, or agent of the Borrower.
- (c) Any parent, subsidiary, or other affiliated entity of the Borrower.
- (d) Any immediate family member of any principal of the Borrower.
- (e) Any guarantor or co-Borrower of the Loan.

"**Control**" and derivative terms means the possession, directly or indirectly, and acting either alone or together with others, of the power or authority to direct or cause the direction of the management,

---

20

material policies, material business decisions or the affairs of a Person, whether through the ownership of equity securities or interests, by contract or other means.

"**Person**" means any natural person, business, corporation, company, and or association, limited liability company, partnership, limited partnership, limited liability partnership, joint venture, business enterprise, trust, government authority or other legal entity.

**8.10.1. Remedies Upon Cross-Default**.  Upon the occurrence of a Cross-Default Event, without limiting any other rights of Lender under this Agreement or other Loan Documents, Lender shall have the right to:

(a)      Declare the entire unpaid principal balance of the Loan, together with all accrued interest and other sums due under the Loan Documents, to be immediately due and payable.

(b)      Pursue any and all remedies available under the Loan Documents or at law or in equity, including but not limited to foreclosure of the Security Instrument, collection of rents, and appointment of a receiver.

(c)      Exercise any other rights or remedies as provided in the Loan Documents or as available at law or in equity.

**8.10.2. Notification of Cross-Default Event.**  Borrower agrees to notify Lender in writing immediately upon the occurrence of any Cross-Default Event.  Failure to provide such notification shall constitute an additional Event of Default under the Loan Documents.

BORROWER'S INITIALS: _____

**8.11.    Survival of Warranties**.  All agreements, representations, and warranties made in this Agreement shall survive the execution and delivery of this Agreement, of the Loan Documents, and the making of the Loan under this Agreement and continue in full force and effect until the Secured Obligations have been fully paid and satisfied.

**8.12.    Attorney Fees**.  Borrower agrees to pay the following costs, expenses, and Attorneys' Fees paid or incurred by Lender, or adjudged by a court: (a) reasonable costs of collection and costs, expenses, and Attorneys' Fees paid or incurred in connection with the collection or enforcement of the Loan Documents, whether or not suit is filed; (b) reasonable costs, expenses, and Attorneys' Fees paid or incurred in connection with representing Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under the Loan Documents; (c) reasonable costs, expenses, and Attorneys' Fees incurred to protect the lien of the Security Instrument; and (d) costs of suit and such sum as the court may adjudge as Attorneys' Fees in any action to enforce payment of the Loan Documents or any part of it.

In addition to the aforementioned, costs, and expenses, Lender in any lawsuit or other dispute shall be entitled to its Attorneys' Fees, and all other fees, costs, and expenses incurred in any post-judgment proceedings to collect or enforce any judgment.  This provision for the recovery of post-judgment fees, costs, and expenses is separate and several and shall survive the merger of the Loan Documents into any judgment on the Loan Agreement, Note, Guaranty, Security Instrument, or any other Loan Documents.

**8.13.    Governing Law; Consent to Jurisdiction and Venue**.  This Agreement is made by Lender and accepted by Borrower in the State of California, except that at all times the provisions for the creation, perfection, priority, enforcement and foreclosure of the liens and security interests created in the Real Property Collateral under the Loan Documents shall be governed by and construed according to the laws of the state in which each Real Property Collateral is situated.  To the fullest extent permitted by the law of the state in which each Real Property Collateral is situated, the law of the State of California shall govern the validity and enforceability of all Loan Documents, and the debt or obligations arising hereunder (but the foregoing shall not be construed to limit Lender's rights with respect to such security interest created in

---

21

the state in which each Real Property Collateral is situated). The parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Real Property Collateral, shall be Orange County, California, or the applicable federal district court that covers said County, and Borrower submits to personal jurisdiction in that forum for any and all purposes. Borrower waives any right Borrower may have to assert the doctrine of forum non conveniens or to object to such venue.

BORROWER'S INITIALS: _____

**8.14.** **Legal Relationships**. The relationship between Borrower and Lender is that of lender and borrower, and no partnership, joint venture, or other similar relationship shall be inferred from this Agreement. Borrower shall not have the right or authority to make representations, to act, or to incur debts or liabilities on behalf of Lender. Borrower is not executing this Agreement as an agent or nominee for an undisclosed principal, and no third-party beneficiaries are or shall be created by the execution of this Agreement.

**8.15.** **Dispute Resolution: Waiver of Right to Jury Trial**.

    **8.15.1. ARBITRATION.** CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO ARBITRATE ANY DISPUTES TO RESOLVE ANY CLAIMS (AS DEFINED IN THE ARBITRATION AGREEMENT).

    **8.15.2. WAIVER OF RIGHT TO JURY TRIAL.** CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT AND WAIVER OF RIGHT TO JURY TRIAL WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM (AS DEFINED IN THE ARBITRATION AGREEMENT) OR CAUSE OF ACTION BASED ON OR ARISING FROM THE LOAN.

BORROWER'S INITIALS: _____

**8.16.** **Counterparts**. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. This Agreement shall be deemed fully executed and effective when all Parties have executed at least one of the counterparts, even though no single counterpart bears all such signatures.

**8.17.** **Severability.** If any provision of the Loan Documents, or the application of them to the circumstances, is held void, invalid, or unenforceable by a court of competent jurisdiction, the Loan Documents, and the applications of such provision to other parties or circumstances, shall not be affected thereby, the provisions of the Loan Documents being severable in any such instance.

**8.18.** **Cooperation.** Borrower acknowledges that Lender and its successors and assigns may (a) sell, transfer, or assign the Loan Documents to one or more investors as a whole loan, in a rated or unrated public offering or private placement; (b) participate the Loan to one or more investors in a rated or unrated public offering or private placement; (c) deposit the Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets in a rated or unrated public offering or private placement; or (d) otherwise sell the Loan or interest therein to investors in a rated or unrated public offering or private placement. (The transactions referred to in clauses (a)-(d) are hereinafter referred to as "Secondary Market Transactions.") Borrower shall, at Lender's expense, cooperate in good faith with Lender in effecting any such Secondary Market Transaction and shall cooperate in good faith to implement all requirements reasonably imposed by the participants involved in any Secondary Market Transaction (including, without limitation, a rating agency and/or an institutional purchaser, participant, or investor) including, without limitation, all structural or other changes to the Loan Documents, modifications to any documents to the Loan Documents, delivery of opinions of counsel acceptable to the rating agency or such other purchasers, participants or investors, and addressing such matters as the rating agency or such other

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8159

v194

Borrower's Initials: _____

EXHIBIT 4                                    Page 22 of 24

purchasers, participants, or investors may require; provided, however, that the Borrower shall not be required to modify any documents evidencing or securing the Loan Documents that would modify (i) the interest rate payable under the Note, (ii) the stated Maturity Date, (iii) the amortization of principal of the Note, or (iv) any other material terms or covenants of the Note. Borrower shall provide such information and documents relating to Borrower, the Collateral, any Leases (as defined in the Security Instrument), and any lessees as Lender or the rating agency or such other purchasers, participants, or investors may reasonably request in connection with a Secondary Market Transaction. Lender shall have the right to provide to the rating agency or prospective purchasers, participants, or investors any information in its possession including, without limitation, financial statements relating to Borrower, the Collateral, and any lessee. Borrower acknowledges and agrees that certain information regarding the Loan and the parties thereto and the Real Property Collateral may be included in a private placement memorandum, prospectus, or other disclosure documents and consents to the release of such information to third parties.

**8.19.    Obligations of Borrower Joint and Several.** If more than one Person is named as Borrower, each obligation of Borrower under this Agreement shall be the joint and several obligations of each such Person.

**8.20.    No Modifications or Amendments; No Waiver.** Except as specified herein, the Loan Documents may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

**8.21.    Integration.** This Agreement and all schedules and exhibits hereto referred to herein, together with the Note and the other Loan Documents, embody the final, entire agreement among the parties and supersede any and all prior commitments, agreements, representations and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties. There are no oral agreements among the parties. Except as otherwise provided in this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any Loan Document, the provision contained in this Agreement shall govern and control.

**8.22.    REMIC Savings Clause.** Notwithstanding anything to the contrary in this Agreement, if the Loan is held by a "real estate investment conduit" (a "REMIC") within the meaning of Section 860D of the Internal Revenue Code of 1986, as amended (the "IRS Code"), and following the release of any Real Property Collateral the ratio of the outstanding principal balance of the Loan to the value of the Real Property Collateral securing the Loan is greater than 125% (based solely on the value of the real property and excluding personal property or going concern value, if any, as determined by Lender in its sole discretion, using any commercially reasonable method permitted to a REMIC under the IRS Code) (such amount, the "REMIC LTV"), then Borrower shall pay down the principal balance of the Loan by an amount equal to the greater of (A) an amount of principal required to be paid pursuant to this Section and (B) the least of the following amounts: (1) if the released Real Property Collateral is sold in an arm's length transaction with an unrelated third party, the net proceeds of such sale; (2) the fair market value of the released Real Property Collateral at the time of the release, as determined by Lender in its sole discretion using any commercially reasonable method permitted to a REMIC under the IRS Code; and (3) an amount such that the REMIC LTV does not increase due to the release.

THIS AGREEMENT MAY BE EXECUTED IN COUNTER-PARTS.


[SIGNATURES FOLLOW]

---

23

IN WITNESS WHEREOF, Borrower has executed this Agreement as of the date first written above by and through their duly authorized representatives.

**BORROWER:**

**SERENADE NEWPORT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY**

By:

Sahand Zargari, Manager

---

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement       Loan No. 8159

v194

Borrower's Initials:

EXHIBIT 4                                                Page 24 of 24

# EXHIBIT 5

# EXHIBIT 5

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (this "Agreement") dated as of June 17, 2025, is entered into by Serenade Newport, LLC, a California limited liability company ("Borrower"), for the benefit of Sitlani Holdings LLC, a California limited liability company as to an undivided 200,000.00/500,000.00 interest; and Mahesh Tilokani, Married man as his sole and separate property as to an undivided 300,000.00/500,000.00 interest (collectively, "Lender").

In consideration of the covenants, conditions, representations, and warranties contained in this Agreement, the parties agree as follows:

1.  **DEFINITIONS.** As used herein, the following terms shall have the following meanings (all terms defined in this Section or in any other provision of this Agreement in the singular are to have the plural meanings when used in the plural and vice versa, and whenever the context requires, each gender shall include any other gender):

1.1.  **"Agreement"** shall mean this Loan and Security Agreement together with all schedules and exhibits hereto, as amended, supplemented or otherwise modified from time to time.

1.2.  **"Applicable Law"** shall mean: (a) with respect to matters relating to the creation, perfection and procedures relating to the enforcement of the liens created pursuant to a Security Instrument (including specifically, without limitation, the manner of establishing the amount of any deficiency for which Borrower is liable after any foreclosure of any Real Property Collateral), the laws of the state where the Real Property Collateral subject to such Security Instrument is located; or (b) with respect to any other Loan Document (including but not limited to the Note and this Agreement) the laws of the State of California (or any other jurisdiction whose laws are mandatorily applicable notwithstanding the parties' choice of California law). In either case, Applicable Law shall refer to such laws, as such laws now exist, or may be changed or amended or come into effect in the future.

1.3.  **"Attorneys' Fees."** Any and all attorney fees (including the allocated cost of in-house counsel), paralegal, and law clerk fees, including, without limitation, fees for advice, negotiation, consultation, arbitration, and litigation at the pretrial, trial, and appellate levels, and in any bankruptcy proceedings, and attorney costs and expenses incurred or paid by Lender as provided in the Loan Documents.

1.4.  **"Bankruptcy Code"** shall mean the provisions of Title 11 of the United States Code, as amended; 11 U.S.C. §§ 101-1532 or any bankruptcy, insolvency, state or federal debtor relief statute.

1.5.  **"Collateral"** shall mean the collateral described in Section 2 below.

1.6.  **"Environmental Laws"** shall mean any Governmental Requirements pertaining to health, industrial hygiene, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) as amended (42 United States Code ("U.S.C.") §§ 9601-9675); the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. §§ 6901-6992k); the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101-5127); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251-1376); the Clean Air Act (42 U.S.C. §§ 7401-7671q); the Toxic Substances Control Act (15 U.S.C. §§ 2601-2692); the Refuse Act (33 U.S.C. §§ 407-426p); the Emergency Planning and Community Right-To-Know Act (42 U.S.C. §§ 11001-11050); the Safe Drinking Water Act (42 U.S.C. §§ 300f-300j), and all present or future environmental quality or protection laws, statutes or codes or other requirements of any federal or state governmental unit, or of any regional or local governmental unit with jurisdiction over the Collateral.

1.7.  **"Event of Default"** shall mean any event specified in the Event of Default heading below.

1.8.  **"Governmental Authority"** shall mean any and all courts, boards, agencies, commissions, offices, or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, or otherwise) whether now or later in existence.

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 8160

v194

Borrower's Initials: _S Z_

EXHIBIT 5    Page 1 of 24

**1.9.** **"Governmental Requirements"** shall mean any and all laws, statutes, codes, ordinances, regulations, enactments, decrees, judgments, and orders of any Governmental Authority.

**1.10.** **"Guarantor"** shall mean Sahand Zargari; and Michael John Gerro, and any other guarantor of any Indebtedness evidenced by a Loan Document between Lender and any other guarantor.

**1.11.** **"Guaranty"** shall mean each Guaranty, Limited Guaranty, Springing Guaranty, or Guaranty of Completion of even date herewith executed by a Guarantor.

**1.12.** **"Hazardous Materials"** means any and all (a) substances defined as "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act (49 United States Code §§5101-5127), and in the regulations promulgated under those laws; (b) substances defined as "hazardous wastes" under Environmental Laws and in the regulations promulgated under that law in the State where the Real Property Collateral is located and in the regulations promulgated under that law; (c) substances defined as "hazardous substances" under Environmental Laws in the State where the Real Property Collateral is located; (d) substances listed in the United States Department of Transportation Table (49 Code of Federal Regulations § 172.101 and amendments); (e) substances defined as "medical wastes" under Environmental Laws in the State where the Real Property Collateral is located; (f) asbestos-containing materials; (g) polychlorinated biphenyl; (h) underground storage tanks, whether empty, filled, or partially filled with any substance; (i) petroleum and petroleum products, including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any such mixture; and (j) such other substances, materials, and wastes that are or become regulated under applicable local, state, or federal law, or that are classified as hazardous or toxic under any Governmental Requirements or that, even if not so regulated, are known to pose a hazard to the health and safety of the occupants of the Real Property Collateral or of real property adjacent to it.

**1.13.** **"Indebtedness"** means the principal of, interest on, and all other amounts and payments due under or evidenced by the following:

    **1.13.1.** The Note (including, without limitation, any prepayment premium, late payment, and other charges payable under the Note);

    **1.13.2.** This Agreement;

    **1.13.3.** The Security Instrument and all other Loan Documents;

    **1.13.4.** All funds later advanced by Lender to or for the benefit of Borrower under any provision of any of the Loan Documents;

    **1.13.5.** Any future loans or amounts advanced by Lender to Borrower when evidenced by a written instrument or document that specifically recites that the Secured Obligations evidenced by such document are secured by the terms of the Security Agreement, including, but not limited to, funds advanced to protect the security or priority of the Security Agreement; and

    **1.13.6.** Any amendment, modification, extension, rearrangement, restatement, renewal, substitution, or replacement of any of the foregoing.

**1.14.** **"Insurance Rating Requirements"** means the requirements for a property insurance policy issued by an insurer having a claims-paying or financial strength rating of any one of the following: (A) at least "A-:VIII" from A.M. Best Company, (B) at least "A3" (or the equivalent) from Moody's Investors Service, Inc. or (C) at least "A-" from Standard & Poor's Ratings Service.

**1.15.** **"Lender Retained Funds"** shall mean all of Borrower's right, title and interest in and to any funds retained by the Lender or its agents including but not limited to any Appraisal Reserves, Debt Service Reserves, Default Reserves, Impounds, Construction Reserves, Rehabilitation Reserves, Tax Reserves, Capital Expenditure Reserves and Insurance Reserves.

**1.16.** **"Loan"** shall mean the loan and financial accommodations made by the Lender to the Borrower in accordance with the terms of this Agreement and the Loan Documents.

**1.17.** **"Loan Amount"** shall mean Five Hundred Thousand and 00/100 Dollars ($500,000.00).

2

**1.18.** **"Loan Document(s)"** means this Agreement, the Note, Security Agreement, and any other agreement executed in connection therewith, all other documents evidencing, securing or otherwise governing the Loan between Lender, Borrower, any guarantor, pledgor, or debtor, whether now existing or made in the future, and all amendments, modifications, and supplements thereto. Notwithstanding the foregoing, when used in the definitions of Indebtedness, Secured Obligations, and Obligations, and in relation to the discussion of the Secured Obligations, Obligations and Indebtedness that are secured by any Security Agreement, the term "Loan Documents" specifically excludes any Guaranty and Environmental Indemnity Agreement, each of which are not secured by any Security Agreement unless specifically identified therein.

**1.19.** **"Maturity Date"** shall mean July 1, 2026.

**1.20.** **"Note(s)"** means any and all promissory notes payable by Borrower, as maker to the order of Lender or order, executed concurrently herewith or subsequent to the execution of this Agreement, evidencing a loan from Lender to Borrower, together with any interest thereon at the rate provided in such promissory note and any modifications, extensions or renewals thereof, whether or not any such modification, extension is evidenced by a new or additional promissory note or notes. Note shall include the Secured Note of even date herewith payable by Borrower to the order of Lender in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00), which matures on the Maturity Date, evidencing the Loan, in such form as is acceptable to Lender, together with any and all rearrangements, extensions, renewals, substitutions, replacements, modifications, restatements, and amendments to the Secured Note.

**1.21.** **"Person"** means any natural person, business, corporation, company, and or association, limited liability company, partnership, limited partnership, limited liability partnership, joint venture, business enterprise, trust, government authority or other legal entity.

**1.22.** **"Personal Property Collateral"** shall mean any property pledged to secure the Note that is not Real Property Collateral.

**1.23.** **"Real Property Collateral"** shall mean all Mortgaged Property described in the Security Instrument(s), commonly known as 1501 Serenade Terrace, (Corona Del Mar Area), Newport Beach, California 92625.

**1.24.** **"Secured Obligations"** shall have the meaning defined in Section 2 below and shall include all Indebtedness, obligations, and liabilities of the Borrower under the Loan Documents, whether on account of principal, interest, indemnities, fees (including, without limitation, Attorneys' Fees, remarketing fees, origination fees, collection fees, and all other professional fees), costs, expenses, taxes, or otherwise.

**1.25.** **"Security Agreement"** shall mean any and all agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract or otherwise creating, evidencing, governing or representing a security interest of Lender in the Collateral securing the Secured Obligations, including, but not limited to any Collateral Security Agreement, Security Instrument, or Ownership Interest Pledge Agreement, as applicable. The term shall refer to all Security Agreements both individually and collectively.

**1.26.** **"Security Instrument(s)"** shall mean any and all agreements of even date herewith that secure the Real Property Collateral, including but not limited to any (i) Deeds of Trust, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (ii) Mortgages, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (iii) Deeds to Secure Debt, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (iv) Security Deeds, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, and (v) Mortgages.

**1.27.** **"Tenant Affiliate"** shall mean any occupant of the Real Property Collateral, other than Borrower, that is directly or indirectly controlling, controlled by or under common control with, the Borrower.

---

© Lightning Docs™: All Rights Reserved.
Loan and Security Agreement      Loan No. 8160

v194

Borrower's Initials: _SZ_

EXHIBIT 5                          Page 3 of 24

Capitalized terms not otherwise defined shall have their respective meanings as defined in the Loan Documents.

## 2.  GENERAL.

**2.1.    Amount and Purpose**.  In reliance on Borrower's representations and warranties, and subject to the terms and conditions in this Agreement and in the Loan Documents, Lender agrees to make the Loan to Borrower on the terms and conditions set forth in the Note, this Agreement and the other Loan Documents.

**2.2.    Payment**.  Borrower shall repay the Loan in accordance with the provisions of the Note.  The principal balance outstanding under the Note shall be due and payable in full on the Maturity Date.

**2.3.    Loan Documentation and Security.**  Borrower shall execute and acknowledge, or obtain the execution and acknowledgment of, and deliver concurrently with this Agreement, the Loan Documents and other documents signed in connection with this Agreement.  Any reference to the Loan Documents shall refer to such documents as they may be amended, renewed, or extended from time to time with the written approval of Lender.  All of the Loan Documents shall be in form and substance satisfactory to Lender and shall include such consents from third parties as Lender deems necessary or appropriate.

**2.4.    Creation of Security Interest; Collateral.**  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and for the purpose of securing the full and timely payment and performance of the Secured Obligations for the benefit of Lender, Borrower hereby irrevocably and unconditionally grants, transfers, bargains, conveys and assigns to the Lender a continuing general, lien on, and security interest in, all the Borrower's estate, right, title, and interest that the Borrower now has or may later acquire in and to the following, which shall be collectively referred to as the "Collateral":

    **2.4.1.    Real Property Collateral.**  All Real Property Collateral.

    **2.4.2.    Personal Property Collateral.**  All Personal Property Collateral.

    **2.4.3.    Borrower Funds.**  All of Borrower's interest in and to the proceeds of the Secured Obligations, whether disbursed or not; all present and future monetary deposits given by Borrower to any public or private utility with respect to utility services furnished to the Real Property Collateral; all Lender Retained Funds; and all accounts maintained by the Borrower with Lender or any subsidiary or affiliate of Lender, including, without limitation, any accounts established in connection with the Secured Obligations regardless of whether or not such accounts are with Lender;

    **2.4.4.    Lender Retained Funds.**  The Lender Retained Funds shall be subject to the sole and absolute control of Lender during the term of this Agreement.  Borrower shall execute such documents and take such other action as may be requested by Lender to ensure in Lender such sole and absolute control.  Borrower shall have no right to the Lender Retained Funds except as provided in this Agreement and the Note.  Upon the maturity of the Note, any remaining funds in the Lender Retained Funds shall be credited against amounts due under the Note.  Upon the occurrence of an Event of Default hereunder, Lender shall have (i) the right to withdraw all or any portion of the Lender Retained Funds and apply the Lender Retained Funds against the amounts owing under the Note, or any other Loan Document in such order of priority as Lender may determine; (ii) all rights and remedies of a secured party under the Uniform Commercial Code; or (iii) the right to exercise all remedies under the Loan Documents or otherwise available in law or in equity.  Unless an agreement is made in writing or applicable law requires interest to be paid on the Lender Retained Funds, Lender shall not be required to pay Borrower any interest or earnings on the Lender Retained Funds.

    **2.4.5.    Additional Property.**  Any additional personal property otherwise set forth in the Loan Documents;

    **2.4.6.    Proceeds.**  All proceeds of, supporting obligations for, additions and accretions to, substitutions and replacements for, and changes in any of the Collateral described in this Agreement.

**2.5.    Secured Obligations.**  Borrower grants a security interest in the Collateral for the purpose of securing the following Secured Obligations:

---

4

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8160

v194

Borrower's Initials: _____

EXHIBIT 5

**2.5.1.** <u>Notes.</u> Payment of all obligations at any time under any and all Notes.

**2.5.2.** <u>Loan Documents.</u> Payment and/or performance of each and every other obligation of Borrower under the Loan Documents;

**2.5.3.** <u>Related Loan Documents.</u> Payment and/or performance of each covenant and obligation on the part of Borrower or its affiliates to be performed pursuant to any and all Loan Documents that have been or may be executed by Borrower or its affiliates evidencing or securing one or more present or future loans by Lender or its affiliates to Borrower or its affiliates (each a "Related Loan," and collectively, the "Related Loans"), whether now existing or made in the future, together with any and all modifications, extensions and renewals thereof; provided, however, that nothing contained herein shall be construed as imposing an obligation upon Lender, or as evidencing Lender's intention, to make any Related Loan to Borrower or its affiliates;

**2.5.4.** <u>Future Obligations.</u> Payment to Lender of all future advances, Indebtedness and further sums and/or performance of such further obligations as Borrower may undertake to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Lender, its successors and assigns, (it being contemplated by Borrower and Lender that Borrower may hereafter become indebted to Lender in such further sum or sums), when such borrower and/or obligations are evidenced by a written instrument reciting that it or they are secured by this Agreement and a related Security Instrument or Security Agreement; and

**2.5.5.** <u>Modifications and Payments.</u> Payment and performance of all modifications, amendments, extensions, and renewals, however evidenced, of any of the Secured Obligations.

**2.6.** <u>Application of Payments.</u> Except as otherwise expressly provided by Governmental Requirements or any other provision of the Loan Documents, all payments received by Lender from Borrower under the Loan Documents shall be applied by Lender in the following order: (a) costs, fees, charges, and advances paid or incurred by Lender or payable to Lender and interest thereon under any provision of this Agreement, the Note, the Security Agreement, or any other Loan Documents, in such order as Lender, in its sole and absolute discretion, elects, (b) interest payable under the Note, and (c) principal under the Note.

**2.7.** <u>Termination.</u> This Agreement shall terminate following the repayment in full of all amounts due under the Note, this Agreement and any other documents evidencing the Loan, so long as no written claim has been made hereunder prior to such expiration date.

**3.** <u>BORROWER'S REPRESENTATIONS AND WARRANTIES.</u> To induce Lender to make the Loan, Borrower represents and warrants as follows, which representations and warranties shall be true and correct as of the execution of this Agreement and shall survive the execution and delivery of the Loan Documents:

**3.1.** <u>Capacity.</u> Borrower and the individuals executing Loan Documents on Borrower's behalf have the full power, authority, and legal right to execute and deliver, and to perform and observe the provisions of this Agreement, the other Loan Documents, and any other document, agreement, certificate, or instrument executed in connection with the Loan, and to carry out the contemplated transactions. All signatures of Borrower and Guarantor, and the individuals executing Loan Documents on their respective behalf, are genuine.

**3.2.** <u>Authority and Enforceability.</u> Borrower's execution, delivery, and performance of this Agreement, the other Loan Documents, and any other document, agreement, certificate, or instrument executed in connection with the Loan, have been duly authorized by all necessary corporate or other business entity action and do not and shall not require any registration with, consent, or approval of, notice to, or any action by any Person or Governmental Authority. Borrower has obtained or will obtain all approvals necessary for Borrower to comply with the Loan Documents. This Agreement, the Note, and the other Loan Documents executed in connection with the Loan, when executed and delivered by Borrower,

---

5

shall constitute the legal, valid, binding, and joint and several obligations of Borrower enforceable in accordance with their respective terms. Borrower (a) is duly formed and/or organized and validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the state where the Real Property Collateral is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Collateral and carry on its business as now conducted and proposed to be conducted. Borrower now has and shall continue to have the full right, power and authority to operate and lease the Property, to encumber the Collateral as provided herein and to perform all of the other obligations to be performed by Borrower under the Note, the Security Instrument, this Agreement and the other Loan Documents. Borrower has full power, authority and legal right to mortgage, grant, bargain, sell, encumber, pledge, assign, warrant, transfer and convey the Collateral pursuant to the terms hereof and to keep and observe all of the terms of this Agreement.

**3.3.    Compliance with Other Instruments.**  The execution and delivery of this Agreement and the other Loan Documents, and compliance with their respective terms, and the issuance of the Note and other Loan Documents as contemplated in this Agreement, shall not result in a breach of any of the terms or conditions of, or result in the imposition of, any lien, charge, or encumbrance (except as created by this Agreement, the Security Agreement and the other Loan Documents) on any Collateral, or constitute a default (with due notice or lapse of time or both) or result in an occurrence of an event for which any holder or holders of indebtedness may declare the same due and payable under, any indenture, agreement, order, judgment, or instrument to which Borrower is a party or by which Borrower or its properties may be bound or affected.

**3.4.    Compliance with Law.**  The execution and delivery of this Agreement, the Note, and the other Loan Documents, or any other document, agreement, certificate, or instrument to which Borrower is bound in connection with the Loan, do not conflict with, result in a breach or default under, or create any lien or charge under any provision of any Governmental Requirements to which it is subject and shall not violate any of the Governmental Requirements.

**3.5.    Adverse Events.**  Since the date of the financial statements delivered to Lender before execution of this Agreement, neither the condition (financial or otherwise) nor the business of Borrower and the Collateral have been materially adversely affected in any way.

**3.6.    Litigation.**  There are no actions, suits, investigations, or proceedings pending or, to Borrower's knowledge after due inquiry and investigation, threatened against or affecting Borrower at law or in equity, before or by any Person or Governmental Authority, that, if adversely determined, would have a material adverse effect on the business, properties, or condition (financial or otherwise) of Borrower, the Collateral, or on the validity or enforceability of this Agreement, any of the other Loan Documents, or the ability of Borrower to perform under any of the Loan Documents.

**3.7.    No Untrue Statements.**  All statements, representations, and warranties made by Borrower in this Agreement or any other Loan Document and any other agreement, document, certificate, or instrument previously furnished or to be furnished by Borrower to Lender under the Loan Documents (a) are and shall be true, correct, and complete in all material respects at the time they were made and as of the execution of this Agreement, (b) do not and shall not contain any untrue statement of a material fact, and (c) do not and shall not omit to state a material fact necessary to make the information in them neither misleading nor incomplete. Borrower understands that all such statements, representations, and warranties shall be deemed to have been relied on by Lender as a material inducement to make the Loan.

**3.8.    Policies of Insurance.**  Each copy of the insurance policies relating to the Collateral delivered to Lender by Borrower (a) is a true, correct, and complete copy of the respective original policy in effect on the date of this Agreement, and no amendments or modifications of said documents or instruments not included in such copies have been made, and (b) has not been terminated and is in full force and effect. Borrower is not in default in the observance or performance of its material obligations under said documents

---

6

Borrower's Initials: _S2_

EXHIBIT 5                                                    Page 6 of 24

or instruments and Borrower has done all things required to be done as of the date of this Agreement to keep unimpaired its rights thereunder.

**3.9.    Financial Statements.**  All financial statements furnished to Lender are true and correct in all material respects, are prepared in accordance with generally accepted accounting principles, and do not omit any material fact the omission of which makes such statement or statements misleading.  There are no facts that have not been disclosed to Lender by Borrower in writing that materially or adversely affect or could potentially in the future affect the Collateral or the business prospects, profits, or condition (financial or otherwise) of Borrower or any Guarantor or Borrower's abilities to perform the Secured Obligations and pay the Indebtedness.

**3.10.    Taxes.**  Borrower has filed or caused to be filed all tax returns that are required to be filed by Borrower under the Governmental Requirements of each Governmental Authority with taxing power over Borrower, and Borrower has paid, or made provision for the payment of, all taxes, assessments, fees, Impositions (as defined in the Security Instrument), and other governmental charges that have or may have become due under said returns, or otherwise, or under any assessment received by Borrower except that such taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with generally accepted accounting principles) have been provided.

**3.11.    Further Acts.**  Borrower shall, at its sole cost and expense, and without expense to Lender, do, execute, acknowledge, and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers, and assurances as Lender shall from time to time require, for the purpose of better assuring, conveying, assigning, transferring, pledging, mortgaging, warranting, and confirming to Lender the Collateral and rights, and as to Lender the security interest, conveyed or assigned by this Agreement or intended now or later so to be, or for carrying out the intention or facilitating the performance of the terms of this Agreement, or for filing, registering, or recording this Agreement and, on demand, shall execute and deliver, and authorizes Lender to execute in the name of Borrower, to the extent it may lawfully do so, one or more financing statements, chattel mortgages, or comparable security instruments, to evidence more effectively the lien of Lender on the Collateral.

**3.12.    Filing Fees.**  Borrower shall pay all filing, registration, or recording fees, all Governmental Authority stamp taxes and other fees, taxes, duties, imposts, assessments, and all other charges incident to, arising from, or in connection with the preparation, execution, delivery, and enforcement of the Note, this Agreement, the other Loan Documents, or any instrument of further assurance.

**3.13.    Entity Compliance.**  As long as any part of the Secured Obligation is owed by Borrower, Borrower, if a corporation, limited liability company, partnership, or trust shall do all things necessary to preserve and keep in full force and effect its existence, franchises, rights, and privileges as such entity under the laws of the state of its incorporation or formation, and shall comply with all Governmental Requirements of any Governmental Authority applicable to Borrower or to any Collateral or any part of it, and Borrower shall qualify and remain in good standing in each jurisdiction where it is required to be so under any applicable Governmental Requirement.

**3.14.    Improper Financial Transactions.**

**3.14.1.**  Borrower is, and shall remain at all times, in full compliance with all applicable laws and regulations of the United States of America that prohibit, regulate or restrict financial transactions, and any amendments or successors thereto and any applicable regulations promulgated thereunder (collectively, the "Financial Control Laws"), including but not limited to those related to money laundering offenses and related compliance and reporting requirements (including any money laundering offenses prohibited under the Money Laundering Control Act, 18 U.S.C. Section 1956 and 1957 and the Bank Secrecy Act, 31 U.S.C. Sections 5311 et seq.) and the Foreign Assets Control Regulations, 31 C.F.R. Section 500 et seq.

**3.14.2.**  Borrower represents and warrants that: Borrower is not a Barred Person (hereinafter defined); Borrower is not owned or controlled, directly or indirectly, by any Barred Person; and Borrower is not acting, directly or indirectly, for or on behalf of any Barred Person.

---

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8160

v194

Borrower's Initials: _SZ_

EXHIBIT 5                                    Page 7 of 24

**3.14.3.** Borrower represents and warrants that it understands and has been advised by legal counsel on the requirements of the Financial Control Laws.

**3.14.4.** Under any provision of the Loan Documents where Lender shall have the right to approve or consent to any particular action, including, without limitation any (A) sale, transfer, assignment of any Collateral, or any direct or indirect ownership interest in Borrower, (B) leasing of any Collateral, or any portion thereof, or (C) incurring any additional financing secured by the Collateral, or any portion thereof, or by any direct or indirect ownership interest in Borrower, Lender shall have the right to withhold such approval or consent, in its sole discretion.

**3.14.5.** Borrower covenants and agrees that it will upon request provide Lender with (or cooperate with Lender in obtaining) information required by Lender for purposes of complying with any Financial Control Laws. As used in this Agreement, the term "Barred Person" shall mean (A) any person, group or entity named as a "Specially Designated National and Blocked Person" or as a person who commits, threatens to commit, supports, or is associated with terrorism as designated by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), (B) any person, group or entity named in the lists maintained by the United States Department of Commerce (Denied Persons and Entities), (C) any government or citizen of any country that is subject to a United States Embargo identified in regulations promulgated by OFAC, and (D) any person, group or entity named as a denied or blocked person or terrorist in any other list maintained by any agency of the United States government.

**3.15.** **Representation on Use of Proceeds.** Borrower represents and warrants to Lender that the proceeds of the Loan will be used solely for business, commercial investment, or similar purposes, and that no portion of it will be used for personal, family, or household purposes.

**3.16.** **Made or Arranged by a Real Estate Broker.** Borrower acknowledges that this Loan was made or arranged by a licensed California Real Estate Broker and that the licensee's participation was a material factor in consummating this Loan.

**3.17.** **Brokerage Fees.** Borrower represents and warrants to Lender that Borrower has not dealt with any Person, other than the parties identified in the final settlement statement, who are or may be entitled to any finder's fee, brokerage commission, loan commission, or other sum in connection with the execution of the Loan Documents, the consummation of the transactions contemplated by the Loan Documents, or the making of the Loan by Lender to Borrower, and Borrower indemnifies and agrees to hold Lender harmless from and against any and all loss, liability, or expense, including court costs and Attorneys' Fees, that Lender may suffer or sustain if such warranty or representation proves inaccurate in whole or in part. The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**3.18.** **Perfection and Priority of Security Interest.** Borrower represents and warrants that unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any security agreements, or permitted the filing or attachment of any security interests on or affecting any of the Collateral directly or indirectly securing repayment of the Loan, that would be prior or that may in any way be superior to Lender's security interests and rights in and to the Collateral.

**3.19.** **Title to Property.** Borrower represents and warrants that Borrower is the sole owner of and has good marketable title to the fee interest in the Collateral, free from any lien or encumbrance of any kind whatsoever.

**3.20.** **Occupancy.** Neither Borrower nor any Guarantor, nor any of its principals, affiliates, relatives, agents, or employees shall reside at the Real Property Collateral.

**3.21.** **Legal Use.** No portion of the Collateral has been or will be purchased, utilized, improved, equipped or furnished with proceeds of any illegal activity nor is any illegal activity occurring and there has not been and shall never be committed by Borrower or any other person in occupancy of or involved with the operation or use of the Collateral any act or omission affording the federal government or any state or local government the right of forfeiture. The Collateral at all times will be utilized in accordance with the certificate of occupancy, certificate of completion, permit and any other law, code or ordinance affecting

---

8

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8160

v194

Borrower's Initials: _____

EXHIBIT 5                                    Page 8 of 24

or governing the Collateral. Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Collateral and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification. The Collateral and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws, Applicable Laws and other similar laws.

**3.22.    Leases and Rents.**  To the extent applicable, and except as disclosed in the certified rent roll delivered to and approved by Lender in writing prior to the date hereof, (a) Borrower is the sole owner of the entire lessor's interest in any leases; (b) the leases are valid and enforceable and in full force and effect; (c) all leases are arms-length agreements with bona fide, independent third parties; (d) no party under any lease is in default; (e) all rents due have been paid in full and no tenant is in arrears in its payment of rents; (f) the terms of all alterations, modifications and amendments to the leases are reflected in the certified rent roll delivered to and approved by Lender; (g) none of the rents reserved in any leases have been assigned or otherwise pledged or hypothecated; (h) none of the rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (i) the premises demised under the leases have been completed and the tenants under any leases have accepted the same and have taken possession of the same on a rent-paying basis; (j) there exist no offsets or defenses to the payment of any portion of the rents and Borrower has no monetary obligation to any tenant under any lease; (k) Borrower has received no notice from any tenant challenging the validity or enforceability of any lease; (l) there are no agreements with the tenants under the leases other than expressly set forth in each lease; (m) the leases are valid and enforceable against Borrower and the tenants set forth therein; (n) no lease contains an option to purchase, right of first refusal to purchase, or any other similar provision; (o) no one has any possessory interest in, or right to occupy, the Real Property Collateral except under and pursuant to a lease; (p) each lease is subordinate to the Security Instrument, either pursuant to its terms or a recordable subordination agreement; (q) no lease has the benefit of a non-disturbance agreement that would be considered unacceptable to prudent institutional lenders; (r) all security deposits relating to the leases reflected on the certified rent roll delivered to Lender have been collected by Borrower and are being held in accordance with Applicable Laws; (s) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any tenant have already been received such tenant; and (t) no brokerage commissions or finders fees are due and payable regarding any lease.

**4.    INSURANCE.**  Lender's obligation to make the Loan and perform its duties under this Agreement shall be subject to the full and complete satisfaction of the following conditions precedent:

**4.1.    Casualty Insurance.**  Borrower shall at all times keep the Collateral insured for the benefit of Lender as follows, despite Governmental Requirements that may detrimentally affect Borrower's ability to obtain or may materially increase the cost of such insurance coverage:

**4.1.1.**  Against damage or loss by fire and such other hazards (including lightning, windstorm, hail, explosion, riot, acts of striking employees, civil commotion, vandalism, malicious mischief, aircraft, vehicle, and smoke) as are covered by the broadest form of extended coverage endorsement available from time to time, in an amount not less than the Full Insurable Value (as defined below) of the Collateral, with a deductible amount not to exceed an amount satisfactory to Lender; windstorm coverage is included under the extended coverage endorsement of most hazard policies, but in some states it may be excluded. If the hazard policy excludes the windstorm/hail endorsement a separate windstorm policy must be provided. The coverage amounts must equal that of the hazard policy;

**4.1.2.**  Rent loss or business interruption or use and occupancy insurance on such basis and in such amounts and with such deductibles as are satisfactory to Lender;

---

9

**4.1.3.**  Against damage or loss by flood if the Collateral is located in an area identified by the Secretary of Housing and Urban Development or any successor or other appropriate authority (governmental or private) as an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, modified, supplemented, or replaced from time to time, on such basis and in such amounts as Lender may require;

**4.1.4.**  Against damage or loss from (a) sprinkler system leakage and (b) boilers, boiler tanks, heating and air conditioning equipment, pressure vessels, auxiliary piping, and similar apparatus, on such basis and in such amounts as Lender may require;

**4.1.5.**  During any alteration, construction, or replacement of Improvements, or any substantial portion of it, a Builder's All Risk policy with extended coverage with course of construction and completed value endorsements and such other endorsements as may be required by Lender, including stipulations that coverage will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender, for an amount at least equal to the Full Insurable Value of the Improvements, and workers' compensation, in statutory amounts, with provision for replacement with the coverage described herein, without gaps or lapsed coverage, for any completed portion of the Improvements; and

**4.1.6.**  If applicable, against damage or loss by earthquake, in an amount and with a deductible satisfactory to Lender, if such insurance is required by Lender in the exercise of its business judgment in light of the commercial real estate practices existing at the time the insurance is issued and in the County where the Collateral is located.

**4.2.**    **Liability Insurance.**  Borrower shall procure and maintain workers' compensation insurance for Borrower's employees, public liability and comprehensive general liability insurance (owner's and if required by Lender, general contractor's) covering Borrower, and Lender against claims for bodily injury or death or for damage occurring in, on, about, or resulting from the Real Property Collateral, or any street, drive, sidewalk, curb, or passageway adjacent to it, in standard form and with such insurance company or companies and in an amount of at least as Lender may require, which insurance shall include completed operations, product liability, and blanket contractual liability coverage that insures contractual liability under the indemnifications set forth in this Agreement and the Loan Documents (but such coverage or its amount shall in no way limit such indemnification).

**4.3.**    **Other Insurance.**  Borrower shall procure and maintain such other insurance or such additional amounts of insurance, covering Borrower or the Collateral, as (a) may be required by the terms of any construction contract for construction on the Collateral or by any Governmental Authority, (b) may be specified in any other Loan Documents, or (c) may be required by Lender from time to time.

**4.4.**    **Form of Policies.**  All insurance policies required under this Section shall be fully paid for and nonassessable.  The policies shall contain such provisions, endorsements, and expiration dates as Lender from time to time reasonably requests and shall be in such form and amounts, and be issued by such insurance companies doing business in the State where the Collateral is located, as Lender shall approve in Lender's sole and absolute discretion.  Unless otherwise expressly approved in writing by Lender, each insurer shall have a claims-paying or financial strength rating that satisfies the Insurance Rating Requirements.  (All policies shall (a) contain a waiver of subrogation endorsement; (b) provide that the policy will not lapse or be canceled, amended, or materially altered (including by reduction in the scope or limits of coverage) without at least 30 days prior written notice to Lender; (c) with the exception of the comprehensive general liability policy, contain a lender's endorsement (438 BFU Endorsement or equivalent), and name Lender as insured; and (d) include such deductibles as Lender may approve.  If a policy required under this Section contains a co-insurance or overage clause, the policy shall include a stipulated value or agreed amount endorsement acceptable to Lender.

**4.5.**    **Duplicate Originals or Certificates.**  Duplicate original policies evidencing the insurance required herein and any additional insurance that may be purchased on the Collateral by or on behalf of Borrower shall be deposited with and held by Lender and, in addition, Borrower shall deliver to Lender (a) receipts

© Lightning Docs™; All Rights Reserved.                                                              v194
Loan and Security Agreement      Loan No. 8160

EXHIBIT 5                                                    Page 10 of 24

Borrower's Initials: _____

evidencing payment of all premiums on the policies and (b) duplicate original renewal policies or a binder with evidence satisfactory to Lender of payment of all premiums at least 30 days before the policy expires. In lieu of the duplicate original policies to be delivered to Lender provided for herein, Borrower may deliver an underlier of any blanket policy, and Borrower may also deliver original certificates from the issuing insurance company, evidencing that such policies are in full force and effect and containing information that, in Lender's reasonable judgment, is sufficient to allow Lender to ascertain whether such policies comply with the requirements herein.

**4.6.      Increased Coverage.**  If Lender determines that the limits of any insurance carried by Borrower are inadequate or that additional coverage is required, Borrower shall, within 10 days after written notice from Lender, procure such additional coverage as Lender may require in Lender's sole and absolute discretion.

**4.7.      No Separate Insurance.**  Borrower shall not carry separate or additional insurance concurrent in form or contributing in the event of loss with that required herein unless endorsed in favor of Lender as required by this Section and otherwise approved by Lender in all respects.

**4.8.      Transfer of Title.**  In the event of foreclosure of any Collateral or other transfer of title or assignment of any Collateral in extinguishment, in whole or in part, of the Secured Obligations and the Indebtedness, all right, title, and interest of Borrower in and to all insurance policies required herein or otherwise then in force with respect to the Collateral and all proceeds payable under, and unearned premiums on, such policies shall immediately vest in the purchaser or other transferee of the Collateral.

**4.9.      Replacement Cost.**  For purposes of this Agreement, the term "Full Insurable Value" means the actual cost of replacing the Collateral in question, without allowance for depreciation, as calculated from time to time (but not more often than once every calendar year) by the insurance company or companies holding such insurance or, at Lender's request, by appraisal made by an appraiser, engineer, architect, or contractor proposed by Borrower and approved by said insurance company or companies and Lender. Borrower shall pay the cost of such appraisal.

**4.10.     No Warranty.**  No approval by Lender of any insurer may be construed to be a representation, certification, or warranty of its solvency and no approval by Lender as to the amount, type, or form of any insurance may be construed to be a representation, certification, or warranty of its sufficiency.

**4.11.     Lender's Right to Obtain.**  Borrower shall deliver to Lender original policies or certificates evidencing such insurance at least 30 days before the existing policies expire.  If any such policy is not so delivered to Lender or if any such policy is canceled, whether or not Lender has the policy in its possession, and no reinstatement or replacement policy is received before termination of insurance, Lender, without notice to or demand on Borrower, may (but is not obligated to) obtain such insurance insuring only Lender with such company as Lender may deem satisfactory, and pay the premium for such policies, and the amount of any premium so paid shall be charged to and promptly paid by Borrower or, at Lender's option, may be added to the Indebtedness.  Borrower acknowledges that, if Lender obtains insurance, it is for the sole benefit of Lender, and Borrower shall not rely on any insurance obtained by Lender to protect Borrower in any way.

**4.12.     Duty to Restore After Casualty.**  If any act or occurrence of any kind or nature (including any casualty for which insurance was not obtained or obtainable) results in damage to or loss or destruction of the Collateral, Borrower shall immediately give notice of such loss or damage to Lender and, if Lender so instructs, shall promptly, at Borrower's sole cost and expense, regardless of whether any insurance proceeds will be sufficient for the purpose, commence and continue diligently to completion to restore, repair, replace, and rebuild the Collateral as nearly as possible to its value, condition, and character immediately before the damage, loss, or destruction.

## 5.      BORROWER COVENANTS AND REPORTING REQUIREMENTS.

### 5.1.      Financial Statements.

---

11

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8160

v194

Borrower's Initials: _SB_

EXHIBIT 5                    Page 11 of 24

**5.1.1.  Borrower's Financial Statements.**  Borrower shall furnish to Lender the following on receipt of Lender's written request and without expense to Lender: (a) an annual statement of the operation of the Real Property Collateral prepared and certified by Borrower and any Tenant Affiliate, showing in reasonable detail satisfactory to Lender total Rents (as defined in the Security Instrument) received and total expenses together with an annual balance sheet and profit and loss statement, within 90 days after the close of each fiscal year of Borrower and any Tenant Affiliate, beginning with the fiscal year first ending after the date of recordation of the Security Instrument; (b) within 30 days after the end of each calendar quarter (March 31, June 30, September 30, December 31) interim statements of the operation of the Real Property Collateral showing in reasonable detail satisfactory to Lender total Rents and other income and receipts received and total expenses for the previous quarter, certified by Borrower; and (c) copies of Borrower's and any Tenant Affiliate's annual state and federal income tax returns within 30 days after filing them.  Borrower shall keep accurate books and records, and allow Lender, its representatives and agents, on notice, at any time during normal business hours, access to such books and records regarding acquisition, construction, development, and operations of the Real Property Collateral, including any supporting or related vouchers or papers, shall allow Lender to make extracts or copies of any such papers, and shall furnish to Lender and its agents convenient facilities for the audit of any such statements, books, and records.

**5.1.2.  Recordkeeping.**  Borrower shall keep adequate records and books of account in accordance with generally accepted accounting principles and practices applied consistently throughout the period reported and shall permit Lender, by its agents, accountants, and attorneys, to examine Borrower's records and books of account and to discuss the affairs, finances, and accounts of Borrower with the officers of Borrower, at such reasonable times as Lender may request.

**5.1.3.  Additional Financial Statements.**  Except to the extent already required herein, Borrower, its controlling shareholders, all Tenant Affiliates and all Guarantors of the Indebtedness, if any, shall deliver to Lender with reasonable promptness after the close of their respective fiscal years a balance sheet and profit and loss statement, prepared by the principal of the Borrower or an independent certified public accountant satisfactory to Lender, setting forth in each case, in comparative form, figures for the preceding year, which statements shall be accompanied by the unqualified opinion of the principal of the Borrower or such accountant as to their accuracy.  Throughout the term of the Loan, Borrower, any Tenant Affiliate and any Guarantor shall deliver, with reasonable promptness, to Lender such other information with respect to Borrower, Tenant Affiliate or Guarantor as Lender may from time to time request.  All financial statements of Borrower, Tenant Affiliate or Guarantor shall be prepared using reasonably accepted accounting practices applied on a consistent basis and shall be delivered in duplicate.  Documents and information submitted by Borrower to Lender are submitted confidentially, and Lender shall not disclose them to third parties and shall limit access to them to what is necessary to service the Loan, accomplish the normal administrative, accounting, tax-reporting, and other necessary functions, to sell all or any part of the Loan and to report such information as required to the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Internal Revenue Service, and similar entities.

**5.1.4.  No Waiver of Default or Rights.**  Lender's exercise of any right or remedy provided for herein shall not constitute a waiver of, or operate to cure, any default by Borrower under this Agreement, or preclude any other right or remedy that is otherwise available to Lender under this Agreement or Governmental Requirements.

**5.2.  Borrower's Obligation to Notify Lender.**

**5.2.1.  Bankruptcy, Insolvency, Transfer, or Encumbrance.**  Borrower shall notify Lender in writing, at or before the time of the occurrence of any Event of Default, of such event and shall promptly furnish Lender with any and all information on such event that Lender may request.

**5.2.2.  Government Notice.**  Borrower shall give immediate written notice to Lender of any notice, proceeding or inquiry by any Governmental Authority.  Borrower shall provide such notice to

---

12

Lender within five (5) days of Borrower's knowledge, constructive or actual, of any such notice, proceeding or inquiry by any Government Authority.

**5.3.    Funds for Taxes, Insurance, and other Impositions.** If Borrower is in default under this Agreement or any of the Loan Documents, regardless of whether the default has been cured, then Lender may at any subsequent time, at its option to be exercised on 30 days written notice to Borrower, require Borrower to deposit with Lender or its designee, at the time of each payment of an installment of interest or principal under the Note, an additional amount sufficient to discharge the Impositions (as defined in the Security Instrument) as they become due. The calculation of the amount payable and of the fractional part of it to be deposited with Lender shall be made by Lender in its sole and absolute discretion. These amounts shall be held by Lender or its designee not in trust and not as agent of Borrower and shall not bear interest, and shall be applied to the payment of any of the Impositions (as defined in the Security Instrument) under the Loan Documents in such order or priority as Lender shall determine. If at any time within 30 days before the due date of these obligations the amounts then on deposit shall be insufficient to pay the obligations under the Note and this Agreement in full, Borrower shall deposit the amount of the deficiency with Lender within 10 days after Lender's demand. If the amounts deposited are in excess of the actual obligations for which they were deposited, Lender may refund any such excess, or, at its option, may hold the excess in a reserve account, not in trust and not bearing interest, and reduce proportionately the required monthly deposits for the ensuing year. Nothing in this Section shall be deemed to affect any right or remedy of Lender under any other provision of this Agreement or under any statute or rule of law to pay any such amount and to add the amount so paid to the Indebtedness secured by the Security Instrument. Lender shall have no obligation to pay insurance premiums or taxes except to the extent the fund established under this Section is sufficient to pay such premiums or taxes, to obtain insurance, or to notify Borrower of any matters relative to the insurance or taxes for which the fund is established under this Section.

Lender or its designee shall hold all amounts so deposited as additional security for the sums secured by the Security Instrument. Lender may, in its sole and absolute discretion and without regard to the adequacy of its security under the Security Instrument, apply such amounts or any portion of it to any Indebtedness secured by the Security Instrument, and such application shall not be construed to cure or waive any default or notice of default under this Agreement, or any other Loan Document.

If Lender requires deposits to be made under this Section, Borrower shall deliver to Lender all tax bills, bond and assessment statements, statements for insurance premiums, and statements for any other obligations referred to above as soon as Borrower receives such documents.

If Lender sells or assigns the Loan, Lender shall have the right to transfer all amounts deposited under this Section to the purchaser or assignee. After such a transfer, Lender shall be relieved and have no further liability under this Agreement for the application of such deposits, and Borrower shall look solely to such purchaser or assignee for such application and for all responsibility relating to such deposits.

**5.4.    Compliance with Law.** Borrower shall: (a) maintain a yearly accounting cycle; (b) maintain in full force and effect all material licenses, permits, governmental authorizations, bonds, franchises, leases, trademarks, patents, contracts, and other rights necessary or desirable to the conduct of its business, or related to the Collateral; (c) continue in, and limit its operations to, substantially the same general lines of business as those presently conducted by it; (d) pay when due all taxes, license fees, and other charges upon the Collateral or upon Borrower's business, property or the income therefrom; and (e) comply with all Governmental Requirements.

**5.5.    Care of Collateral.** Borrower shall: (a) keep the Collateral in good condition and repair; (b) restore and repair to the equivalent of its original condition all or any part of any Collateral that may be damaged or destroyed, whether or not insurance proceeds are available to cover any part of the cost of such restoration and repair, and regardless of whether Lender permits the use of any insurance proceeds to be used for restoration under this Agreement, Security Instrument, and Collateral Security Agreement; (c) comply with all laws affecting the Collateral or requiring that any alterations, repairs, replacements, or improvements be made thereon; (d) not commit or permit waste on or to any

---

13

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8160

Borrower's Initials: _____

EXHIBIT 5                                    Page 13 of 24

Collateral, or commit, suffer, or permit any act or violation of law to occur on it; (e) not abandon any Collateral; (f) notify Lender in writing of any condition of any Collateral that may have a significant and measurable effect on its market value; (g) do all other things that the character or use of the Collateral may reasonably render necessary to maintain it in the same condition (reasonable wear and tear expected) as existed at the date of this Agreement; (h) at all times warrant and defend Borrower's ownership and possession of the Collateral; and (i) keep the Collateral free from all liens, claims, encumbrances and security interests.

**5.6.    Transfer of Collateral.** Borrower will not, without obtaining the prior written consent of Lender, transfer or permit any transfer of any Collateral or any part thereof to be made, or any interest therein to be created by way of a sale (except as expressly permitted herein), or by way of a grant of a security interest, or by way of a levy or other judicial process.

**5.7.    Indemnify Lender.** Borrower shall indemnify and hold the Lender and its successors and assigns harmless from and against any and all losses, cost, expense (including, without limitation Attorneys' Fees, consulting fees and court costs), demand, claim or lawsuit arising out of or related to or in any way connected with or arising out of Borrower's breach of the provisions of this Agreement or any of the other Loan Documents. Lender may commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement, or the Collateral, and Borrower shall pay all of Lender's reasonable costs and expenses so incurred on demand. If Borrower fails to provide such indemnity as the same accrues and as expenses are incurred, the amount not paid shall be added to the principal amount of the Note and bear interest thereon at the same rate then in effect (including any default rate in effect) and shall be secured by the same collateral as securing the Note and Loan Documents. This Section shall survive execution, delivery, performance, and termination of this Agreement and the other Loan Documents.

**5.8.    Estoppel Certificates.** Within 10 days after Lender's request for such information, Borrower shall execute and deliver to Lender, and to any third party designated by Lender, in recordable form, a certificate of the principal financial or accounting officer of Borrower ("Estoppel Certificate"), dated within 3 days after delivery of such statements, or the date of such request, as the case may be, reciting that the Loan Documents are unmodified and in full force and effect, or that the Loan Documents are in full force and effect as modified and specifying all modifications asserted by Borrower. Such certificate shall also recite the amount of the Indebtedness and cover other matters with respect to the Indebtedness or Secured Obligations as Lender may reasonably require, the date(s) through which payments due on the Indebtedness have been paid and the amount(s) of any payments previously made on the Indebtedness. The certificate shall include a detailed statement of any right of setoff, counterclaim, or other defense that Borrower contends exists against the Indebtedness or the Secured Obligations; a statement that such Person knows of no Event of Default or prospective Event of Default that has occurred and is continuing, or, if any Event of Default or prospective Event of Default has occurred and is continuing, a statement specifying the nature and period of its existence and what action Borrower has taken or proposes to take with respect to such matter; and, except as otherwise specified, a statement that Borrower has fulfilled all Secured Obligations that are required to be fulfilled on or before the date of such certificate.

**5.8.1.    Failure to Deliver Estoppel Certificate.** If Borrower fails to execute and deliver the Estoppel Certificate within such 10-day period, (a) the Loan Documents shall, as to Borrower, conclusively be deemed to be either in full force and effect, without modification, or in full force and effect, modified in the manner and to the extent specified by Lender, whichever Lender reasonably and in good faith may represent; (b) the Indebtedness shall, as to Borrower, conclusively be deemed to be in the amount specified by Lender and no setoffs, counterclaims, or other defenses exist against the Indebtedness; and (c) Borrower shall conclusively be deemed to have irrevocably constituted and appointed Lender as Borrower's special attorney-in-fact to execute and deliver such certificate to any third party.

**5.8.2.    Reliance on Estoppel Certificate.** Borrower and Lender expressly agree that any certificate executed and delivered by Borrower, or any representation in lieu of a certificate made by Lender

---

14

as provided for above, may be relied on by any prospective purchaser or any prospective assignee of any interest of Lender in the Note and other Indebtedness secured by the Security Instrument or in the Real Property Collateral, and by any other Person, without independent investigation or examination, to verify the accuracy, reasonableness, or good faith of the recitals in the certificate or representation.

**5.9.** **Appraisal and Inspections.** In addition to any other right to require an appraisal or inspection of the Real Property Collateral provided in the Loan Documents, Lender may from time to time, at Borrower's expense, order an appraisal or inspection of any Real Property Collateral where:

**5.9.1.** There has been a change in any market conditions or other circumstances that in Lender's sole and absolute discretion would make a prior appraisal no longer accurate;

**5.9.2.** The occurrence of any fact or circumstance which in Lender's belief would alter the value or prior evaluated condition of any Real Property Collateral.

## 6.    ENVIRONMENTAL MATTERS.

**6.1.** **Environmental Indemnity Agreement.** Concurrently with the execution of this Agreement, Borrower shall execute and deliver to Lender a separate Environmental Indemnity Agreement ("Environmental Indemnity") in form and substance satisfactory to Lender, pursuant to which Borrower will indemnify, defend, and hold Lender harmless from and against any and all losses, damages, claims, costs, and expenses incurred by Lender as a result of the existence or alleged existence of hazardous or toxic substances on, under, or about the Real Property Collateral in violation of Environmental Laws as provided in the Environmental Indemnity. The obligations of the Borrower under the Environmental Indemnity shall not be secured by the Security Instrument.

**6.2.** **Borrower's Representations and Warranties.** Borrower represents and warrants to Lender that each and every representation and warranty in the Environmental Indemnity (collectively "Environmental Representations") is true and correct.

**6.3.** **Survival of Representations and Warranties.** The Environmental Representations shall be continuing and shall be true and correct from the date of this Agreement. The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**6.4.** **Notice to Lender.** Borrower shall give prompt written notice to Lender of:

**6.4.1.** Any proceeding or inquiry by any Governmental Authority regarding the presence or threatened presence of any Hazardous Materials on the Real Property Collateral;

**6.4.2.** All claims made or threatened by any third party against Borrower or the Real Property Collateral relating to any loss or injury resulting from any Hazardous Materials;

**6.4.3.** Any notice given to Borrower under Environmental Laws; and

**6.4.4.** Discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Real Property Collateral that could cause it or any part of it to be subject to any restrictions on the ownership, occupancy, transferability, or use of the Real Property Collateral under any Environmental Laws.

**6.5.** **Lender's Right to Join Legal Actions.** Lender shall have the right, at its option, but at Borrower's sole cost and expense, to join and participate in, as a party if it so elects, any legal proceedings or actions initiated by or against Borrower or the Real Property Collateral in connection with any Environmental Laws.

## 7.    DEFAULT AND REMEDIES.

**7.1.** **Event of Default.** The occurrence of any of the following events shall constitute an Event of Default under this Agreement:

**7.1.1.** **Payment of Indebtedness.** Borrower fails to pay any installment of interest and/or principal under the Note or any other Indebtedness when due and such failure continues for more than ten

---

© Lightning Docs™; All Rights Reserved.                                                                v194
Loan and Security Agreement       Loan No. 8160

Borrower's Initials: _____

EXHIBIT 5                                                      Page 15 of 24

(10) days after the date such payment was due and payable whether on maturity, the date stipulated in any Loan Document, by acceleration, or otherwise.

**7.1.2.** **Performance of Obligations.** The failure, refusal, or neglect to perform and discharge fully and timely any of the Secured Obligations as and when required.

**7.1.3.** **Judgment.** If any final judgment, order, or decree is rendered against Borrower or a Guarantor and is not paid or executed on, or is not stayed by perfection of an appeal or other appropriate action, such as being bonded, or is not otherwise satisfied or disposed of to Lender's satisfaction within 30 days after entry of the judgment, order, or decree.

**7.1.4.** **Voluntary Bankruptcy.** If Borrower or its affiliates, or any Guarantor or its affiliates (a) seeks entry of an order for relief as a debtor in a proceeding under the Bankruptcy Code; (b) seeks, consents to, or does not contest the appointment of a receiver or trustee for itself or for all or any part of its property and/or assets; (c) files a petition seeking relief under the bankruptcy, arrangement, reorganization, or other debtor relief laws of the United States or any state or any other competent jurisdiction; (d) makes a general assignment for the benefit of its creditors; or (e) either (i) is unable to or (ii) states in writing its inability to pay its debts as they mature.

**7.1.5.** **Involuntary Bankruptcy.** If (a) a petition is filed against Borrower or any Guarantor seeking relief under any bankruptcy, arrangement, reorganization, or other debtor relief laws of the United States or any state or other competent jurisdiction; or (b) a court of competent jurisdiction enters an order, judgment, or decree appointing, without the consent of Borrower or any Guarantor, a receiver or trustee for it, or for all or any part of its property; and (c) such petition, order, judgment, or decree is not discharged or stayed within 30 days after its entry.

**7.1.6.** **Foreclosure of Other Liens.** If the holder of any lien or security interest on the Collateral (without implying Lender's consent to the existence, placing, creating, or permitting of any lien or security interest) institutes foreclosure or other proceedings to enforce its remedies thereunder and any such proceedings are not stayed or discharged within 30 days after institution of such foreclosure proceedings.

**7.1.7.** **Sale, Encumbrance, or Other Transfer.** If Borrower (a) sells, gives an option to purchase, exchanges, assigns, conveys, encumbers (including, but not limited to PACE/HERO loans, any loans where payments are collected through property tax assessments, and super-voluntary liens which are deemed to have priority over the lien of the Security Instrument) (other than with a Permitted Encumbrance as defined in the Security Instrument), transfers possession, or alienates all or any portion of the Collateral, or any of Borrower's interest in the Collateral, or suffers its title to, or any interest in, the Collateral to be divested, whether voluntarily or involuntarily; or if there is a sale or transfer of any interests in Borrower; or if Borrower changes or permits to be changed the character or use of the Collateral, or drills or extracts or enters into any lease for the drilling or extracting of oil, gas, or other hydrocarbon substances or any mineral of any kind or character on the Real Property Collateral; or (b) if title to the Collateral becomes subject to any lien or charge, voluntary or involuntary, contractual or statutory, without Lender's prior written consent; or (c) if a junior voluntary or involuntary deed of trust or mortgage lien in favor of another lender encumbers the Real Property Collateral (other than a Permitted Encumbrance) without Lender's express prior written consent thereto, which consent may be withheld in Lender's sole and absolute discretion, then Lender, at Lender's option, may, without prior notice and subject to Applicable Law, declare all sums secured by the Security Instrument, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in the Loan Documents.

**7.1.8.** **Title and Lien Priority.** If Borrower's, or any other pledgor of Collateral, as applicable, title to any or all of the Collateral or Lender's security interest on the Collateral or the status of Lender's lien as a lien and security interest in the priority position indicated in any Security Agreement on any Collateral is endangered in any manner, and Borrower fails to cure the same on Lender's demand.

**7.1.9.** **Other Defaults.** The occurrence of an Event of Default or any default, as defined or described in the other Loan Documents, or the occurrence of a default on any Indebtedness or Secured Obligations.

16

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 8160

v194

Borrower's Initials: _____

EXHIBIT 5                                             Page 16 of 24

**7.1.10. Levy on Assets.** A levy on any of the assets of Borrower or any Guarantor, and such levy is not stayed or abated within 30 days after such levy.

**7.1.11. Breach of Representations.** The breach by Borrower, any Guarantor, or any member, general partner, principal or beneficial owner of any of the foregoing of any representation, warranty, or covenant in this Agreement or other Loan Documents or if any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made.

**7.1.12. Default Under Prior Security Instrument, or Lien.** The failure to pay on a timely basis, or the occurrence of any other default under any note, deed of trust, contract of sale, lien, charge, encumbrance, or security interest encumbering or affecting the Collateral and having priority over the lien of Lender.

**7.1.13. Materially Adverse Event.** The occurrence of any event or circumstances that in Lender's sole judgment materially adversely affects (i) the ability of Borrower or any Guarantor  to perform any of its obligations under this Agreement or under any of the Loan Documents, including, without limitation, the occurrence of any event of dissolution or termination of Borrower, of any member of Borrower, or of any Guarantor; (ii) the business or financial condition of Borrower, or of any member of Borrower, or of any Guarantor; or (iii) the operation or value of the Collateral.

**7.1.14. Violation of Governmental Requirements.** The failure of Borrower, any tenant, or any other occupant of the Real Property Collateral to comply with any Governmental Requirement. Any potential violation by a tenant or other occupant of the Real Property Collateral of any Governmental Requirement is an Event of Default under the terms of this Agreement; and upon the occurrence of any such violation, Lender, at Lender's option, may, without prior notice, declare all Indebtedness, regardless of the stated due date(s), immediately due and payable and may exercise all rights and remedies in this Agreement, and any other Loan Documents.

**7.2.    Remedies.** On the occurrence of an Event of Default, Lender may, in addition to any other remedies that Lender may have under this Agreement or under the Loan Documents or by law, at its option and without prior demand or notice, take any or all of the following actions:

**7.2.1.** The Lender may, without prejudice to any of its other rights under any Loan Document or by Applicable Law, declare all Secured Obligations to be immediately due and payable without presentment, notice of intent to accelerate, representation, demand of payment or protest, which are hereby expressly waived.

**7.2.2.** The obligation of the Lender, if any, to make additional disbursements, advances (including Construction Disbursements), loans or financial accommodations of any kind to the Borrower shall immediately terminate upon the occurrence of an Event of Default.

**7.2.3.** If an Event of Default shall have occurred and be continuing, the Lender may exercise any remedy provided by any or all Security Agreements.  In addition, the Lender may exercise in respect of any Collateral, in addition to other rights and remedies provided for herein (or in any Loan Document) or otherwise available to it, all the rights and remedies of a secured party under the applicable Uniform Commercial Code (the "Code") whether or not the Code applies to the affected Collateral, and also may (i) require the Borrower to, and the Borrower hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties and (ii) without notice except as specified below or by Applicable Law, sell the Collateral or any part thereof in one or more lots at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit, or for future delivery, and upon such other terms as the Lender may deem commercially reasonable. Borrower agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of the Collateral regardless of notice of sale having

---

© Lightning Docs™; All Rights Reserved.                                                                                    v194
Loan and Security Agreement        Loan No. 8160

Borrower's Initials: _SZ_

EXHIBIT 5                                                    Page 17 of 24

been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

**7.2.4.**   Unless otherwise required by Applicable Law, all cash proceeds received by the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, or then or at any time thereafter applied in whole or in part by the Lender against all or any part of the Secured Obligations in such order as the Lender shall elect.   Any surplus of such cash or cash proceeds held by the Lender and remaining after the full, and final payment of all the Secured Obligations shall be paid over to the Borrower or to such other Person to which the Lender may be required under Applicable Law, or directed by a court of competent jurisdiction, to make payment of such surplus.

**7.3.**    **Rights and Remedies Cumulative.**  All rights and remedies provided for herein or in any other Loan Document are not exclusive, each shall be cumulative and in addition to any and all other rights and remedies existing at law or in equity, and all such remedies shall survive the acceleration of one or more of the Notes.  Lender's exercise or partial exercise of, or failure to exercise, any remedy shall not restrict Lender from further exercise of that remedy or any other available remedy.   No extension of time for payment or performance of any obligation shall operate to release discharge, modify, change or affect the original liability of Borrower for any obligations, either in whole or in part.

**7.4.**    **Waiver of Marshalling.**  Despite the existence of interests in the Collateral other than that created by the Security Agreements, and despite any other provision of this Agreement, if Borrower defaults in paying the Indebtedness or in performing any Secured Obligations, Lender shall have the right, in Lender's sole and absolute discretion, to establish the order in which the Collateral will be subjected to the remedies provided in this Agreement and Security Agreement and to establish the order in which all or any part of the Indebtedness secured by the Security Agreement is satisfied from the proceeds realized on the exercise of the remedies provided in the Security Agreement.  Borrower and any Person who now has or later acquires any interest in the Collateral with actual or constructive notice of this Agreement and/or any Security Agreement waives any and all rights to require a marshaling of assets in connection with the exercise of any of the remedies provided in this Agreement, any Security Agreement or otherwise provided by Governmental Requirements.

**7.5.**    **Limitations on Borrower During Cure Period.**  For any period during which Borrower has an opportunity to cure an Event of Default in accordance with this Agreement, the Note, the Security Agreement or any other Loan Document, Borrower shall not (a) make any distributions to its members and (b) make any expenditures outside the ordinary course of business, except to cure a Default of this Agreement, the Note, the Security Agreement or any other Loan Document.

**7.6.**    **Limitation of Liability.**  No claim may be made by Borrower, or any other Person against Lender or its affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, and waives the damages themselves, whether or not accrued and whether or not known or suspected to exist in its favor.

# 8.    GENERAL TERMS.

**8.1.**    **No Waiver by Lender.**  No waiver by Lender of any right or remedy provided by the Loan Documents or Governmental Requirements shall be effective unless such waiver is in writing and signed by authorized officer(s) of Lender.  Waiver by Lender of any right or remedy granted to Lender under the Loan Documents or Governmental Requirements as to any transaction or occurrence shall not be deemed a waiver of any future transaction or occurrence.  The acceptance of payment of any sum secured by the

---

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8160

v194

Borrower's Initials: _____

EXHIBIT 5                                                    Page 18 of 24

Collateral after its due date, or the payment by Lender of any Indebtedness or the performance by Lender of any Secured Obligations of Borrower under the Loan Documents, on Borrower's failure to do so, or the addition of any payment so made by Lender to the Indebtedness secured by the Collateral, or the exercise of Lender's right to enter the Real Property Collateral and receive and collect the Rents from it, or the assertion by Lender of any other right or remedy under the Loan Documents, shall not constitute a waiver of Lender's right to require prompt performance of all other Secured Obligations of Borrower under the Loan Documents and payment of the Indebtedness, or to exercise any other right or remedy under the Loan Documents for any failure by Borrower to timely and fully pay the Indebtedness and perform its Secured Obligations under the Loan Documents. Lender may waive any right or remedy under the Loan Documents or Governmental Requirements without notice to or consent from Borrower, any Guarantor of the Indebtedness and of the Secured Obligations under the Loan Documents, or any holder or claimant of a lien or other interest in the Collateral that is junior to the lien of Lender, and without incurring liability to Borrower or any other Person by so doing.

**8.2.** **Successors and Assigns**. This Agreement is made and entered into for the sole protection and benefit of Lender and Borrower and their successors and assigns, and no other Person or Persons shall have any right of action under this Agreement. The terms of this Agreement shall inure to the benefit of the successors and assigns of the parties, provided, however, that the Borrower's interest under this Agreement cannot be assigned or otherwise transferred without the prior consent of Lender. Lender in its sole discretion may transfer this Agreement, and may sell or assign participations or other interests in all or any part of this Agreement, all without notice to or the consent of Borrower.

**8.3.** **Notice.** Except for any notice required by Governmental Requirements to be given in another manner, (a) all notices required or permitted by the Loan Documents shall be in writing; (b) each notice shall be sent (i) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (ii) by certified United States mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight delivery service, marked for next-business-day delivery; and (c) all notices shall be addressed to the appropriate party at its address as follows or such other addresses as may be designated by notice given in compliance with this provision:

|                |                                                      |
|----------------|------------------------------------------------------|
| Lender:        | Sitlani Holdings                                     |
|                | 16186 Palomino Valley Rd                            |
|                | San Diego, California 92127                          |
|                |                                                      |
|                | With a copy to:                                      |
|                |                                                      |
|                | FCI Lender Services                                 |
|                | Attn: Loan Servicing Dept.                          |
|                | P.O. Box 27370                                       |
|                | Anaheim Hills, California 92809-0112                 |
|                |                                                      |
| Borrower:      | Serenade Newport, LLC, a California limited          |
|                | liability company                                    |
|                | 3 Longboat                                           |
|                | Newport Beach, California 92657                      |

Notices will be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery; or (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 8160

v194

Borrower's Initials: _S Z_

EXHIBIT 5                                           Page 19 of 24

after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending.

To the extent permitted by Governmental Requirements, if there is more than one Borrower, notice to any Borrower shall constitute notice to all Borrowers. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address(es).

**8.4.    Authority to File Notices**. Borrower irrevocably appoints, designates, and authorizes Lender as its agent (this agency being coupled with an interest) to file or send to any third party any notice or documents or take any other action that Lender reasonably deems necessary or desirable to protect its interest under this Agreement, or under the Loan Documents, and will on request by Lender, execute such additional documents as Lender may require to further evidence the grant of this right to Lender.

**8.5.    Attorney-in-Fact**. Borrower irrevocably appoints Lender its true and lawful attorney-in-fact, which appointment is coupled with an interest, for purposes of accomplishing any of the foregoing. Borrower further nominates and appoints Lender as attorney-in-fact to perform all acts and execute all documents deemed necessary by Lender in furtherance of the terms of this Agreement; except, however, for receiving notice on behalf of Borrower.

**8.6.    Time**. Time is of the essence in the Loan Documents.

**8.7.    Amendments, Termination, Waiver**. No amendment, supplement, termination, or waiver of any provision of this Agreement or of any of the Loan Documents, nor consent to any departure by Borrower from the terms of this Agreement or of any of the other Loan Documents, shall be effective unless it is in writing and signed by Lender and Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**8.8.    Headings**. The article, section and paragraph headings in this Agreement are for reference only and in no way define, limit, extend, or interpret the scope of this Agreement or of any particular article or section.

**8.9.    Validity**. If any provision of this Agreement is held to be invalid, that holding shall not affect in any respect the validity of the remainder of this Agreement.

**8.10.    Cross-Default**. Any default under the terms of any loan agreement, promissory note, deed of trust, mortgage, lease, conditional sale contract or other agreement, document or instrument evidencing, governing or securing any indebtedness owing by Borrower or any guarantor or any Affiliate of Borrower and/or guarantor to Lender or any Affiliate of Lender, whether previously executed or executed hereafter; shall, at Lender's option, constitute an Event of Default and a "Cross-Default Event" under this Agreement. Notwithstanding anything contained in the Loan Documents to the contrary, any Loan sold, participated, or otherwise transferred to a third party shall not be cross-defaulted or cross-collateralized with any other loan not sold or transferred to the same third party. The following definitions shall apply to this Section:

"**Affiliate**" for the purposes of this Section, shall include but not be limited to:

(a) Any person or entity that directly or indirectly Controls, is Controlled by, or is under common Control with the Borrower.

(b) Any principal, partner, shareholder, officer, director, member, manager, employee, or agent of the Borrower.

(c) Any parent, subsidiary, or other affiliated entity of the Borrower.

(d) Any immediate family member of any principal of the Borrower.

(e) Any guarantor or co-Borrower of the Loan.

"**Control**" and derivative terms means the possession, directly or indirectly, and acting either alone or together with others, of the power or authority to direct or cause the direction of the management, material policies, material business decisions or the affairs of a Person, whether through the ownership of equity securities or interests, by contract or other means.

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 8160

v194

Borrower's Initials: _____

EXHIBIT 5    Page 20 of 24

"**Person**" means any natural person, business, corporation, company, and or association, limited liability company, partnership, limited partnership, limited liability partnership, joint venture, business enterprise, trust, government authority or other legal entity.

**8.10.1. Remedies Upon Cross-Default**.  Upon the occurrence of a Cross-Default Event, without limiting any other rights of Lender under this Agreement or other Loan Documents, Lender shall have the right to:

(a)    Declare the entire unpaid principal balance of the Loan, together with all accrued interest and other sums due under the Loan Documents, to be immediately due and payable.

(b)    Pursue any and all remedies available under the Loan Documents or at law or in equity, including but not limited to foreclosure of the Security Instrument, collection of rents, and appointment of a receiver.

(c)    Exercise any other rights or remedies as provided in the Loan Documents or as available at law or in equity.

**8.10.2. Notification of Cross-Default Event**.  Borrower agrees to notify Lender in writing immediately upon the occurrence of any Cross-Default Event.  Failure to provide such notification shall constitute an additional Event of Default under the Loan Documents.

BORROWER'S INITIALS: 

**8.11.    Survival of Warranties**.  All agreements, representations, and warranties made in this Agreement shall survive the execution and delivery of this Agreement, of the Loan Documents, and the making of the Loan under this Agreement and continue in full force and effect until the Secured Obligations have been fully paid and satisfied.

**8.12.    Attorney Fees**.  Borrower agrees to pay the following costs, expenses, and Attorneys' Fees paid or incurred by Lender, or adjudged by a court: (a) reasonable costs of collection and costs, expenses, and Attorneys' Fees paid or incurred in connection with the collection or enforcement of the Loan Documents, whether or not suit is filed; (b) reasonable costs, expenses, and Attorneys' Fees paid or incurred in connection with representing Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under the Loan Documents; (c) reasonable costs, expenses, and Attorneys' Fees incurred to protect the lien of the Security Instrument; and (d) costs of suit and such sum as the court may adjudge as Attorneys' Fees in any action to enforce payment of the Loan Documents or any part of it.

In addition to the aforementioned fees, costs, and expenses, Lender in any lawsuit or other dispute shall be entitled to its Attorneys' Fees, and all other fees, costs, and expenses incurred in any post-judgment proceedings to collect or enforce any judgment.  This provision for the recovery of post-judgment fees, costs, and expenses is separate and several and shall survive the merger of the Loan Documents into any judgment on the Loan Agreement, Note, Guaranty, Security Instrument, or any other Loan Documents.

**8.13.    Governing Law; Consent to Jurisdiction and Venue**.  This Agreement is made by Lender and accepted by Borrower in the State of California, except that at all times the provisions for the creation, perfection, priority, enforcement and foreclosure of the liens and security interests created in the Real Property Collateral under the Loan Documents shall be governed by and construed according to the laws of the state in which each Real Property Collateral is situated.  To the fullest extent permitted by the law of the state in which each Real Property Collateral is situated, the law of the State of California shall govern the validity and enforceability of all Loan Documents, and the debt or obligations arising hereunder (but the foregoing shall not be construed to limit Lender's rights with respect to such security interest created in the state in which each Real Property Collateral is situated).  The parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Real Property Collateral, shall be Orange County, California, or the applicable

21

federal district court that covers said County, and Borrower submits to personal jurisdiction in that forum for any and all purposes. Borrower waives any right Borrower may have to assert the doctrine of forum non conveniens or to object to such venue.

BORROWER'S INITIALS: _____

**8.14.   Legal Relationships.** The relationship between Borrower and Lender is that of lender and borrower, and no partnership, joint venture, or other similar relationship shall be inferred from this Agreement. Borrower shall not have the right or authority to make representations, to act, or to incur debts or liabilities on behalf of Lender. Borrower is not executing this Agreement as an agent or nominee for an undisclosed principal, and no third-party beneficiaries are or shall be created by the execution of this Agreement.

**8.15.   Dispute Resolution: Waiver of Right to Jury Trial.**

**8.15.1. ARBITRATION.**   CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO ARBITRATE ANY DISPUTES TO RESOLVE ANY CLAIMS (AS DEFINED IN THE ARBITRATION AGREEMENT).

**8.15.2. WAIVER OF RIGHT TO JURY TRIAL.**   CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT AND WAIVER OF RIGHT TO JURY TRIAL WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM (AS DEFINED IN THE ARBITRATION AGREEMENT) OR CAUSE OF ACTION BASED ON OR ARISING FROM THE LOAN.

BORROWER'S INITIALS: _____

**8.16.   Counterparts.** This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. This Agreement shall be deemed fully executed and effective when all Parties have executed at least one of the counterparts, even though no single counterpart bears all such signatures.

**8.17.   Severability.** If any provision of the Loan Documents, or the application of them to the circumstances, is held void, invalid, or unenforceable by a court of competent jurisdiction, the Loan Documents, and the applications of such provision to other parties or circumstances, shall not be affected thereby, the provisions of the Loan Documents being severable in any such instance.

**8.18.   Cooperation.** Borrower acknowledges that Lender and its successors and assigns may (a) sell, transfer, or assign the Loan Documents to one or more investors as a whole loan, in a rated or unrated public offering or private placement; (b) participate the Loan to one or more investors in a rated or unrated public offering or private placement; (c) deposit the Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets in a rated or unrated public offering or private placement; or (d) otherwise sell the Loan or interest therein to investors in a rated or unrated public offering or private placement. (The transactions referred to in clauses (a)-(d) are hereinafter referred to as "Secondary Market Transactions.") Borrower shall, at Lender's expense, cooperate in good faith with Lender in effecting any such Secondary Market Transaction and shall cooperate in good faith to implement all requirements reasonably imposed by the participants involved in any Secondary Market Transaction (including, without limitation, a rating agency and/or an institutional purchaser, participant, or investor) including, without limitation, all structural or other changes to the Loan Documents, modifications to any documents to the Loan Documents, delivery of opinions of counsel acceptable to the rating agency or such other purchasers, participants or investors, and addressing such matters as the rating agency or such other purchasers, participants, or investors may require; provided, however, that the Borrower shall not be required to modify any documents evidencing or securing the Loan Documents that would modify (i) the interest rate payable under the Note, (ii) the stated Maturity Date, (iii) the amortization of principal of the

22

Note, or (iv) any other material terms or covenants of the Note. Borrower shall provide such information and documents relating to Borrower, the Collateral, any Leases (as defined in the Security Instrument), and any lessees as Lender or the rating agency or such other purchasers, participants, or investors may reasonably request in connection with a Secondary Market Transaction. Lender shall have the right to provide to the rating agency or prospective purchasers, participants, or investors any information in its possession including, without limitation, financial statements relating to Borrower, the Collateral, and any lessee. Borrower acknowledges and agrees that certain information regarding the Loan and the parties thereto and the Real Property Collateral may be included in a private placement memorandum, prospectus, or other disclosure documents and consents to the release of such information to third parties.

**8.19.** **Obligations of Borrower Joint and Several.** If more than one Person is named as Borrower, each obligation of Borrower under this Agreement shall be the joint and several obligations of each such Person.

**8.20.** **No Modifications or Amendments; No Waiver.** Except as specified herein, the Loan Documents may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

**8.21.** **Integration.** This Agreement and all schedules and exhibits hereto referred to herein, together with the Note and the other Loan Documents, embody the final, entire agreement among the parties and supersede any and all prior commitments, agreements, representations and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties. There are no oral agreements among the parties. Except as otherwise provided in this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any Loan Document, the provision contained in this Agreement shall govern and control.

**8.22.** **REMIC Savings Clause.** Notwithstanding anything to the contrary in this Agreement, if the Loan is held by a "real estate investment conduit" (a "REMIC") within the meaning of Section 860D of the Internal Revenue Code of 1986, as amended (the "IRS Code"), and following the release of any Real Property Collateral the ratio of the outstanding principal balance of the Loan to the value of the Real Property Collateral securing the Loan is greater than 125% (based solely on the value of the real property and excluding personal property or going concern value, if any, as determined by Lender in its sole discretion, using any commercially reasonable method permitted to a REMIC under the IRS Code) (such amount, the "REMIC LTV"), then Borrower shall pay down the principal balance of the Loan by an amount equal to the greater of (A) the amount of principal required to be paid pursuant to this Section and (B) the least of the following amounts: (1) if the released Real Property Collateral is sold in an arm's length transaction with an unrelated third party, the net proceeds of such sale; (2) the fair market value of the released Real Property Collateral at the time of the release, as determined by Lender in its sole discretion using any commercially reasonable method permitted to a REMIC under the IRS Code; and (3) an amount such that the REMIC LTV does not increase due to the release.

THIS AGREEMENT MAY BE EXECUTED IN COUNTER-PARTS.


[SIGNATURES FOLLOW]

---

23

Borrower's Initials:

IN WITNESS WHEREOF, Borrower has executed this Agreement as of the date first written above by and through their duly authorized representatives.

**BORROWER:**

SERENADE NEWPORT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By: _____
    Sahand Zargari, Manager

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 8160

v194

Borrower's Initials: ____

EXHIBIT 5                                    Page 24 of 24

# EXHIBIT 6

# EXHIBIT 6



500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

## AMENDED PRELIMINARY REPORT (Revision Updated)

Prominent Escrow
170 Newport Center Dr, Ste 150
Newport Beach, CA 92660
Attn:  Stephanie Chew Rezaei

Our Order Number: CBT-25006071
Your Reference: 06-20161-SR
**When Replying Please Contact:**
California Best Title Company, Inc.
500 S Kraemer Blvd, Suite 300
Brea, CA 92821
License #:  6267-9
Attn:  Scott Enda
(949)385-1953

Todays Date:           July 14, 2025

**Property Address:    1501 Serenade Terrace, (Corona Del Mar Area), Newport Beach, CA 92625**

In response to the application for a Policy of Title Insurance, California Best Title Company, Inc. hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein and/or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies of Title Insurance are set forth in Exhibit B attached.  The policy to be issued may contain an arbitration clause.  When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit B.  Copies of the Policy forms should be read.  They are available from the office which issued this report.

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Exhibit B of this report carefully.  The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the Policy or Policies of Title Insurance and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a Policy or Policies of Title Insurance and no liability is assumed hereby.  If it is desired that liability be assumed prior to the issuance of a Policy or Policies of Title Insurance, a Binder or Commitment should be requested.

**Effective Date: July 8, 2025, at 07:30 AM.**

Scott Enda
Sr. Title Officer
Phone: (949)385-1953
Email: tu20@calbesttitle.com

**The form of policy of title insurance contemplated by this report is:**
ALTA Owner's Policy of Title Insurance (6-17-06) with coverage amount $9,380,000.00, Underwritten by: **First American Title Insurance Company**

# SCHEDULE A

The estate or interest in the land hereinafter described or referred to covered by this Report is:

Fee Simple.

Title to said estate or interest at the date hereof is vested in:

Serenade Newport, LLC, a California Limited Liability Company

The land hereinafter referred to is situated in the City of Newport Beach, County of Orange, State of CA, and is described as follows:

Lot 39 in Tract No. 1701, in the City of Newport Beach, County of Orange, State of California, as shown on a Map recorded in Book 52, Pages 9 and 10, inclusive of Miscellaneous Maps, in the Office of the County Recorder of said County.

Excepting therefrom all oil, gas casinghead gas, asphaltum and other hydrocarbons and all chemical gas now or hereafter found, situated or located in all or any part or portion of the land herein described lying more than 500 feet below the surface thereof, together with the right to slant drill for and remove all or any of said oil, gas, casinghead gas, asphaltum and other hydrocarbon, and chemical gas lying below a depth of more than 500 feet below the surface of but without any right whatsoever to enter upon the surface of said land or upon any land or upon any part or said lands within 500 feet vertical distance below the surface thereof, as reserved in the deed by The Irvine Company, recorded March 28, 1984 as Instrument No. 84-126815 of Official Records.

APN: 050-282-16

**EXHIBIT A**

Legal Description

The land hereinafter referred to is situated in the City of Newport Beach, County of Orange, State of CA, and is described as follows:

Lot 39 in Tract No. 1701, in the City of Newport Beach, County of Orange, State of California, as shown on a Map recorded in Book 52, Pages 9 and 10, inclusive of Miscellaneous Maps, in the Office of the County Recorder of said County.

Excepting therefrom all oil, gas casinghead gas, asphaltum and other hydrocarbons and all chemical gas now or hereafter found, situated or located in all or any part or portion of the land herein described lying more than 500 feet below the surface thereof, together with the right to slant drill for and remove all or any of said oil, gas, casinghead gas, asphaltum and other hydrocarbon, and chemical gas lying below a depth of more than 500 feet below the surface of but without any right whatsoever to enter upon the surface of said land or upon any land or upon any part or said lands within 500 feet vertical distance below the surface thereof, as reserved in the deed by The Irvine Company, recorded March 28, 1984 as Instrument No. 84-126815 of Official Records.

APN: 050-282-16

# SCHEDULE B

At the date hereof, Exceptions to coverage, in addition to the printed Exception and Exclusions contained in said policy form would be as follows:

1.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2025-2026 which are a lien not yet payable.

2.  Property taxes for the fiscal year shown below are paid.  For proration purposes the amounts are:

    Fiscal year:      2024-2025
    1st Installment: $31,394.84
    2nd Installment: $31,394.84
    Exemption:       $0.00
    Land:            $4,592,147.00
    Improvements:    $1,337,883.00
    Total Value:     $5,930,030.00
    Code Area:       07-001
    Assessment No:  050-282-16

3.  Assessments, if any, for community facility districts affecting said land which may exist by virtue of assessment maps or notices filed by said districts.  Said assessments are collected with the County Taxes.

4.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the revenue and taxation code of the State of California.

5.  Water rights, claims or title to water in or under said land, whether or not shown by the public records.

6.  That certain easement for public utilities and incidental use as shown on the map or plat of Tract No. 1701 recorded in Book 52, Pages 9 and 10, inclusive of Miscellaneous Maps.

    Affects: Said land.

7.  An easement for the purpose shown below and rights incidental thereto as set forth in a document:
    Purpose:              underground electric lines
    Recorded:        December 8, 1954 in Book 2891 Page 119, of Official Records.
    Affects:         said land

    The effect of a document entitled "Partial Quitclaim of Easement", recorded July 13, 1995 as Instrument No. 95-0298244 of Official Records.

8.  An easement for the purpose shown below and rights incidental thereto as set forth in a document:
    Purpose:              pole lines conduits
    Recorded:        in Book 2893 Page 473, of Official Records.
    Affects:         said land

9.  Terms, provisions, options, rights of first refusal, covenants, conditions, restrictions, easements, charges, assessments and liens provided in the Covenants, Conditions and Restrictions recorded in Book 9752 Page 373 of Official Records, but omitting any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that the covenant, condition or restriction (a) is exempt under Title 42 of the United States Code, or (b) relates to handicap, but does not discriminate against handicapped persons.

    Liens and charges for upkeep and maintenance as set forth in the above mentioned declaration, payable to Irvine Terrace.

    Said covenants, conditions, and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

10. Terms, provisions, options, rights of first refusal, covenants, conditions, restrictions, easements, charges, assessments and liens provided in the Covenants, Conditions and Restrictions recorded in Book 9808 Page 888 of Official Records, but omitting any covenant, condition or restriction, if any, based on race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that the covenant, condition or restriction (a) is exempt under Title 42 of the United States Code, or (b) relates to handicap, but does not discriminate against handicapped persons.

Liens and charges for upkeep and maintenance as set forth in the above mentioned declaration, payable to Irvine Terrace.

Said covenants, conditions, and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

Amendment to said Covenants recorded in Book 11748 Page 1027 of Official Records.

The terms and provisions contained in the document entitled Declaration of Agreement and Appointment Recorded:  April 19, 2011 as Instrument Number 2011000199768, of Official Records.

Reference is made to said document for further particulars.

11. Easements, Covenants and Conditions contained in the deed from Trust Services of America, Inc., a California Corporation, as Trustee Under Trust No. 71-1923-00-3, Successor to Title Insurance and Trust Company, a California Corporation, as Trustee Under Trust No. 1R-1923-00-2, and The Irvine Company, a Michigan Corporation, as Grantor, to George C. Messenger and Priscilla B. Messenger, husband and wife, as joint tenants, as Grantee, recorded March 28, 1984 as Instrument No. 84-126815 of Official Records. Reference being made to the document for full particulars, but deleting any covenant, condition, or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, sexual orientation, familial status, disability, handicap, national origin, genetic information, gender, gender identity, gender expression, source of income (as defined in California Government Code § 12955(p)) or ancestry, to the extent such covenants, conditions or restrictions violation 42 U.S.C. § 3604(c) or California Government Code § 12955. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

12. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

Amount:  $5,278,125.00
Dated:  June 17, 2025
Trustor:  Serenade Newport, LLC, a California Limited Liability Company
Trustee:   California TD Specialists
Beneficiary:  PPRF REIT, LLC, a California Limited Liability Company (CFL License No. 60DBO-176790)
Recorded:  June 18, 2025 as Instrument Number 2025000174619 of Official Records.

a.    Before issuing its policy of title insurance, this Company will require for review, the following documents from the Limited Liability Company named below.

Limited Liability Company:      PPRF REIT, LLC, a California Limited Liability Company

A.    A copy of its operating agreement and any and all amendments supplements and/or modifications thereto, certified by the appropriate manager or member.

B.    Confirmation that its Article of Organization (LLC-1), and Certificate of Amendment (LLC-2) any restated Articles of Organization (LLC-10) and/or Certificate of Correction (LLC-11) have been filed with the Secretary of State.

C.    If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

D.    If the Limited Liability Company was formed in foreign jurisdiction, evidence, satisfactory to the Company, that it was validly formed, is in good standing and authorized to do business in the state of origin.

E.    If the Limited Liability Company was formed in a foreign jurisdiction, evidence satisfactory to the Company, that it has complied with CA "doing business" laws, if applicable.

b.    To avoid delays at the time of closing, please submit the original note, deed of trust and request for reconveyance to this office, at least 1 week prior to the close of escrow.

13.    Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

Amount:  $500,000.00
Dated:  June 17, 2025
Trustor:  Serenade Newport, LLC, a California Limited Liability Company
Trustee:   California TD Specialists
Beneficiary:  Sitlani Holdings LLC, a California Limited Liability Company as to an undivided 200,000.00/500,000.00 interest; and Mahesh Tilokani, married man as his sole and separate property as to an undivided 300,000.00/500,000.00 interest
Recorded:  June 18, 2025 as Instrument Number 2025000174620 of Official Records.

a.    Before issuing its policy of title insurance, this Company will require for review, the following documents from the Limited Liability Company named below.

Limited Liability Company:      Sitlani Holdings LLC, a California Limited Liability Company

A.    A copy of its operating agreement and any and all amendments supplements and/or modifications thereto, certified by the appropriate manager or member.

B.    Confirmation that its Article of Organization (LLC-1), and Certificate of Amendment (LLC-2) any restated Articles of Organization (LLC-10) and/or Certificate of Correction (LLC-11) have been filed with the Secretary of State.

C.    If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

D.    If the Limited Liability Company was formed in foreign jurisdiction, evidence, satisfactory to the Company, that it was validly formed, is in good standing and authorized to do business in the state of origin.

E.    If the Limited Liability Company was formed in a foreign jurisdiction, evidence satisfactory to the Company, that it has complied with CA "doing business" laws, if applicable.

b.    If said deed of trust is to be reconveyed or a subordination agreement executed, the Company does not require the spouse(s) of the beneficiary(s) to sign any demand nor join in the execution of the request for reconveyance or subordination agreement.

c.    To avoid delays at the time of closing, please submit the original note, deed of trust and request for reconveyance to this office, at least 1 week prior to the close of escrow.

14.    The effect of a document entitled Temporary Protective Order recorded June 19, 2025 as Instrument No. 2025000175159 of Official Records.

15.    Matters Which May Be Disclosed By Inspection or Survey or Both Matters which may be disclosed by an inspection or by a survey of said land satisfactory to this Company, or by inquiry of the parties in possession thereof.

16.    An inspection of said land has been ordered; upon its completion we will advise you of our findings.

17.    Proof of payment of all currently due and payable Homeowners Association and/or maintenance and/or common element fees and dues must be submitted at closing.

18.    Before issuing its policy of title insurance, this Company will require for review, the following documents from the Limited Liability Company named below.

Limited Liability Company:    Serenade Newport, LLC, a California Limited Liability Company

A.    A copy of its operating agreement and any and all amendments supplements and/or modifications thereto, certified by the appropriate manager or member.

B.    Confirmation that its Article of Organization (LLC-1), and Certificate of Amendment (LLC-2) any restated Articles of Organization (LLC-10) and/or and Certificate of Correction (LLC-11) have been filed with the Secretary of State.

C.    If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

D.    If the Limited Liability Company was formed in foreign jurisdiction, evidence, satisfactory to the Company, that it was validly formed, is in good standing and authorized to do business in the state of origin.

E.    If the Limited Liability Company was formed in a foreign jurisdiction, evidence satisfactory to the Company, that it has complied with CA "doing business" laws, if applicable.

19.    We will require a Statement of Information from the parties named below in order to complete this report, based on the effect of documents, proceedings, liens, decrees, or other matter which do not specifically describe said land, but which, if any do exist, may affect the title or impose liens or encumbrances thereon.

Parties:  All Parties

(Note:  The Statement of Information is necessary to complete the search and examination of title under this order.  Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact another party with the same or similar name.  Be assured that the Statement of Information is essential and will be kept strictly confidential to this file).

20.    ID may be required if we have no way to verify the Seller or Borrowers Signature

Documents must be notarized by a Notary personally known to escrow or approved by California Best Title

Hard Money Loans. Require 2 forms of ID

**END OF SCHEDULE B**

**CBT | CALIFORNIA BEST TITLE**

500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

Attn:

**Borrower:  Caren Weinreich and Gadi Weinreich**

**Lenders Supplemental Report**

The above numbered report (including any supplements or amendments thereto) is hereby modified and/or supplemented in order to reflect the following additional items relating to the issuance of an American Land Title Association loan policy form as follows:

A.    This report is preparatory to this issuance of an American Land Title Association loan policy of title insurance. This report discloses nothing, which would preclude the issuance of said American Land Title Association loan policy of title insurance with endorsement No. 100 attached thereto.

B.    The improvements on said land are designated as:

PUD   (Residential)
1501 Serenade Terrace, (Corona Del Mar Area), in the City of Newport Beach, County of Orange, State of California.

C.    Pursuant to information provided to California Best Title Company, Inc. as of the date hereinabove, the proposed insured loan amount is $0.00 with the proposed insured lender being .

D.    The only conveyance(s) affecting said land recorded with 24 months of the date of this report are as follows:

Deed Type:      Grant Deed
Grantor:        Mordechai H. Ferder and Edit F. Ferder, as Trustees of The Haim Family Trust, u/d/t February 24, 2009
Grantee:        Serenade Newport, LLC, a California Limited Liability Company
Recorded:       June 18, 2025 as Instrument No. 2025000174618, of Official Records.

**CBT** | **CALIFORNIA BEST TITLE**

500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

## Notes and Requirements Section

Note 1:  On July 1, 1985, Assembly Bill 3132 became effective.  Assembly Bill 3132 adds and repeals portions of Sections 480.3 and 480.4 of the Revenue and Taxation Code of the State of California.

The act requires the County Assessor and/or Recorder to make available a statutorily prescribed form entitled "Preliminary Change of Ownership Report".  Said report must be completed by the buyer and filed concurrently with the recordation of the documents evidencing the change of ownership.  Failure to present the Change of Ownership Report at the time of recordation will cause the County Recorder to charge an additional $20.00 penalty recording fee.  The fee cannot be charged if the transfer document is accompanied by the affidavit stating that the buyer/transferee is not a resident of the State of California.  This report is for official use only and is not open to public inspection.

For further information, contact the Change of Ownership Section in the Assessor's Office located in the County of said property or the County Recorder's Office located in the County of said property.

Note 2:  Attached are Privacy Policy Notices in compliance with the Gramm-Leach-Bliley Act (GLBA) effective July 1, 2001.  Please review said Notices regarding personal information.

Note 3:  The map attached hereto may or may not be a survey of the land depicted thereon.  You should not rely upon it for any purpose other than orientation to the general location of the parcel or parcels depicted.  This company expressly disclaims any liability for alleged loss or damage which may result from reliance upon this map.

Note 4:  Part of the RESPA Rule to simply and improve the process of obtaining mortgages and reduce consumer settlement costs requires the settlement agent to disclose the agent and underwriter split of title premiums, including endorsements as follows:

California Best Title Company, Inc. retains 88% of the total premium and endorsements.

First American Title Insurance Company retains 12% of the total premium and endorsements.

# CBT | CALIFORNIA BEST TITLE

500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

**Notice Regarding Your Deposit of Funds**

California Insurance Code Sections 12413 *et. Seq*. Regulates the disbursement of escrow and sub-escrow funds by title companies. The law requires that funds be deposited in the title company escrow and sub-escrow accounts and be available for withdrawal prior to disbursement.  Funds deposited with the Company by wire transfer may be disbursed upon receipt.  Funds deposited with the Company via cashier's checks drawn on a California based bank may be disbursed the next business day after the day of deposit.  If funds are deposited with by other methods, recording or disbursement may be delayed.   All escrow and sub-escrow funds received by the Company will be deposited with other funds in one or more non-interest bearing escrow accounts of the Company in a financial institution selected by the Company.  The Company and/or its parent company may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with the financial institution, and the Company shall have no obligation to account to the depositing party in any manner for the value of, or to pay such party, any benefit received by the Company and/or its parent Company.  Those benefits may include, without limitation, credits allowed by such financial institution on loans to the Company and/or its parent company and earnings on investments made on the proceeds of such loans, accounting, reporting and other services and products of such financial institution.   Such benefits shall be deemed additional compensation of the Company for its services in connection with the escrow or sub-escrow.  If funds are to be deposited with **California Best Title Company, Inc.** by wire transfer, they should be wired to the following bank/account:

**Wiring Instructions for this Office**

| | |
|---|---|
| Wire To: | **PCB Bank** |
| | **3701 Wilshire Blvd. Ste. 100** |
| | **Los Angeles, CA 90010** |
| | **Attn:  Wire Department** |
| ABA/Routing No.: | **122043602** |
| Bank Account: | **01435700** |
| Account Name: | **California Best Title Company, Inc.** |
| Reference Order No.: | **CBT-25006071** |
| Property Address: | **1501 Serenade Terrace, (Corona Del Mar Area)** |
| | **Newport Beach, CA 92625** |
| Attention: | **Scott Enda** |

## EXHIBIT B (07-01-21)

### CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY – 1990 (11-09-18)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.  (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters: (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy; or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  (a) Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a) Unpatented mining claims;  (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;  (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c)  are shown by the public records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

### CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE OWNER'S POLICY (02-04-22)
### EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:

1.   (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to: (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement on the Land; (iii) the subdivision of land; or (iv) environmental remediation or protection. (b) any governmental forfeiture, police, regulatory, or national security power. (c) the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b. Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.

2.  Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.

3.  Any defect, lien, encumbrance, adverse claim, or other matter: (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or (e) resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a: (a) fraudulent conveyance or fraudulent transfer; (b) voidable transfer under the Uniform Voidable Transactions Act; or (c) preferential transfer: (i) to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or (ii) for any other reason not stated in Covered Risk 9.b.

5.  Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.

6.  Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy. Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.

7.  Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document are excepted from coverage.

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.

4.  Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.  Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.

7.  Any lien or right to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

## CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (07-01-2021) ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE
### EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy and We will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to: (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement on the Land; (iii) the subdivision of land; or (iv) environmental remediation or protection. (b) any governmental forfeiture, police, or regulatory, or national security power. (c) the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b. Exclusion 1 does not modify or limit the coverage provided under Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23, or 27.

2.  Any power to take the Land by condemnation. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 17.

3.  Any defect, lien, encumbrance, adverse claim, or other matter: (a) created, suffered, assumed, or agreed to by You; (b) not Known to Us, not recorded in the Public Records at the Date of Policy, but Known to You and not disclosed in writing to Us by You prior to the date You became an Insured under this policy; (c) resulting in no loss or damage to You; (d) attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 5, 8.f., 25, 26, 27, 28, or 32); or (e) resulting in loss or damage that would not have been sustained if You paid consideration sufficient to qualify You as a bona fide purchaser of the Title at the Date of Policy.

4.  Lack of a right: (a) to any land outside the area specifically described and referred to in Item 3 of Schedule A; and (b) in any street, road, avenue, alley, lane, right-of-way, body of water, or waterway that abut the Land. Exclusion 4 does not modify or limit the coverage provided under Covered Risk 11 or 21.

5.  The failure of Your existing structures, or any portion of Your existing structures, to have been constructed before, on, or after the Date of Policy in accordance with applicable building codes. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 14 or 15.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transfer of the Title to You is a: (a) fraudulent conveyance or fraudulent transfer; (b) voidable transfer under the Uniform Voidable Transactions Act; or (c) preferential transfer: (i) to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or (ii) for any other reason not stated in Covered Risk 30.

7.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

8.  Negligence by a person or an entity exercising a right to extract or develop oil, gas, minerals, groundwater, or any other subsurface substance.

9.  Any lien on Your Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy. Exclusion 9 does not modify or limit the coverage provided under Covered Risk 8.a. or 27.

10.  Any discrepancy in the quantity of the area, square footage, or acreage of the Land or any improvement to the Land.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
• For Covered Risk 16, 18, 19 and 21, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|
| **Covered Risk 16: 1% of Policy Amount shown in Schedule A or $2,500 (whichever is less)** | **$10,000** |
| **Covered Risk 18: 1% of Policy Amount shown in Schedule A  or $5,000 (whichever is less)** | **$25,000** |
| **Covered Risk 19: 1% of Policy Amount shown in Schedule A  or $5,000 (whichever is less)** | **$25,000** |
| **Covered Risk 21: 1% of Policy Amount shown in Schedule A  or $2,500 (whichever is less)** | **$5,000** |

## CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13) ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.  Governmental police power, and the existence or violation of those portions of any law or government regulation concerning: a. building; b. zoning; c. land use; d. improvements on the Land; e. land division; and f. environmental protection. This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2.  The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3.  The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4.  Risks: a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records; b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date; c. that result in no loss to You; or d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.  Failure to pay value for Your Title.

6.  Lack of a right: a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and b. in streets, alleys, or waterways that touch the Land. This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.  The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

9.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
• For Covered Risk 16, 18, 19 and 21, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|
| **Covered Risk 16: 1% of Policy Amount shown in Schedule A or $2,500 (whichever is less)** | **$10,000** |
| **Covered Risk 18: 1% of Policy Amount shown in Schedule A  or $5,000 (whichever is less)** | **$25,000** |
| **Covered Risk 19: 1% of Policy Amount shown in Schedule A  or $5,000 (whichever is less)** | **$25,000** |
| **Covered Risk 21: 1% of Policy Amount shown in Schedule A  or $2,500 (whichever is less)** | **$5,000** |

### ALTA OWNER'S POLICY (07-01-2021) EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to: (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement on the Land; (iii) the subdivision of land; or (iv) environmental remediation or protection. (b) any governmental forfeiture, police, regulatory, or national security power. (c) the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b. Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.

2.  Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.

3.  Any defect, lien, encumbrance, adverse claim, or other matter: (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or (e) resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A is a: (a) fraudulent conveyance or fraudulent transfer; (b) voidable transfer under the Uniform Voidable Transactions Act; or (c) preferential transfer: (i) to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or (ii) for any other reason not stated in Covered Risk 9.b.

5.  Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.

6.  Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due after the Date of Policy. Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.

7.  Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

*NOTE: The 2021 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage. In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed as 1 through 7 below:*

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land or (b) asserted by persons or parties in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.

4.  Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.  Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.

7.  Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

## 2006 ALTA OWNER'S POLICY (06-17-06) EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to (i) the occupancy, use, or enjoyment of the Land; (ii)  the character, dimensions, or location of any improvement erected on the Land; (iii) the subdivision of land;  or  (iv) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a)does not modify or limit the coverage provided under Covered Risk 5.  (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is (a) a fraudulent conveyance or fraudulent transfer; or (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.  The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c)  are shown by the Public Records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

## ALTA LOAN POLICY (07-01-2021) EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to: (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement on the Land; (iii) the subdivision of land; or (iv) environmental remediation or protection. (b) any governmental forfeiture, police, regulatory, or national security power: (c) the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b. Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.

2.  Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.

3.  Any defect, lien, encumbrance, adverse claim, or other matter: (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or (e) resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser or encumbrancer had been given for the Insured Mortgage at the Date of Policy.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business law.

5.  Invalidity or unenforceability of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury law or Consumer Protection Law.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction creating the lien of the Insured Mortgage is a: (a) fraudulent conveyance or fraudulent transfer; (b) voidable transfer under the Uniform Voidable Transactions Act; or (c) preferential transfer: (i) to the extent the Insured Mortgage is not a transfer made as a contemporaneous exchange for new value; or (ii) for any other reason not stated in Covered Risk 13.b.

7.  Any claim of a PACA-PSA Trust. Exclusion 7 does not modify or limit the coverage provided under Covered Risk 8.

8.  Any lien on the Title for real estate taxes or assessments imposed by a governmental authority and created or attaching between the Date of Policy and the date of recording of the Insured Mortgage in the Public Records. Exclusion 8 does not modify or limit the coverage provided under Covered Risk 2.b. or 11.b.

9.  Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## 2006 ALTA LOAN POLICY (06-17-06) EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to; (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement erected on the Land; (iii) the subdivision of land; or (iv) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.  (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters: (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;(c) resulting in no loss or damage to the Insured Claimant; (d) attaching or create subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is: (a) a fraudulent conveyance or fraudulent transfer; or (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).
The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c)  are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material not shown by the public records.

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-01-21) EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to: i. the occupancy, use, or enjoyment of the Land; ii. the character, dimensions, or location of any improvement on the Land; iii. the subdivision of land; or iv. environmental remediation or protection. (b) any governmental forfeiture, police, regulatory, or national security power. (c) the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b. Exclusion 1.b. does not modify or limit the coverage provided under Covered Risk 5, 6, 12.c., 12.d., 13, or 15.
2.  Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3.  Any defect, lien, encumbrance, adverse claim, or other matter: (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 10, 15, 16, 17, 18, 19, 20, 21, 22, 23, 26, and 27); or (e) resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser or encumbrancer had been given for the Insured Mortgage at the Date of Policy.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business law.
5.  Invalidity or unenforceability of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury law or Consumer Protection Law. Exclusion 5 does not modify or limit the coverage provided in Covered Risk 25.
6.  Any claim of invalidity, unenforceability, or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the Title. Exclusion 6 does not modify or limit the coverage provided under Covered Risk 10.
7.  The failure of the residential structure, or any portion of it, to have been constructed before, on, or after the Date of Policy in accordance with applicable building codes. Exclusion 7 does not modify or limit the coverage provided in Covered Risk 5 or 6.
8.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction creating the lien of the Insured Mortgage is a: (a) fraudulent conveyance or fraudulent transfer; (b) voidable transfer under the Uniform Voidable Transactions Act; or (c) preferential transfer: (i) to the extent the Insured Mortgage is not a transfer made as a contemporaneous exchange for new value; or (ii) for any other reason not stated in Covered Risk 26.b.
9.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
10.  Negligence by a person or an Entity exercising a right to extract or develop oil, gas, minerals, groundwater, or any other subsurface substance.
11.  Any lien on the Title for real estate taxes or assessments imposed by a governmental authority and created or attaching between the Date of Policy and the date of recording of the Insured Mortgage in the Public Records. Exclusion 11 does not modify or limit the coverage provided under Covered Risk 10.b. or 24.
12.  Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (12-02-13) EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions, or location of any improvement erected on the Land; (iii) the subdivision of land; or (iv) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk  5, 6, 13(c), 13(d), 14 or 16.  (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed, or agreed to by the Insured Claimant; (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant became an Insured under this policy; (c) resulting in no loss or damage to the Insured Claimant; (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

EXHIBIT B (Continued)

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is (a) a fraudulent conveyance or fraudulent transfer, or (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

# CBT | CALIFORNIA BEST TITLE

500 S Kraemer Blvd, Suite 300, Brea, CA 92821
Main: 949-385-1953 | Direct: (949)385-1953

## Privacy Policy Notice

We are committed to safeguarding customer information.

When we request information from you or about you, it is for our own legitimate business purposes and not for the benefit of any unaffiliated party.

We use personal consumer information only for legitimate business purposes in a manner consistent with title insurance and escrow practices in compliance with applicable laws and regulations.

We will obey the laws governing the collection, use, and dissemination of personal data; and

We will endeavor to educate our employees on the responsible collection and use of personal information.

# PURPOSE OF THIS NOTICE

Title V of the Gramm-Leach-Bliley Act ("GLBA") generally requires a financial institution (which term includes title insurers, underwritten title companies and those providing real estate settlement services) to disclose to all its customers the privacy policies and practices with respect to information sharing of consumer nonpublic personal information with both affiliates and non-affiliated third parties. In compliance with GLBA, we are providing you with this document, which notifies you of the privacy policies and practices of California Best Title. This disclosure does not apply to business, commercial or agricultural transactions.

We may collect nonpublic personal information about you from the following sources:

1. Information we receive from you, such as on applications or other forms.
2. Information about your transactions we secure from our files, or from our affiliates or others.
3. Information we receive from a consumer-reporting agency.
4. Information we receive from others involved in your transaction, such as the real estate agent, lender, surveyor or appraiser.

Unless it is specifically stated otherwise in an amended Privacy Policy Notice, no additional nonpublic personal information will be collected about you.

We may disclose any of the above information that we collect about our customers or former customers to our affiliates or to non-affiliated third parties as permitted by law. This includes, but is not limited to, financial service providers (e.g., banks, consumer finance lenders, securities and insurance companies, etc.), non-financial companies (e.g., settlement or fulfillment service providers, or title plant operated by a third-party vendor).

WE DO NOT DISCLOSE ANY NONPUBLIC PERSONAL INFORMATION ABOUT YOU WITH ANYONE FOR ANY PURPOSE THAT IS NOT SPECIFICALLY PERMITTED BY LAW.

**First American Title™**

## Privacy Notice

**Last Updated and Effective Date**: December 1, 2024

First American Financial Corporation and its subsidiaries and affiliates (collectively, "First American," "we," "us," or "our") describe in our full privacy notice ("Notice"), which can be found at https://www.firstam.com/privacy-policy/, how we collect, use, store, sell or share your personal information when: (1) you access or use our websites, mobile applications, web-based applications, or other digital platforms where the Notice is posted ("Sites"); (2) you use our products and services ("Services"); (3) you communicate with us in any manner, including by e-mail, in-person, telephone, or other communication method ("Communications"); (4) we obtain your information from third parties, including service providers, business partners, and governmental departments and agencies ("Third Parties"); and (5) you interact with us to conduct business dealings, such as the personal information we obtain from business partners and service providers and contractors who provide us certain business services ("B2B"). This shortened form of the Notice describes some of the terms contained in the full Privacy Notice. Personal information is sometimes also referred to as personal data, personally identifiable information or other like terms to mean any information that directly or indirectly identifies you or is reasonably capable of being associated with you or your household. However, certain types of information are not personal information and thus, not within the scope of our Notice, such as: (1) publicly available information; and (2) de-identified and aggregated data that is not capable of identifying you. If we use de-identified or aggregated data, we commit to maintain and use the information in a non-identifiable form and not attempt to reidentify the information, unless required or permitted by law.

This Notice applies wherever it is posted. To the extent a First American subsidiary or affiliate has different privacy practices, such entity shall have their own privacy statement posted as applicable.

Please note that this Notice does not apply to any information we collect from job candidates and employees. Our employee and job candidate privacy notice can be found here.

**What Type Of Personal Information Do We Collect About You?** We collect a variety of categories of personal information about you. To learn more about the categories of personal information we collect, please visit https://www.firstam.com/privacy-policy/.

**How Do We Collect Your Personal Information?** We collect your personal information: (1) directly from you; (2) automatically when you interact with us; and (3) from other parties, including business parties and affiliates.

**How Do We Use Your Personal Information?** We may use your personal information in a variety of ways, including but not limited to providing the services you have requested, fulfilling your transactions, complying with relevant laws and our policies, and handling a claim. To learn more about how we may use your personal information, please visit https://www.firstam.com/privacy-policy/.

**How Do We Disclose Your Personal Information?** We may disclose your personal information, including to subsidiaries, affiliates, and to unaffiliated parties, such as service providers and contractors: (1) with your consent; (2) in a business transfer; and (3) for legal process and protection. Although we do not "sell" your information in the traditional sense, the definition of "sale" is broad under the CCPA that some disclosures of your information to third parties may be considered a "sale" or "sharing" for targeted advertising. To learn more about how we disclose your personal information, please visit https://www.firstam.com/privacy-policy/.

**How Do We Store and Protect Your Personal Information?** The security of your personal information is important to us. We take all commercially reasonable steps to make sure your personal information is protected. We use our best efforts to maintain commercially reasonable technical, organizational, and physical safeguards, consistent with applicable law, to protect your personal information.

**How Long Do We Keep Your Personal Information?** We keep your personal information for as long as necessary in accordance with the purpose for which it was collected, our business needs, and our legal and regulatory obligations.

© 2025 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE:FAF

Form 10-PRIVACY25 (12-17-24)          Page 1 of 2          Privacy Notice (2025 First American Financial Corporation)
English Adopted (1-1-25)

EXHIBIT 6

Page 17 of 22          0122250006071

*First American Title*™

**Your Choices** We provide you the ability to exercise certain controls and choices regarding our collection, use, storage, and disclosure of your personal information. You can learn more about your choices by visiting https://www.firstam.com/privacy-policy/.

**International Jurisdictions**: Our Services are offered in the United States of America (US), and are subject to US federal, state, and local law. If you are accessing the Services from another country, please be advised that you may be transferring your information to us in the US, and you consent to that transfer and use of your information in accordance with the Notice. You also agree to abide by the applicable laws of applicable US federal, state, and local laws concerning your use of the Services, and your agreements with us.

**Changes to Our Policy**: We may change the Notice from time to time. Any and all changes to the Notice will be reflected on this page and in the full Notice, and where appropriate provided in person or by another electronic method.

**YOUR CONTINUED USE, ACCESS, OR INTERACTION WITH OUR SERVICES OR YOUR CONTINUED COMMUNICATIONS WITH US AFTER THIS NOTICE HAS BEEN PROVIDED TO YOU WILL REPRESENT THAT YOU HAVE READ AND UNDERSTOOD THE NOTICE.**

**For California Residents** If you are a California resident, you may have certain rights under California law, including but not limited to the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act and its implementing regulations. To learn more, please visit https://www.firstam.com/privacy-policy/.

**Contact Us**: dataprivacy@firstam.com or toll free at 1-866-718-0097.

© 2025 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE:FAF

Form 10-PRIVACY25 (12-17-24)    Page 2 of 2    Privacy Notice (2024 First American Financial Corporation)
English Adopted (1-1-25)

EXHIBIT 6    Page 18 of 22
DFST25006071

EXHIBIT 6                                                    Page 19 of 22

CB1125006071

## Statement of Information (Confidential)

Note:  This form is needed in order to eliminate judgments and liens against people with similar names

The street address of the property in this transaction is:    (if none, leave blank)

Address _____    City _____

Occupied by:    ☐ Owner    ☐ Tenants    ☐ Lessee          ☐ Single Residence    ☐ Multiple Residence    ☐ Commercial    ☐ Vacant Land

Any construction/improvements in last 6 months?    ☐ Yes    ☐ No      Is any portion of new loan to be used for improvements?    ☐ Yes    ☐ No

If yes, state nature of work done or contemplated  _____

| *Party 1* | | | *Party 2* | | |
|---|---|---|---|---|---|
| First | Middle | Last | First | Middle | Last |
| Former last name(s), if any | | | Former last name(s), if any | | |
| Birthplace | | Birth Date | Birthplace | | Birth Date |
| Social  Security No. | | Driver's License No. | Social  Security No. | | Driver's License No. |

I  ☐ am single  ☐ am married  ☐ Have a domestic partner          I  ☐ am single  ☐ am married  ☐ Have a domestic partner

Name of <u>current</u> spouse or domestic partner (if other than Party 2)      Name of <u>current</u> spouse or domestic partner (if other than Party 1)

Name of <u>former</u> spouse/domestic partner (if none, write "none")      Name of <u>former</u> spouse/domestic partner (if none, write "none")

**Marriage or Domestic Partnership Between Parties 1 and 2**

Are Parties 1 & 2:    Married? ☐        Domestic Partners? ☐        Date of Marriage/Domestic Partnership:_____

**Party 1 – Occupations for Last 10 Years**

| Present Occupation | Firm Name | Address | No. of Years |
|---|---|---|---|
| Prior Occupation | Firm Name | Address | No. of Years |

**Party 1 – Residences for Last 10 Years**

| Number and Street | City and State | From | To |
|---|---|---|---|
| | | | |
| | | | |

**Party 2 – Occupations for Last 10 Years**

| Present Occupation | Firm Name | Address | No. of Years |
|---|---|---|---|
| Prior Occupation | Firm Name | Address | No. of Years |

**Party 2 – Residences for Last 10 Years**

| Number and Street | City and State | From | To |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Have any of the above parties owned or operated a business?    ☐ Yes    ☐ No      If so, please list names

I have never been adjudged, bankrupt nor are there any unsatisfied judgments or other matters pending against me which might affect my title to this property, except as follows:

The undersigned declare under penalty of perjury that the above information is true and correct.          (all parties must sign)

Date  _____

Signature _____          Signature _____

Home Phone _____ Work Phone _____          Home Phone _____ Work Phone _____

Email Address _____          Email Address _____

EXHIBIT 6                                    Page 20 of 22
621 25006071

# Statement of Information (Confidential)

Note:  This form is needed in order to eliminate judgments and liens against people with similar names

The street address of the property in this transaction is:   (if none, leave blank)

Address _____     City _____

Occupied by:   ☐ Owner   ☐ Tenants   ☐ Lessee         ☐ Single Residence   ☐ Multiple Residence   ☐ Commercial   ☐ Vacant Land

Any construction/improvements in last 6 months?   ☐ Yes  ☐ No     Is any portion of new loan to be used for improvements?   ☐ Yes  ☐ No

If yes, state nature of work done or contemplated _____

| *Party 1* | *Party 2* |
|---|---|

First          Middle          Last                    First          Middle          Last

Former last name(s), if any                           Former last name(s), if any

Birthplace              Birth Date                     Birthplace              Birth Date

Social  Security No.          Driver's License No.     Social  Security No.          Driver's License No.

I  ☐ am single  ☐ am married  ☐ Have a domestic partner        I  ☐ am single  ☐ am married  ☐ Have a domestic partner

Name of underlined current spouse or domestic partner (if other than Party 2)     Name of underlined current spouse or domestic partner (if other than Party 1)

Name of underlined former spouse/domestic partner (if none, write "none")     Name of underlined former spouse/domestic partner (if none, write "none")

### Marriage or Domestic Partnership Between Parties 1 and 2

Are Parties 1 & 2:     Married? ☐          Domestic Partners? ☐          Date of Marriage/Domestic Partnership:_____

### Party 1 – Occupations for Last 10 Years

Present Occupation          Firm Name                    Address                         No. of Years

Prior Occupation          Firm Name                    Address                         No. of Years

### Party 1 – Residences for Last 10 Years

Number and Street                              City and State                         From        To

### Party 2 – Occupations for Last 10 Years

Present Occupation          Firm Name                    Address                         No. of Years

Prior Occupation          Firm Name                    Address                         No. of Years

### Party 2 – Residences for Last 10 Years

Number and Street                              City and State                         From        To

Have any of the above parties owned or operated a business?   ☐ Yes  ☐ No     If so, please list names

I have never been adjudged, bankrupt nor are there any unsatisfied judgments or other matters pending against me which might affect my title to this property, except as follows:

The undersigned declare under penalty of perjury that the above information is true and correct.          (all parties must sign)

Date _____     Signature _____     Signature _____

                            Home Phone          Work Phone          Home Phone          Work Phone

                            Email Address                            Email Address

EXHIBIT 6                                          Page 21 of 22
                                                   CSI-25006071

# EXHIBIT 7

# EXHIBIT 7

Electronically Filed by Superior Court of California, County of Orange, 07/02/2025 11:47:00 AM
30-2025-01488102-CU-BC-CJC - ROA # 37 - DAVID H. YAMASAKI, Clerk of the Court By A. Burton, Deputy Clerk.

Todd C. Theodora (SBN 120426)
*TTheodora@tocounsel.com*
Jonathan E. Altman (SBN 170607)
*jaltman@tocounsel.com*
Alice M. Hodsden (SBN 340796)
*ahodsden@tocounsel.com*
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

*Counsel for Plaintiffs Bryan Gadol and Darren Testa*

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| BRYAN GADOL, an individual, and DARREN TESTA, an individual,<br><br>     Plaintiffs,<br><br>v.<br><br>MORDECHAI FERDER, a/k/a MOTI FERDER, an individual; MORDECHAI FERDER as the trustee of the HAIM FAMILY TRUST; SIMBA IL HOLDINGS, LLC, a Delaware Corporation; SERENADE NEWPORT, LLC, a California Limited Liability Company; and DOES 1 through 25, inclusive,<br><br>     Defendants. | Case No. 30-2025-01488102-CU-BC-CJC<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>    **(1) BREACH OF GUARANTY**<br>    **(2) FRAUD**<br>    **(3) MONEY HAD AND RECEIVED**<br>    **(4) PROMISSORY ESTOPPEL**<br>    **(5) UNJUST ENRICHMENT**<br>    **(6) VIOLATION OF THE UNIFORM**<br>        **FRAUDULENT TRANSFER ACT**<br><br>**JURY TRIAL DEMANDED**<br><br>Assigned for all purposes to: Hon. Jonathan Fish (Dept. C-11)<br><br>Complaint Filed: June 6, 2025<br>Trial: None Set |

Plaintiffs Bryan Gadol ("Mr. Gadol") and Darren Testa ("Mr. Testa") (collectively, "Plaintiffs") allege against Mordechai Ferder, a/k/a Moti Ferder ("Mr. Ferder"), Mr. Ferder as the trustee of the Haim Family Trust ("Haim Trust"), Simba IL Holdings, LLC[1] ("Simba IL Holdings" and collectively with Mr. Ferder and the Haim Trust, the "Guarantors"), Serenade Newport, LLC ("Serenade Newport"), and Does 1-25 (collectively, the "Defendants" and together with Plaintiffs, the "Parties") as follows:

## NATURE OF ACTION

1.      Mr. Ferder is the founder of a jewelry company, Lugano Diamonds and Jewelry, Inc. ("Lugano"), and until recently, was the Chief Executive Officer of Lugano since its inception.

2.      On or about May 8, 2024, Mr. Gadol executed an agreement with Lugano for the co-ownership of diamonds (the "Gadol Agreement") to be held and safeguarded as inventory for Lugano which provided for, among other things, a complete guaranty by the Guarantors of Lugano's payment obligations under the Gadol Agreement (the "Gadol Guaranty"). A true and correct copy of the Agreement is attached to this Complaint as **Exhibit A**.

3.      On or about February 3, 2024, Mr. Testa executed an agreement with Lugano for the co-ownership of diamonds (the "Testa Agreement") to be held and safeguarded as inventory for Lugano which provided for, among other things, a complete guaranty by the Guarantors of Lugano's payment obligations under the Testa Agreement (the "Testa Guaranty"). A true and correct copy of the Testa Agreement is attached to this Complaint as **Exhibit B**. The Gadol and Testa Agreements are collectively referred to herein as the "Agreements." The Gadol and Testa Guaranties are collectively referred to herein as the "Guaranties."

4.      The Agreements provided that Lugano would purchase diamonds, with Plaintiffs paying a share of the cost of the diamonds. Lugano would then design and manufacture jewelry from the diamonds and thereafter sell the jewelry for a profit.

5.      Mr. Ferder concealed and misrepresented his true intentions never to honor his Guaranties, never to buy diamonds with Plaintiffs' money, and to improperly retain the monies Plaintiffs wired to Lugano.

---

[1] Upon information and belief, Simba IL Holdings, LLC is the same entity as Simba IC Holdings, LLC.

6.      The Agreements were provided to the Plaintiffs by Lugano and contain customary terms and conditions for similar investments, including an investment return waterfall whereby first, the investor would receive the investment amount back, second, Lugano would be compensated for any expenses incurred in the setting of the diamonds and, third, the Company and investor would split the remaining profit. The Agreements also contain a right to payment clause that (1) allowed Plaintiffs to request at any time that Lugano purchase their interest in the diamonds and (2) provided that Lugano shall pay Plaintiffs a minimum return described in the Agreement no later than 5 days from the request.

7.      On May 8, 2025, Mr. Gadol exercised his right to payment through correspondence sent to Lugano's now-CEO Josh Gaynor. A true and correct copy of the May 8, 2025 Correspondence is attached hereto as **Exhibit C**.

8.      On May 9, 2025, Mr. Testa exercised his right to payment through correspondence sent to Lugano's now-CEO Josh Gaynor. A true and correct copy of the May 9, 2025 Correspondence is attached hereto as **Exhibit D**.

9.      Lugano has failed to pay Plaintiffs any amount of money to date pursuant to the Agreements and the May 8, 2025 and May 9, 2025 Correspondence. Mr. Ferder, the Haim Trust, and Simba IL Holdings' have not paid Plaintiffs pursuant to the Guaranties.

10.     As a result of Mr. Ferder, the Haim Trust, and Simba IL Holdings' breach of the Gadol Guarantee, Mr. Gadol suffered damages in amount of at least $7,929,072 as of June 4, 2025.

11.     As a result of Mr. Ferder, the Haim Trust, and Simba IL Holdings' breach of the Testa Guarantee, Mr. Testa suffered damages in amount of at least $6,377,794.84 as of June 4, 2025.

## **PARTIES**

12.     Mr. Gadol is an individual who is a resident of Orange County, California.

13.     Mr. Testa is an individual who is a resident of Orange County, California.

14.     Plaintiffs are informed and believe, and on that basis allege, that Mr. Ferder is a citizen of the State of California and resides in Corona Del Mar, California.

15.     Plaintiffs are informed and believe, and on that basis allege, that Mr. Ferder is, and at all times herein mentioned was, the trustee of the Haim Trust.

16.     Plaintiffs are informed and believe, and on that basis allege, that Simba IL Holdings is, and

at all times herein mentioned was, a limited liability company with an unknown principal place of business.

17.    Plaintiffs are informed and believe, and on that basis allege, that Serenade Newport, LLC is, and at all times herein mentioned was, a limited liability company with a principal place of business in Orange, California.

18.    The true names and capacities, whether individual, corporate, associate, or otherwise of Does 1 through 25, inclusive, are unknown to Plaintiffs at the present time. Plaintiffs therefore sue such defendants by fictitious names. Plaintiffs will seek leave of Court to amend this Complaint when the true names and capacities of such defendants are ascertained. On information and belief, each of the defendants designated as Doe is responsible in some manner and is liable to Plaintiffs under each cause of action set forth in this Complaint.

**<u>GENERAL ALLEGATIONS AS TO PLAINTIFF BRYAN GADOL</u>**

19.    On or about May 8, 2024, Mr. Ferder, the Haim Trust, and Simba IL Holdings entered into the Gadol Guaranty set forth in the Gadol Agreement. (Ex. A, ¶ 6.)

20.    The Gadol Agreement superseded prior agreements that Mr. Gadol had entered into with Mr. Ferder, in his individual capacity, the Haim Trust, and Simba IL Holdings which were executed on or around January 21, 2021, May 10, 2021, November 10, 2023, December 1, 2023 and March 29, 2024.

21.    In the prior agreements and the Gadol Agreement, Mr. Ferder solicited Mr. Gadol to purchase an ownership interest in diamonds that Lugano was supposedly manufacturing into jewelry for profitable resale.

22.    In May 2021 and August 2021, Lugano paid Mr. Gadol a total of $534,166 in connection with the corresponding prior agreements. Mr. Gadol never received any additional payments pursuant to the prior agreements or the Gadol Agreement.

23.    Mr. Gadol paid Mr. Ferder a total of $3,052,250 pursuant to the terms of the Gadol Agreement.

24.    Mr. Ferder "recommended to [Mr. Gadol] to invest in the purchase of one or more diamonds" and that Mr. Gadol "made such investments pursuant to the following prior agreements and/or arrangements[.]" (Ex. A, Recital B.) Under Recital B, summarized below:

(i)    Investor invested $780,000 as of 11/l0/23 pursuant to a contract which provided that the investment would be used to purchase diamonds from which Lugano

would make and sell jewelry ("Prior Agreement 1"). The proceeds from the sale of the jewelry would be disbursed according to the following waterfall:

a.  First, the amount invested by the Investor is repaid in full.
b.  Next, the cost of setting the stones is reimbursed to Lugano.
c.  Last, the remaining proceeds are divided 50/50 between Lugano and the Investor.

(ii)  Investor invested $272,250 as of 12/1/23 pursuant to a contract which provided that the investment would be used to purchase diamonds from which Lugano would make and sell jewelry ("Prior Agreement 2"). The distribution waterfall for Prior Agreement 2 was identical to the waterfall for Prior Agreement 1.

(iii)  Investor invested $1,000,000 on 3/29/24 pursuant to a contract which provided that the investment would be used to purchase diamonds from which Lugano would make and sell jewelry ("Prior Agreement 3" and collectively with Prior Agreement 1 and Prior Agreement 2, the "Prior Agreements"). The distribution waterfall for Prior Agreement 3 was identical to the waterfall for Prior Agreement 1 and 2. The Prior Agreements provided that the terms of the waterfall would be adjusted if necessary so that the minimum amount of the profit to be paid to the Investor would yield a minimum return on investment as set forth in the Prior Agreements.

25.    In January 2025, Mr. Gadol paid an additional $1,000,000 pursuant to the terms of the Gadol Agreement, for a total of $3,052,250. A true and correct copy of Correspondence regarding the January 2025 payment is attached hereto as **Exhibit E**.

26.    The Gadol Agreement provides that "Lugano consummated the purchase of the Diamonds on behalf of [Mr. Gadol] in connection with the Prior Agreements, with the intent of making rings from the diamonds and thereafter selling the diamonds to third parties . . . ." (Ex. A, Recital C.)

27.    The Agreement provides that:

Lugano and [Mr. Ferder] acknowledge and agree (a) the Diamonds have been purchased for the original investment amounts set forth in the Recitals on behalf of the Investor and are accounted for accurately and in conformity with this Agreement on the books and records of Lugano, (b) the Diamonds are in the possession of Lugano on behalf of Investor and are stored in safekeeping with other precious stones in Lugano's inventory, (c) the Diamonds are fully insured to cover the minimum returns set forth in the Prior Agreements, (d) Lugano is fully responsible for any damage and risk of loss of the Diamonds for any reason prior to the sale of the Diamonds to the Buyers, and (e) there is no more than $25M of similar inventory financing arrangements outstanding with Lugano as of the date of this Agreement.

(Ex. A, ¶ 2.)

28.     The Gadol Agreement provides that "[w]ithin 3 business days following the sale of the Diamonds . . . , [Mr. Ferder] will provide a complete accounting to [Mr. Gadol] along with reasonable back-up as may be requested and wire the necessary funds to [Mr. Gadol] . . . ." (Ex. A, ¶ 4.)

29.     The Gadol Agreement grants Mr. Gadol a right to payment which enables Mr. Gadol to:

> [R]equest at any time . . . with 5 days prior Notice, for Lugano to purchase the Diamonds from [Mr. Gadol] for the Minimum Return and Lugano shall wire such amount to the Investor at an account designated by the Investor no later than 5 days from the date Notice was provided by the Investor.

(Ex. A, ¶ 5.)

30.     The Gadol Guaranty states that Mr. Ferder, the Haim Trust, and Simba IL Holdings "hereby irrevocably and unconditionally guarantees, on a joint and several basis, Lugano's complete and timely compliance with and performance of all representations, agreements, covenants and obligations of Lugano under this Agreement." (Ex. A, ¶ 6.)

31.     Paragraph Seven, subsection b, provides that the Agreement "contains the complete agreement by, between and among the parties and supersedes any prior understandings, agreements or representations by, between or among the parties, written or oral, which may have related to the subject matter hereof in any way." (Ex. A, ¶ 7(b).)

32.     The Gadol Agreement was signed by (i) Mr. Gadol; (ii) Mr. Ferder on behalf of Lugano; (iii) Mr. Ferder individually as Guarantor; (iv) Mr. Ferder as trustee on behalf of the Haim Trust as Guarantor; and (v) Mr. Ferder as trustee on behalf of Simba IL Holdings as Guarantor.

33.     Mr. Ferder misrepresented and concealed his true intentions regarding the Gadol Agreement. He never intended to pay Mr. Gadol on the Gadol Guaranty, and induced Mr. Gadol to enter into the contract through his misrepresentations and concealment regarding the Gadol Guaranty and the other false representations in the Gadol Agreement. Had Mr. Gadol known of Mr. Ferder's true intentions, he would never have entered into the Agreement.

34.     Mr. Ferder received the payment from Mr. Gadol in the amount of $3,052,250 and used it for his personal benefit and the benefit of the Haim Trust and Simba IL Holdings.

35.     On May 8, 2025, Mr. Gadol sent an email to Lugano and its now-CEO Josh Gaynor in which he exercised his right to payment as permitted by Paragraph 5 of the Gadol Agreement. (Ex. C.) The

balance owed to Mr. Gadol as of May 31, 2025 pursuant to the Gadol Agreement was $7,862,696.

36.    Defendants have paid no money to Mr. Gadol pursuant to the Gadol Agreement.

## **GENERAL ALLEGATIONS AS TO PLAINTIFF DARREN TESTA**

37.    On or about February 3, 2024, Mr. Ferder, the Haim Trust, and Simba IL Holdings entered into the Testa Guaranty set forth in the Testa Agreement. (Ex. B, ¶ 6.)

38.    The Testa Agreement superseded prior agreements that Mr. Testa entered into with Mr. Ferder, in his individual capacity, the Haim Trust, and Simba IL Holdings which were executed on or around May 10, 2021, October 12, 2023, and November 10, 2023.

39.    In the prior agreements and the Testa Agreement, Mr. Ferder solicited Mr. Testa to purchase an ownership interest in diamonds that Lugano was supposedly manufacturing into rings for profitable resale.

40.    In May 2021, Lugano paid Mr. Testa $241,666 in connection with the corresponding prior agreements. Mr. Testa never received any additional payments pursuant to the prior agreements or the Testa Agreement.

41.    Mr. Testa paid Mr. Ferder $2,512,500 pursuant to the terms of the Testa Agreement.

42.    Mr. Ferder "recommended to [Mr. Testa] to invest in certain diamonds . . . ." (Ex. B, Recital B.)

43.    The Testa Agreement provides that "Lugano consummated the purchase of the Diamonds on behalf of [Mr. Testa] in connection with the Prior Agreements, with the intent of making rings from the diamonds and thereafter selling the diamonds to third parties . . . ." (Ex. B, Recital C.)

44.    Paragraph Two of the Agreement provides that:

> Lugano and [Mr. Ferder] acknowledge and agree (a) the Diamonds have been purchased for the original investment amounts set forth in the Recitals on behalf of the Investor and are accounted for accurately and in conformity with this Agreement on the books and records of Lugano, (b) the Diamonds are in the possession of Lugano on behalf of Investor and are stored in safekeeping with other precious stones in Lugano's inventory, (c) the Diamonds are fully insured to cover the minimum returns set forth in the Prior Agreements, (d) Lugano is fully responsible for any damage and risk of loss of the Diamonds for any reason prior to the sale of the Diamonds to the Buyers, and (e) there is no more than $30M of similar inventory financing arrangements outstanding with Lugano as of the date of this Agreement, and (f) the Spreadsheet is true and correct in all respects.

(Ex. B, ¶ 2.)

45.     The Testa Agreement provides that "[w]ithin 3 business days following the sale of the Diamonds . . . , [Mr. Ferder] will provide a complete accounting to [Mr. Testa] along with reasonable back-up as may be requested and wire the necessary funds to [Mr. Testa] . . . ." (Ex. B, ¶ 4.)

46.     The Testa Agreement grants Mr. Testa a right to payment which enables Mr. Testa to:

> [R]equest at any time . . . with 5 days prior notice, for Lugano to purchase the Diamonds from [Mr. Testa] for the Minimum Return and Lugano shall wire such amount to the Investor at an account designated by the Investor no later than 5 days from the sate notice was provided by the Investor.

(Ex. A, ¶ 5.)

47.     The Testa Guaranty states that Mr. Ferder, the Haim Trust, and Simba IL Holdings "hereby irrevocably and unconditionally guarantees, on a joint and several basis, Lugano's complete and timely compliance with and performance of all representations, agreements, covenants and obligations of Lugano under this Agreement." (Ex. B, ¶ 6.)

48.     Paragraph Seven, subsection b, provides that the Testa Agreement "contains the complete agreement by, between and among the parties and supersedes any prior understandings, agreements or representations by, between or among the parties, written or oral, which may have related to the subject matter hereof in any way." (Ex. B, ¶ 7(b).)

49.     The Testa Agreement was signed by (i) Mr. Testa; (ii) Mr. Ferder on behalf of Lugano; (iii) Mr. Ferder individually as Guarantor; (iv) Mr. Ferder as trustee on behalf of the Haim Trust as Guarantor; and (v) Mr. Ferder as trustee on behalf of Simba IL Holdings as Guarantor.

50.     Mr. Ferder misrepresented and concealed his true intentions regarding the Testa Agreement. He never intended to pay Mr. Testa on the Testa Guaranty, and induced Mr. Testa to enter into the contract through his misrepresentations and concealment regarding the Testa Guaranty and the other false representations in the Testa Agreement. Had Mr. Testa known of Mr. Ferder's true intentions, he would never have entered into the Agreement.

51.     Mr. Ferder received the payment in the amount of $2,512,500 and used it for his personal benefit and the benefit of the Haim Trust and Simba IL Holdings.

52.     On May 9, 2025, Mr. Testa sent an email to Lugano and its now-CEO Josh Gaynor in which he exercised his right to payment as permitted by Paragraph 5 of the Agreement. (Ex. D.)  Lugano did not

honor the right to payment.

53.    Neither Mr. Ferder nor any Defendant have paid Mr. Testa any money in satisfaction of the Testa Guaranty.

54.    Defendants have paid no money to Mr. Testa pursuant to the Testa Agreement.

**THE SALE OF 1501 SERENADE TERRACE, CORONA DEL MAR**

55.    Serenade Newport was created and registered with the Secretary of State on June 13, 2025.

56.    Upon information and belief, on June 17, 2025, Serenade Newport purchased 1501 Serenade Terrace, Corona del Mar, 92625 (the "Serenade Property"), from Mr. Ferder as Trustee for the Haim Family Trust for $6,228,125.

57.    At the time of the June 17, 2025 sale of the Serenade Property, the fair market value was $8,995,000.

58.    Approximately a week after the June 17, 2025 purchase, Serenade Newport placed the Serenade Property on the market for $8,995,000.

**FIRST CAUSE OF ACTION**

**BREACH OF GUARANTEE**

**(Against Defendants Mr. Ferder, the Haim Trust, and**

**Simba IL Holdings)**

59.    Plaintiffs reallege and incorporate by this reference the allegations set forth in Paragraphs 1 through 58 above as though fully set forth here.

60.    On or about May 8, 2024, Mr. Ferder, the Haim Trust, and Simba IL Holdings (the "Guarantors") executed the Gadol Guaranty, in writing, wherein the Guarantors "irrevocably and unconditionally guarantee[d], on a joint and several basis, Lugano's complete and timely compliance with and performance of all representations, agreements, covenants and obligation of Lugano under" the Agreement. (Ex. A, ¶ 6.)

61.    On or about February 3, 2024, Mr. Ferder, the Haim Trust, and Simba IL Holdings (the "Guarantors") executed the Testa Guaranty, in writing, wherein the Guarantors "irrevocably and unconditionally guarantee[d], on a joint and several basis, Lugano's complete and timely compliance with and performance of all representations, agreements, covenants and obligation of Lugano under" the

Agreement. (Ex. B, ¶ 6.)

62.     The Guarantors breached their Guaranties to Mr. Gadol and Mr. Testa by failing to ensure Lugano's timely payment to Plaintiffs of all money they are due and owed under the Agreements within 5 days of the date on which Plaintiffs exercised their rights to payment.

63.     Pursuant to the Guaranties, Plaintiffs requested payment of all monies owed to them under the Agreements from the Guarantors, but no payment has been made.

64.     As a direct and proximate result of this breach of the Gadol Guaranty, Mr. Gadol suffered damages in an amount equal to the amount due and owing to him under the Gadol Agreement, which sums are readily ascertainable, and otherwise to be proven at trial of at least $7,929,072 as of June 4, 2025.

65.     As a direct and proximate result of this breach of the Testa Guaranty, Mr. Testa suffered damages in an amount equal to the amount due and owing to him under the Testa Agreement, which sums are readily ascertainable, and otherwise to be proven at trial of at least $6,377,794.84 as of June 4, 2025.

## SECOND CAUSE OF ACTION

### FRAUD

### (Against Defendants Mr. Ferder and DOES 1 through 25, Inclusive)

66.     Plaintiffs reallege and incorporate by this reference the allegations set forth in Paragraphs 1 through 65 above as though fully set forth here.

67.     Mr. Ferder intended to and acted to induce Plaintiffs to give Mr. Ferder money based on the false representations that (i) the diamonds would be purchased on behalf of Plaintiffs and accounted for accurately in the books and records of Lugano; (ii) the diamonds would be kept in the possession of Lugano on behalf of Plaintiffs and stored in safekeeping with other precious stones in Lugano's inventory; (iii) the diamonds would be fully insured; (iv) Lugano would be fully responsible for any damage and risk of loss of the diamonds for any reason prior to the sale of the diamonds; and (v) there was no more than a certain amount as set forth in the Agreements of similar inventory financing arrangements outstanding with Lugano at the time the Agreements were executed. (Exs. A, ¶ 2; B, ¶ 2.)

68.     Mr. Ferder knew that these representations were false and were made with the intention of inducing Plaintiffs to send payment to him. Mr. Ferder concealed that he was not using the money to purchase diamonds pursuant to the Agreements, and that he never intended to honor the Guaranties in the

Agreements, account for the transactions on Lugano's books and records, or keep any of his contractual promises.

69.     Mr. Gadol reasonably relied on the misrepresentations and concealment of Mr. Ferder and paid a total principal amount of $3,052,250.

70.     Mr. Testa reasonably relied on the misrepresentations of Mr. Ferder and paid a total principal amount of $2,512,500.

71.     As a direct and proximate result of fraud by Mr. Ferder, Plaintiffs have suffered damages in an amount to be proven at trial.

72.     The actions of Mr. Ferder were malicious, oppressive and taken in reckless disregard of Plaintiffs' rights, so as to justify an award of punitive damages sufficient to punish and deter Mr. Ferder from engaging in such conduct in the future.

## <u>THIRD CAUSE OF ACTION</u>

### MONEY HAD AND RECEIVED

### (Against Defendants Mr. Ferder and

### DOES 1 through 25, Inclusive)

73.     Plaintiffs reallege and incorporate by this reference the allegations set forth in Paragraphs 1 through 72 above as though fully set forth here.

74.     Mr. Gadol paid $3,052,250 to Mr. Ferder that was intended to be used to purchase the diamonds.

75.     Mr. Testa paid $2,512,500 to Mr. Ferder that was intended to be used to purchase the diamonds.

76.     The money paid by Plaintiffs was not used by Mr. Ferder to purchase the diamonds.

77.     Mr. Ferder has not returned to Mr. Gadol $3,052,250 in principal paid by Mr. Gadol to Mr. Ferder.

78.     Mr. Ferder has not returned to Mr. Testa $2,512,500 in principal paid by Mr. Testa to Mr. Ferder.

/ / /

/ / /

## FOURTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL

### (Against Defendant Mr. Ferder)

79.     Plaintiffs reallege and incorporate by this reference the allegations set forth in Paragraphs 1 through 78 above as though fully set forth here.

80.     Plaintiffs allege, in the alternative, that they are entitled to recover under the doctrine of promissory estoppel if it is determined that either a valid and enforceable contract does not exist, the existing contracts do not cover the subject matter of the dispute between Plaintiffs and Defendants, or the existing contracts are void, invalid, or unenforceable.

81.     Mr. Ferder made clear and unambiguous representations that Plaintiffs' payment would be used to purchase the diamonds, which were to be sold to third parties for profit.

82.     Mr. Ferder made further clear and unambiguous representations that Lugano would return Plaintiffs' original payment amount to them and pay them a split of any remaining profit generated from the sale of the diamonds.

83.     Mr. Ferder, for himself individually and on behalf of the Haim Trust and Simba IL Holdings, made clear and unambiguous representations that he would personally guarantee Lugano's performance of these representations.

84.     Plaintiffs relied on these representations and assurances to their detriment by paying $3,052,250 and $2,512,500, respectively, to Mr. Ferder.

85.     As a direct and proximate result of the acts alleged herein, Plaintiffs suffered substantial detriment caused by reliance on said representations, assurances, and guarantees.

86.     Mr. Gadol has suffered actual, significant, and unconscionable injury in an amount equal to the amount due and owing to him pursuant to the representations and assurances made by Mr. Ferder which sums are readily ascertainable, and otherwise to be proven at trial of at least $7,929,072 as of June 4, 2025.

87.     Mr. Testa has suffered actual, significant, and unconscionable injury in an amount equal to the amount due and owing to him pursuant to the representations and assurances made by Mr. Ferder which sums are readily ascertainable, and otherwise to be proven at trial of at least $6,377,794.84 as of June 4, 2025.

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT

### (Against Defendants Mr. Ferder

### and DOES 1 through 25, Inclusive)

88.     Plaintiffs reallege and incorporate by this reference the allegations set forth in Paragraphs 1 through 87 above as though fully set forth here.

89.     Plaintiffs allege, in the alternative, that they are entitled to recover under the unjust enrichment doctrine if it is determined that either a valid and enforceable contract does not exist, the existing contracts do not cover the subject matter of the dispute between Plaintiffs and Defendants, or the existing contracts are void, invalid, or unenforceable.

90.     Mr. Gadol conferred a benefit upon Mr. Ferder when he paid $3,052,250 to Mr. Ferder for the purpose of purchasing the diamonds.

91.     Mr. Testa conferred a benefit upon Mr. Ferder when he paid $2,512,500 to Mr. Ferder for the purpose of purchasing the diamonds.

92.     Mr. Ferder has retained $3,052,250 in principal that Mr. Gadol provided for his personal benefit and/or the benefit of the Haim Trust and Simba IL Holdings.

93.     Mr. Ferder has retained $2,512,500 in principal that Mr. Testa provided for his personal benefit and/or the benefit of the Haim Trust and Simba IL Holdings.

94.     It would be unjust for Mr. Ferder to retain the benefit.

## SIXTH CAUSE OF ACTION

### Violation of Uniform Fraudulent Transfer Act and Cal. Civ. Code § 3439.05

### (Against Defendants Mordechai Ferder as Trustee of the Haim Family Trust and Serenade

### Newport, LLC)

95.     Plaintiffs reallege and incorporate by this reference the allegations set forth in Paragraphs 1 through 94 above as though fully set forth here.

96.     At all times relevant hereto, Plaintiffs were creditors of the Haim Family Trust as a Guarantor in that Plaintiffs had rights to payment against the Haim Family Trust that they never received.

/ / /

97.     With knowledge that Plaintiffs were a creditor, Defendant Mr. Ferder as Trustee of the Haim Family Trust transferred the Serenade Property, an asset of the Haim Family Trust, to Serenade Newport without receiving a reasonably equivalent value in exchange for the transfer.

98.     Defendants caused the Haim Family Trust to make said transfers with the intent to hinder, delay, or defraud Plaintiffs at the time the transfer was made.

99.     As a result of said fraudulent transfer, Plaintiffs have been damaged in that the Haim Family Trust has been stripped of its assets and no longer has any ability to repay the amounts owed to Plaintiffs under the Agreements, or any other debts as they become due and owing.

100.    As a result of the fraudulent transfers, as aforesaid, Plaintiffs are entitled to an order avoiding the transfer of trust property, including Serenade Property to Serenade Newport, LLC under its control.

101.    In the alternative, Plaintiffs are entitled to the imposition of a constructive trust upon the transferred assets of the Haim Family Trust, including the Serenade Property.

102.    Further, in doing the things alleged herein, Defendants acted wantonly, willfully, maliciously, fraudulently and oppressively, with deliberate intent to injure Plaintiffs, and in conscious disregard of the rights of Plaintiff. As a result, Plaintiffs are entitled to an award of punitive damages against Defendants in an amount subject to proof at trial.

## **PRAYER FOR RELIEF**

Based on the foregoing, Plaintiffs request the following relief:

1.      For compensatory damages against all Defendants, including general and special damages, in an amount to be proven at trial;

2.      For punitive damages;

3.      For a temporary restraining order, preliminary injunction, a permanent injunction, order of attachment, an order to set aside the June 17, 2025 sale of the Serenade Property, and other relief, against Defendants, and each of them;

4.      For pre- and post-judgment interest at the maximum legal rate;

5.      For reasonable attorneys' fees and costs;

6.      For costs of suit; and

1

      7.      For such other and further relief as the Court deems just and proper.

2

3

Dated:  June 30, 2025                    **THEODORA ORINGHER PC**

4

5

By: *Alice Hodsden*

6

                      Todd C. Theodora
                      Jonathan E. Altman

7

                      Alice M. Hodsden

8

                      *Attorneys for Plaintiffs,*
                      *Bryan Gadol and Darren Testa*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

EXHIBIT 7                    Page 16 of 31

## AGREEMENT

This agreement (this "Agreement") is entered into effective as of May 8, 2024 (the "Effective Date"), by and among each of Bryan Gadol, in his individual capacity ("Investor"), Lugano Diamonds & Jewelry, Inc. ("Lugano"), and solely with respect to Sections 6 and 7, Mordechai Ferder, in his individual capacity ("Moti"), the Haim Family Trust and Simba IC Holdings, LLC (collectively, the "Trusts").

## RECITALS

A.    Moti is the founder and Chief Executive Officer of Lugano.

B.    Moti recommended to Investor to invest in the purchase of one or more diamonds (collectively, the "Diamonds") and Investor made such investments pursuant to the following prior agreements and/or arrangements:

(i) Investor invested $780,000 as of 11/10/23 pursuant to a contract with Investor, Moti, Darren Testa and the Trusts with a minimum return of 10% per month, compounding quarterly until paid out in accordance with this Agreement ("Prior Agreement 1");

(ii) Investor invested $272,250 as of 12/1/23 pursuant to a contract with Investor, Moti and the Trusts with a minimum return of 10% per month, compounding quarterly until paid out in accordance with this Agreement ("Prior Agreement 2"); and

(iii) Investor invested $1,000,000 on 3/29/24 pursuant to an arrangement with the Company with a minimum return of 5% for the first week and then 10% per month, compounding quarterly until paid out in accordance with this Agreement ("Prior Agreement 3" and collectively with Prior Agreement 1 and Prior Agreement 2, the "Prior Agreements").

C.    Lugano consummated the purchase of the Diamonds on behalf of the Investor in connection with the Prior Agreements, with the intent of making rings from the diamonds and thereafter selling the Diamonds to third parties (each, a "Buyer" and collectively, the "Buyers").

## AGREEMENT

1.    **Incorporation of Recitals**. The foregoing recitals are incorporated herein and made a part of this Agreement.

2.    **Purchase, Possession, Record Keeping, Insurance and Outstanding Arrangements**. Lugano and Moti acknowledge and agree (a) the Diamonds have been purchased for the original investment amounts set forth in the Recitals on behalf of the Investor and are accounted for accurately and in conformity with this Agreement on the books and records of Lugano, (b) the Diamonds are in the possession of Lugano on behalf of Investor and are stored in safekeeping with other precious stones in Lugano's inventory, (c) the Diamonds are fully insured to cover the minimum returns set forth in the Prior Agreements, (d) Lugano is fully responsible for any damage and risk of loss of the Diamonds for any reason prior to the sale of the Diamonds to the Buyers, and (e) there is no more than $25M of similar inventory financing arrangements outstanding with Lugano as of the date of this Agreement.

1

EXHIBIT 7                    Page 17 of 31

3.　　**Design and Manufacture of Ring; Intent to Sell**. The parties agree that Lugano will be responsible for designing and manufacturing one or more rings for the Diamonds and Lugano will thereafter be responsible for delivering them for sale to the Buyers.

4.　　**Profits and Losses; Distributions; Dissolution**. Within 3 business days following the sale of the Diamonds to the buyers, Lugano and Moti will provide a complete accounting to the Investor along with reasonable back-up as may be requested and wire the necessary funds to the Investor in accordance with Investor's wiring instructions. The parties agree that in connection the sale of the Diamonds, the purchase price paid by the Buyers will be allocated as follows:

(a) first, the original investment amount will be returned to the Investor;

(b) second, Lugano will be reimbursed for the expenses incurred in connection with the production of the rings purchased by the Buyers;

(c) third, any remaining profit will be split between the Investor and Lugano 60% to the Investor, and 40% to Lugano.

Notwithstanding anything contained herein to the contrary, in no event will the Investor receive less than the minimum returns for the Prior Agreements set forth in the Recitals above regardless of the actual purchase price paid by the Buyers for the diamonds and the parties acknowledge and agree that the schedule of Summary of Ending Balances attached hereto as Exhibit A is the true and correct schedule of the minimum returns for the Prior Agreements (the "Minimum Return") and the applicable Minimum Return will be based upon the dates Investor receives payments for the Diamonds.

5.　　**Put Right.** The parties agree that the Investor may request at any time following the Effective Date, with 5 days prior notice, for Lugano to purchase the Diamonds from the Investor for the Minimum Return and Lugano shall wire such amount to the Investor at an account designated by Investor no later than 5 days from the date notice was provided by the Investor. In the event of a sale of substantially all of the assets or equity of Lugano or any transfer of equity in Lugano by Moti or the Trusts (each, a "Triggering Event"), Lugano shall wire the required amounts pursuant to this Agreement (in no event less than the Minimum Return) to the Investor within 3 business days prior to the closing date of any Triggering Event.

6.　　**Guaranty**. Each of Moti and the Trusts hereby irrevocably and unconditionally guarantees, on a joint and several basis, Lugano's complete and timely compliance with and performance of all representations, agreements, covenants and obligations of Lugano under this Agreement.

7.　　**Miscellaneous**.

(a) Amendment and Waiver. Any provision of this Agreement may be amended or waived only in a writing signed by the parties. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. No single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce any right or power, shall preclude any other or further exercise thereof or the exercise of any other right or power. Failure on the part of a party to complain of any act of any party or to declare any party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder until the applicable statute of limitation period has run.

2

EXHIBIT 7                                    Page 18 of 31

(b) <u>Complete Agreement</u>. This Agreement contains the complete agreement by, between and among the parties and supersedes any prior understandings, agreements or representations by, between or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(c) <u>Counterparts</u>. This Agreement may be executed in multiple counterparts (including by means of electronic transmission in portable document format (pdf)), any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument.

(d) <u>Governing law; Venue</u>. This Agreement, and all claims or causes of action (whether in contract, tort, statute or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement will be governed by and construed in accordance with the internal laws of the State of California applicable to agreements executed and performed entirely within such State. In the event of any dispute related to this Agreement the parties hereby irrevocably agree to submit such matter to the state or federal courts located in the Central District of the State of California.

(e) <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any party.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date.

**Investor**

_____
Bryan Gadol

**Lugano:**

Lugano Diamonds and Jewelry, Inc.

By: Mordechai Ferder, CEO

**Guarantors:**

_____
Mordechai Ferder, and individual

Haim Family Trust

_____
By: Mordechai Ferder, Trustee

Simba IC Holdings, LLC

_____
By: Mordechai Ferder, Trustee

3

EXHIBIT 7                    Page 19 of 31

**EXHIBIT A**

**MINIMUM RETURN SCHEDULE**

**(SEE ATTACHED)**

4

EXHIBIT 7                                    Page 20 of 31

# EXHIBIT B

EXHIBIT 7                                            Page 21 of 31

## AGREEMENT

This agreement (this "Agreement") is entered into effective as of Feb 3, 2024 (the "Effective Date"), by and among each of Darren Testa, in his individual capacity ("Investor"), Lugano Diamonds & Jewelry, Inc. ("Lugano"), and solely with respect to Sections 6 and 7, Mordechai Ferder, in his individual capacity ("Moti"), the Haim Family Trust and Simba IC Holdings, LLC (collectively, the "Trusts").

## RECITALS

A.    Moti is the founder and Chief Executive Officer of Lugano.

B.    Moti recommended to Investor to invest in certain diamonds (collectively, the "Diamonds") and Investor made such investments as reflected on Exhibit A attached hereto (the "Spreadsheet").

C.    Lugano consummated the purchase of the Diamonds on behalf of the Investor in connection with the Prior Agreements, with the intent of making rings from the diamonds and thereafter selling the Diamonds to third parties (each, a "Buyer" and collectively, the "Buyers").

## AGREEMENT

1.    **Incorporation of Recitals**.  The foregoing recitals are incorporated herein and made a part of this Agreement.

2.    **Purchase, Possession, Record Keeping, Insurance and Outstanding Arrangements**.  Lugano and Moti acknowledge and agree (a) the Diamonds have been purchased for the original investment amounts set forth in the Recitals on behalf of the Investor and are accounted for accurately and in conformity with this Agreement on the books and records of Lugano, (b) the Diamonds are in the possession of Lugano on behalf of Investor and are stored in safekeeping with other precious stones in Lugano's inventory, (c) the Diamonds are fully insured to cover the minimum returns set forth in the Prior Agreements, (d) Lugano is fully responsible for any damage and risk of loss of the Diamonds for any reason prior to the sale of the Diamonds to the Buyers, (e) there is no more than $30M of similar inventory financing arrangements outstanding with Lugano as of the date of this Agreement, and (f) the Spreadsheet is true and correct in all respects.

3.    **Design and Manufacture of Ring; Intent to Sell**.  The parties agree that Lugano will be responsible for designing and manufacturing one or more rings for the Diamonds and Lugano will thereafter be responsible for delivering them for sale to the Buyers.

4.    **Profits and Losses; Distributions; Dissolution**. Within 3 business days following the sale of the Diamonds to the buyers, Lugano and Moti will provide a complete accounting to the Investor along with reasonable back-up as may be requested and wire the necessary funds to the Investor in accordance with Investor's wiring instructions.  The parties agree that in connection the sale of the Diamonds, the purchase price paid by the Buyers will be allocated as follows:

(a) first, the original investment amount will be returned to the Investor;

(b) second, Lugano will be reimbursed for the expenses incurred in connection with the production of the rings purchased by the Buyers;

(c) third, any remaining profit will be split between the Investor and Lugano 60% to the Investor, and 40% to Lugano.

Notwithstanding anything contained herein to the contrary, in no event will the Investor receive less than the minimum returns set forth in the Spreadsheet regardless of the actual purchase price paid by the Buyers for the diamonds and the parties acknowledge and agree that the Spreadsheet is the true and correct schedule of the minimum returns for the investments (the "Minimum Return") and the applicable Minimum Return will be based upon the dates Investor receives payments from Lugano for the Diamonds.

    **5.**    **Put Right.** The parties agree that the Investor may request at any time following the Effective Date, with 5 days prior notice, for Lugano to purchase the Diamonds from the Investor for the Minimum Return set forth on the Spreadsheet and Lugano shall wire such amount to the Investor at an account designated by Investor no later than 5 days from the date notice was provided by the Investor. In the event of a sale of substantially all of the assets or equity of Lugano or any transfer of equity in Lugano by Moti or the Trusts (each, a "Triggering Event"), Lugano shall wire the required amounts pursuant to this Agreement (in no event less than the Minimum Return) to the Investor within 3 business days prior to the closing date of any Triggering Event.

    **6.**    **Guaranty**. Each of Moti and the Trusts hereby irrevocably and unconditionally guarantees, on a joint and several basis, Lugano's complete and timely compliance with and performance of all representations, agreements, covenants and obligations of Lugano under this Agreement.

    **7.**    **Miscellaneous**.

    (a) Amendment and Waiver.  Any provision of this Agreement may be amended or waived only in a writing signed by the parties. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. No single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce any right or power, shall preclude any other or further exercise thereof or the exercise of any other right or power.  Failure on the part of a party to complain of any act of any party or to declare any party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder until the applicable statute of limitation period has run.

    (b) Complete Agreement.  This Agreement contains the complete agreement by, between and among the parties and supersedes any prior understandings, agreements or representations by, between or among the parties, written or oral, which may have related to the subject matter hereof in any way.

    (c) Counterparts.  This Agreement may be executed in multiple counterparts (including by means of electronic transmission in portable document format (pdf)), any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument.

    (d) Governing law; Venue.  This Agreement, and all claims or causes of action (whether in contract,  tort, statute or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement will be governed by and construed in accordance with the internal laws of

2

EXHIBIT 7                                        Page 23 of 31

the State of California applicable to agreements executed and performed entirely within such State. In the event of any dispute related to this Agreement the parties hereby irrevocably agree to submit such matter to the state or federal courts located in the Central District of the State of California.

(e) No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any party.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date.

**Investor:**

_____

Darren Testa

**Lugano:**

Lugano Diamonds and Jewelry, Inc.

_____
By: Mordechai Ferder, CEO

**Guarantors:**

_____
Mordechai Ferder, and individual

Haim Family Trust                               Simba IC Holdings, LLC

_____                    _____
By: Mordechai Ferder, Trustee              By: Mordechai Ferder, Trustee

EXHIBIT 7                                    Page 24 of 31

3

# EXHIBIT A

## MINIMUM RETURN SCHEDULE

**(SEE ATTACHED)**

EXHIBIT 7                                    Page 25 of 31

4

# **EXHIBIT C**

EXHIBIT 7                                      Page 26 of 31

**From:** Bryan.Gadol@hklaw.com <Bryan.Gadol@hklaw.com>
**Sent:** Thursday, May 8, 2025 1:53 PM
**To:** Josh Gaynor <JGaynor@luganodiamonds.com>
**Cc:** bgadol@gmail.com
**Subject:** Gadol Put Notice


Hi Josh,


I am sending this email from my work email as I cannot get the attachments to upload properly for some reason with my personal email, but this is solely a personal matter and Holland & Knight is not involved in any manner. Moving forward please use my personal email (address copied) for all email correspondence.


As a result of the CODI press release issued yesterday, I hereby tender my put right pursuant to Section 5 of the agreement between me, Lugano Diamonds & Jewelry, Inc., Moti and his trusts referenced therein,  dated May 8, 2024 (already in the company's possession, but attaching a courtesy copy for ease of reference - see first attachment, the "Agreement"), as amended by future correspondence between the parties for an additional investment (the "Supplemental Investment")  of $1M (see 2nd attachment).  I've also attached the minimum return spreadsheet referenced in the Agreement, as amended (already in the company's possession, but attaching a courtesy copy for ease of reference - see 3rd attachment).  As of the put right required redemption date of May 13th, the company owes my family trust $6,991,835.79 and me personally $623,501.05 for a total amount due of $7,615,336.84. I look forward to quickly and amicably working through this with the company and would appreciate confirmation of receipt of this email when received and confirmation that the company is going to perform its obligations under the Agreement by no later than Monday, May 12th.  In the meantime, Lugano is hereby notified to preserve all electronic communications between me and Moti related to these investments via his work email and cell phone.


Regards.


Bryan


EXHIBIT 7                                        Page 27 of 31

# EXHIBIT D

EXHIBIT 7                                    Page 28 of 31

From: **Darren T** <darrente@gmail.com>
Date: Fri, May 9, 2025 at 12:17 PM
Subject: Put Notice
To: <JGaynor@luganodiamonds.com>, Darren Testa <darrente@gmail.com>

Hello Josh,

As a result of the CODI press release issued yesterday, I hereby tender my put right pursuant to Section 5 of the agreement between me, Lugano Diamonds & Jewelry, Inc., Moti and his trusts referenced therein,  dated Feb 3, 2024 in error, but effective as of Feb 3, 2025 (already in the company's possession, but attaching a courtesy copy for ease of reference - see first attachment, the "Agreement").  I've also attached the minimum return spreadsheet referenced in the Agreement (already in the company's possession, but attaching a courtesy copy for ease of reference - see 2nd attachment).  As of the put right required redemption date of May 14th, the company owes me $6,089,911.04. I look forward to quickly and amicably working through this with the company and would appreciate confirmation of receipt of this email when received and confirmation that the company is going to perform its obligations under the Agreement by no later than Tuesday, May 13th.  In the meantime, Lugano is hereby notified to preserve all electronic communications between me and Moti related to these investments via his work email and cell phone.

Regards,

Darren Testa

EXHIBIT 7                                    Page 29 of 31

# EXHIBIT E

EXHIBIT 7                                    Page 30 of 31



EXHIBIT 7                                    Page 31 of 31

# EXHIBIT 8

# EXHIBIT 8

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

**$99.00**

\* $ R 0 0 1 5 6 8 5 1 9 6 $ \*

**2025000195689 08:21 am 07/14/25**

380 CR-SC05 N25 5

0.00 0.00 0.00 0.00 12.00 0.00 0.00 0.00 75.00 0.00

RECORDING REQUESTED BY:
Jonathan E. Altman and Alice M. Hodsden, as
counsel for Plaintiffs Bryan Gadol and Darren
Testa

AND WHEN RECORDED MAIL TO:
Jonathan E. Altman
Alice M. Hodsden
Theodora Oringher PC
535 Alton Blvd., 9th Floor
Costa Mesa, CA 92626

SPACE ABOVE THIS LINE FOR RECORDER'S USE

NOTICE OF PENDENCY OF ACTION PURSUANT TO CCP SECTION 405.20 (LIS PENDENS)

Title of Document

This page is added to provide adequate space for recording information.

EXHIBIT 8                                        Page 1 of 5

Todd C. Theodora (SBN 120426)
 *TTheodora@tocounsel.com*
Jonathan E. Altman (SBN 170607)
 *JAltman@tocounsel.com*
Alice M. Hodsden (SBN 340796)
 *AHodsden@tocounsel.com*
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

*Counsel for Plaintiffs*
*Bryan Gadol and Darren Testa*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| BRYAN GADOL, an individual, and DARREN TESTA, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> MORDECHAI FERDER, a/k/a MOTI FERDER, an individual; MORDECHAI FERDER as the trustee of the HAIM FAMILY TRUST; SIMBA IL HOLDINGS, LLC, a Delaware Corporation; SERENADE NEWPORT, LLC, a California Limited Liability Company; and DOES 1 through 25, inclusive, <br><br> Defendants. | Case No. 30-2025-01488102-CU-BC-CJC <br><br> *[Assigned for All Purposes to Hon. Jonathan Fish, Dept. C11]* <br><br> **NOTICE OF PENDENCY OF ACTION PURSUANT TO CCP SECTION 405.20 (LIS PENDENS)** <br><br> Action Filed:    June 6, 2025 <br> FAC Filed:    July 1, 2025 <br> Trial Date:    None Set |

   **NOTICE IS HEREBY GIVEN** that an action has been commenced in the Superior Court for

the County of Orange in the above-entitled court, Case No. 30-2025-01488102-CU-BC-CJC (the

"Lawsuit"), concerning real property and affecting the possession of and title to real property, by

Plaintiffs Bryan Gadol, an individual, and Darren Testa, an individual, (collectively, "Plaintiffs")

against Defendants Mordechai Ferder a/k/a Moti Ferder, an individual, Mordechai Ferder as the

Trustee of the Haim Family Trust, Simba IL Holdings, LLC, a Delaware Corporation, Serenade

Newport, LLC, a California Limited Liability Company, and DOES 1-25, inclusive (collectively,

Defendants").

1328757.1/82189.05002

1

1   The real property comprising the subject matter of the cause of action under the

2   Uniform Voidable Transactions Act, Cal. Civ. Code § 3439 *et seq.*, is certain real property located

3   within the County of Orange, 1501 Serenade Terrace, Corona del Mar, Assessor's Parcel Number

4   050-282-16 (the "Property"). The mentioned parcel of Property is located within the State of

5   California and is legally described as follows:

6   PROPERTY (APN: 050-282-16)

7   THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF NEWPORT
    BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA AND IS DESCRIBED AS
8   FOLLOWS:

9   LOT 39 IN TRACT NO. 1701, IN THE CITY OF NEWPORT BEACH, COUNTY OF ORANGE,
    STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 52, PAGES 9 AND
10  10, INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER
11  OF SAID COUNTY.

12  EXCEPTING THEREFROM ALL OIL, GAS CASINGHEAD GAS, ASPHALTUM AND OTHER
    HYDROCARBONS AND ALL CHEMICAL GAS NOW OR HEREAFTER FOUND, SITUATED
13  OR LOCATED IN ALL OR ANY PART OR PORTION OF THE LAND HEREIN DESCRIBED
    LYING MORE THAN 500 FEET BELOW THE SURFACE THEREOF, TOGETHER WITH THE
14  RIGHT TO SLANT DRILL FOR AND REMOVE ALL OR ANY OF SAID OIL, GAS,
    CASINGHEAD GAS, ASPHALTUM AND OTHER HYDROCARBON, AND CHEMICAL GAS
15  LYING BELOW A DEPTH OF MORE THAN 500 FEET BELOW THE SURFACE OF BUT
    WITHOUT ANY RIGHT WHATSOEVER TO ENTER UPON THE SURFACE OF SAID LAND
16  OR UPON ANY LAND OR UPON ANY PART OR SAID LANDS WITHIN 500 FEET VERTICAL
17  DISTANCE BELOW THE SURFACE THEREOF, AS RESERVED IN THE DEED BY THE
    IRVINE COMPANY, RECORDED MARCH 28, 1984 AS INSTRUMENT NO. 84-126815 OF
18  OFFICIAL RECORDS.

19  One of the causes of action in the First Amended Complaint is for Transfers Voidable as to

20  Present Creditors. The undersigned further gives notice that she is counsel of record for Plaintiffs

21  Bryan Gadol and Darren Testa.

22
    Dated: July 11, 2025                    THEODORA ORINGHER PC
23
                                            By: *Alice Hodsden*
24                                          _____
                                            Todd C. Theodora
25                                          Jonathan E. Altman
                                            Alice M. Hodsden
26                                          *Attorneys for Plaintiffs Bryan Gadol
                                            and Darren Testa*
27

28

1328757.1/82189.05002                2

THEODORA ORINGHER
COUNSELORS AT LAW

1

## PROOF OF SERVICE

2

*Bryan Gadol and Darren Testa v. Mordechai Ferder, et al.*
Orange County Superior Court Case No. 30-2025-01488102-CU-BC-CJC

3

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

4

5       At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Orange, State of California. My business address is 535 Anton Boulevard, Ninth Floor, Costa Mesa, CA 92626-7109.

6

7       On July 11, 2025, I served true copies of the following document(s) described as **NOTICE OF PENDENCY OF ACTION PURSUANT TO CCP SECTION 405.20 (LIS PENDENS)** on the interested parties in this action as follows:

8

9                    *SEE ATTACHED SERVICE LIST*

10

11

12      **BY CERTIFIED MAIL – RETURN RECEIPT REQUESTED:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing via Certified Mail, Return Receipt Requested, following our ordinary business practices. I am readily familiar with the practice of Theodora Oringher PC for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at Costa Mesa, California.

13

14

15

16

17      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on July 11, 2025, at Costa Mesa, California.

18

19



20      _____
        Desiree Funsch

21

22

23

24

25

26

27

28

1328757.1/82189.05002                              3

*NOTICE OF PENDENCY OF ACTION PURSUANT TO CCP SECTION 405.20 (LIS PENDENS)*

EXHIBIT 8                                          Page 4 of 5

THEODORA ORINGHER
COUNSELORS AT LAW

**THEODORA ☐ ORINGHER**
COUNSELORS AT LAW

1

## SERVICE LIST

2

*Bryan Gadol and Darren Testa v. Mordechai Ferder, et al.*
Orange County Superior Court Case No. 30-2025-01488102-CU-BC-CJC

3

4

| | |
|---|---|
| Lawrence Hoodack<br>Law Offices of Lawrence Hoodack<br>500 N. State College Blvd., Suite 1200<br>Orange, CA 92868<br><br>*Counsel for Defendant,*<br>*Serenade Newport, LLC* | Jeffrey H. Reeves<br>Reeves & Weiss LLP<br>3333 Michelson Dr., Suite 300<br>Irvine, CA 92612<br><br>*On behalf of Mordechai Ferder a.k.a.*<br>*Moti Ferder,; Mordechai Ferder as the*<br>*trustee of the Haim Family Trust; Simba*<br>*IL Holdings. LLC* |
| Brian Paya<br>The Paya Firm<br>10940 Wilshire Blvd, Ste 1600 1600<br>Los Angeles, CA 90024<br><br>*On behalf of The Daftarian Group* | Mahesh Tilokani<br>7154 Santa Isabel Circle<br>Buena Park, CA 90620<br><br>*Interested Party* |
| PPRF REIT, LLC<br>16236 San Dieguito Rd., Ste 4-21<br>P.O. Box 9491<br>Rancho Santa Fe, CA 92067<br><br>*Interested Party* | Sitlani Holdings, LLC<br>16186 Palomino Valley Rd.<br>San Diego, CA 92127<br><br>*Interested Party* |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 9

# EXHIBIT 9

Case Summary:

| Case Id: | 30-2025-01488102-CU-BC-CJC |
|---|---|
| Case Title: | BRYAN GADOL VS. MORDECHAI FERDER |
| Case Type: | BREACH OF CONTRACT/WARRANTY |
| Filing Date: | 06/06/2025 |
| Category: | CIVIL - UNLIMITED |

Register Of Actions:

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 1 | E-FILING TRANSACTION 21663252 RECEIVED ON 06/06/2025 12:54:29 PM. | 06/06/2025 | | *NV* | |
| 2 | COMPLAINT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/06/2025 | 06/06/2025 | | 29 pages | ☐ |
| 3 | CIVIL CASE COVER SHEET FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/06/2025 | 06/06/2025 | | 2 pages | ☐ |
| 4 | SUMMONS ISSUED AND FILED FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/06/2025 | 06/06/2025 | | 1 pages | ☐ |
| 5 | PAYMENT RECEIVED BY ONELEGAL FOR 194 - COMPLAINT OR OTHER 1ST PAPER IN THE AMOUNT OF 435.00, TRANSACTION NUMBER 13631937 AND RECEIPT NUMBER 13460157. | 06/06/2025 | | 1 pages | |
| 6 | CASE ASSIGNED TO JUDICIAL OFFICER FISH, JONATHAN ON 06/06/2025. | 06/06/2025 | | *NV* | |
| 7 | CASE MANAGEMENT CONFERENCE SCHEDULED FOR 11/03/2025 AT 09:00:00 AM IN C13 AT CENTRAL JUSTICE CENTER. | 06/06/2025 | | 2 pages | ☐ |
| 8 | NOTICE OF HEARING OC | 06/06/2025 | | 3 pages | ☐ |
| 9 | PROPOSED ORDER RECEIVED ON 06/11/2025 | 06/11/2025 | | 2 pages | ☑ |
| 10 | E-FILING TRANSACTION 31666641 RECEIVED ON 06/11/2025 01:46:54 PM. | 06/11/2025 | | *NV* | |
| 11 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/11/2025 | 06/11/2025 | | 4 pages | ☐ |
| 12 | E-FILING TRANSACTION 31666642 RECEIVED ON 06/11/2025 01:46:55 PM. | 06/11/2025 | | *NV* | |
| 13 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/11/2025 | 06/11/2025 | | 18 pages | ☐ |
| 14 | E-FILING TRANSACTION 41845546 RECEIVED ON 06/11/2025 01:46:56 PM. | 06/11/2025 | | *NV* | |
| 15 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/11/2025 | 06/11/2025 | | 17 pages | ☐ |
| 16 | E-FILING TRANSACTION 31666643 RECEIVED ON 06/11/2025 01:46:57 PM. | 06/12/2025 | | *NV* | |
| 17 | EX PARTE APPLICATION - OTHER FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/11/2025 | 06/11/2025 | | 14 pages | ☐ |
| 18 | RIGHT TO ATTACH ORDER AFTER HEARING AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT RECEIVED ON 06/11/2025. | 06/11/2025 | | 3 pages | ☐ |
| 19 | TEMPORARY PROTECTIVE ORDER RECEIVED ON 06/11/2025. | 06/11/2025 | | 3 pages | ☐ |
| 20 | PAYMENT RECEIVED BY ONELEGAL FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 60.00, TRANSACTION NUMBER 13634747 AND RECEIPT NUMBER 13462961. | 06/12/2025 | | 1 pages | ☐ |
| 21 | EX PARTE SCHEDULED FOR 06/12/2025 AT 01:30:00 PM IN C13 AT CENTRAL JUSTICE CENTER. | 06/12/2025 | | *NV* | |
| 22 | MINUTES FINALIZED FOR EX PARTE 2025-06-12 13:30:00.0. | 06/12/2025 | | 5 pages | ☐ |
| 23 | RIGHT TO ATTACH ORDER AFTER HEARING AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/12/2025 | 06/12/2025 | | 5 pages | ☐ |
| 24 | E-FILING TRANSACTION 41845547 RECEIVED ON 06/11/2025 01:46:58 PM. | 06/13/2025 | | *NV* | |
| 25 | ORDER - OTHER (RE: RIGHT TO ATTACH ORDER AND ISSUANCE OF WRIT OF ATTACHMENT) FILED BY THE SUPERIOR COURT OF ORANGE ON 06/12/2025 | 06/12/2025 | | 2 pages | ☐ |
| 26 | PAYMENT RECEIVED BY FIRST LEGAL BUYER, INC. FOR INTERPLEADER DEPOSIT IN THE AMOUNT OF 10,000.00, | 06/16/2025 | | 1 pages | ☐ |

EXHIBIT 9

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| | TRANSACTION NUMBER 13636857 AND RECEIPT NUMBER 13465101. | | | | |
| 27 | PAYMENT FOR INTERPLEADER DEPOSIT, TRANSACTION NUMBER 13636857 IN THE AMOUNT OF 10,000.00 VOIDED DUE TO OTHER. CHECK STATES AMOUNT CANNOT EXCEED $2,500.00 AND CHECK WAS WRITTEN FOR $10,000.00 | 06/17/2025 | | 1 pages | ☐ |
| 28 | PAYMENT RECEIVED BY FIRST LEGAL BUYER, INC FOR INTERPLEADER DEPOSIT IN THE AMOUNT OF 10,000.00, TRANSACTION NUMBER 13637490 AND RECEIPT NUMBER 13465734. | 06/17/2025 | | 1 pages | ☐ |
| 29 | E-FILING TRANSACTION NUMBER 41848490 REJECTED. | 06/18/2025 | | 1 pages | ☐ |
| 30 | E-FILING TRANSACTION NUMBER 11500382 REJECTED. | 06/20/2025 | | 1 pages | ☐ |
| 31 | E-FILING TRANSACTION NUMBER 11500808 REJECTED. | 06/20/2025 | | 1 pages | ☐ |
| 32 | E-FILING TRANSACTION 31667328 RECEIVED ON 06/12/2025 11:30:09 AM. | 06/20/2025 | | NV | |
| 33 | APPLICATION FOR RIGHT TO ATTACHMENT ORDER TEMPORARY PROTECTIVE ORDER ETC (ATTACHMENT) FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/12/2025 | 06/12/2025 | | 5 pages | ☐ |
| 34 | E-FILING TRANSACTION 11501730 RECEIVED ON 06/20/2025 01:56:49 PM. | 06/20/2025 | | NV | |
| 35 | WRIT OF ATTACHMENT (ORANGE) ISSUED ON 06/20/2025 | 06/20/2025 | | 2 pages | ☐ |
| 36 | PAYMENT RECEIVED BY ONELEGAL FOR 214 - WRIT IN THE AMOUNT OF 40.00, TRANSACTION NUMBER 13639200 AND RECEIPT NUMBER 13467460. | 06/20/2025 | | 1 pages | ☐ |
| 37 | E-FILING TRANSACTION 31674082 RECEIVED ON 06/25/2025 01:56:07 PM. | 06/26/2025 | | NV | |
| 38 | EX PARTE APPLICATION - OTHER FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/25/2025 | 06/25/2025 | | 61 pages | ☐ |
| 39 | RIGHT TO ATTACH ORDER AFTER HEARING AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT RECEIVED ON 06/25/2025. | 06/25/2025 | | 5 pages | ☐ |
| 40 | EX PARTE RIGHT TO ATTACH ORDER AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT (RESIDENT) FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/25/2025 | 06/25/2025 | | 12 pages | ☐ |
| 41 | TEMPORARY PROTECTIVE ORDER RECEIVED ON 06/25/2025. | 06/25/2025 | | 5 pages | ☐ |
| 42 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/25/2025 | 06/25/2025 | | 19 pages | ☐ |
| 43 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/25/2025 | 06/25/2025 | | 20 pages | ☐ |
| 44 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/25/2025 | 06/25/2025 | | 11 pages | ☐ |
| 45 | PROPOSED ORDER RECEIVED ON 06/25/2025. | 06/25/2025 | | 2 pages | ☐ |
| 46 | PAYMENT RECEIVED BY NATIONWIDE FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING, 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 120.00, TRANSACTION NUMBER 13642469 AND RECEIPT NUMBER 13470729. | 06/26/2025 | | 1 pages | ☐ |
| 47 | EX PARTE SCHEDULED FOR 06/26/2025 AT 01:30:00 PM IN C13 AT CENTRAL JUSTICE CENTER. | 06/26/2025 | | NV | |
| 48 | EX PARTE SCHEDULED FOR 06/26/2025 AT 01:30:00 PM IN C13 AT CENTRAL JUSTICE CENTER. | 06/26/2025 | | NV | |
| 49 | MINUTES FINALIZED FOR EX PARTE 2025-06-26 13:30:00.0. | 06/26/2025 | | 6 pages | ☐ |
| 50 | MINUTES FINALIZED FOR EX PARTE 2025-06-26 13:30:00.0. | 06/26/2025 | | NV | |
| 51 | CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE | 06/26/2025 | | 7 pages | ☐ |
| 52 | RIGHT TO ATTACH ORDER AFTER HEARING AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT FILED BY GADOL, BRYAN; TESTA, DARREN ON 06/26/2025 | 06/26/2025 | | 5 pages | ☐ |
| 53 | E-FILING TRANSACTION 41855677 RECEIVED ON 06/30/2025 03:38:37 PM. | 07/01/2025 | | NV | |
| 54 | WRIT OF ATTACHMENT (AS TO ORANGE COUNTY) ISSUED ON 07/01/2025 | 07/01/2025 | | 4 pages | ☐ |

EXHIBIT 9                                                    Page 2 of 4

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 55 | PAYMENT RECEIVED BY NATIONWIDE FOR 214 - WRIT IN THE AMOUNT OF 40.00, TRANSACTION NUMBER 13645872 AND RECEIPT NUMBER 13474132. | 07/01/2025 | | 1 pages | ☐ |
| 56 | E-FILING TRANSACTION 41856873 RECEIVED ON 07/02/2025 11:47:31 AM. | 07/02/2025 | | *NV* | |
| 57 | AMENDED COMPLAINT FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/02/2025 | 07/02/2025 | | 31 pages | ☐ |
| 58 | SUMMONS ISSUED AND FILED FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/02/2025 | 07/02/2025 | | 1 pages | ☐ |
| 59 | E-FILING TRANSACTION 31678059 RECEIVED ON 07/02/2025 01:37:28 PM. | 07/02/2025 | | *NV* | |
| 60 | EX PARTE APPLICATION - OTHER FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/02/2025 | 07/02/2025 | | 62 pages | ☐ |
| 61 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/02/2025 | 07/02/2025 | | 19 pages | ☐ |
| 62 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/02/2025 | 07/02/2025 | | 107 pages | ☐ |
| 63 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/02/2025 | 07/02/2025 | | 19 pages | ☐ |
| 64 | DECLARATION IN SUPPORT FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/02/2025 | 07/02/2025 | | 7 pages | ☐ |
| 65 | PROPOSED ORDER RECEIVED ON 07/02/2025. | 07/02/2025 | | 2 pages | ☐ |
| 66 | PAYMENT RECEIVED BY NATIONWIDE FOR 36 - MOTION OR OTHER (NOT 1ST) PAPER REQUIRING A HEARING IN THE AMOUNT OF 60.00, TRANSACTION NUMBER 13646727 AND RECEIPT NUMBER 13474987. | 07/02/2025 | | 1 pages | ☐ |
| 67 | EX PARTE SCHEDULED FOR 07/03/2025 AT 01:30:00 PM IN C11 AT CENTRAL JUSTICE CENTER. | 07/02/2025 | | *NV* | |
| 68 | E-FILING TRANSACTION 21677545 RECEIVED ON 07/03/2025 10:43:23 AM. | 07/03/2025 | | *NV* | |
| 69 | OPPOSITION FILED BY TESTA, DARREN ON 07/03/2025 | 07/03/2025 | | 24 pages | ☐ |
| 70 | E-FILING TRANSACTION 11508420 RECEIVED ON 07/03/2025 11:59:57 AM. | 07/03/2025 | | *NV* | |
| 71 | OPPOSITION FILED BY SERENADE NEWPORT LLC ON 07/03/2025 | 07/03/2025 | | 9 pages | ☐ |
| 72 | E-FILING TRANSACTION 21677659 RECEIVED ON 07/03/2025 12:41:32 PM. | 07/03/2025 | | *NV* | |
| 73 | REPLY - OTHER FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/03/2025 | 07/03/2025 | | 4 pages | ☐ |
| 74 | E-FILING TRANSACTION 31681074 RECEIVED ON 07/09/2025 02:53:15 PM. | 07/09/2025 | | *NV* | |
| 75 | NOTICE OF RULING FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/09/2025 | 07/09/2025 | | 6 pages | ☐ |
| 76 | THE MOTION FOR PRELIMINARY INJUNCTION IS SCHEDULED FOR 07/22/2025 AT 10:30 AM IN DEPARTMENT C11. | 07/03/2025 | | *NV* | |
| 77 | MINUTES FINALIZED FOR EX PARTE 2025-07-03 13:30:00.0. | 07/10/2025 | | 3 pages | ☐ |
| 78 | ORDER AFTER HEARING (EX-PARTE) FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/03/2025 | 07/03/2025 | | 2 pages | ☐ |
| 79 | E-FILING TRANSACTION 11513058 RECEIVED ON 07/14/2025 10:08:00 AM. | 07/14/2025 | | *NV* | |
| 80 | DECLARATION - OTHER FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/14/2025 | 07/14/2025 | | 8 pages | ☐ |
| 81 | E-FILING TRANSACTION 11513157 RECEIVED ON 07/14/2025 11:55:36 AM. | 07/14/2025 | | *NV* | |
| 82 | NOTICE OF STAY OF PROCEEDINGS - CASE FILED BY SERENADE NEWPORT LLC ON 07/14/2025 | 07/14/2025 | | 11 pages | ☐ |
| 83 | MINUTES FINALIZED FOR CHAMBERS WORK 07/15/2025 07:50:00 AM. | 07/15/2025 | | 1 pages | ☐ |
| 84 | CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE | 07/15/2025 | | 2 pages | ☐ |
| 85 | E-FILING TRANSACTION 41862385 RECEIVED ON 07/14/2025 01:10:28 PM. | 07/15/2025 | | *NV* | |

EXHIBIT 9

Page 3 of 4

| ROA | Docket | Filing Date | Filing Party | Document | Select |
|---|---|---|---|---|---|
| 86 | NOTICE OF PENDENCY OF ACTION FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/14/2025 | 07/14/2025 | | 7 pages | ☐ |
| 87 | E-FILING TRANSACTION 31686516 RECEIVED ON 07/18/2025 06:05:30 PM. | 07/18/2025 | | NV | |
| 88 | STATEMENT - OTHER FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/18/2025 | 07/18/2025 | | 3 pages | ☐ |
| 89 | THE STATUS CONFERENCE IS SCHEDULED FOR 08/18/2025 AT 10:30 AM IN DEPARTMENT C11. | 07/22/2025 | | NV | |
| 90 | MINUTES FINALIZED FOR MOTION FOR PRELIMINARY INJUNCTION 07/22/2025 10:30:00 AM. | 07/22/2025 | | 1 pages | ☐ |
| 91 | E-FILING TRANSACTION NUMBER 21686953 REJECTED | | | | |

Participants:

| Name | Type | Start Date | End Date |
|---|---|---|---|
| MORDECHAI FERDER | DEFENDANT | | 06/06/2025 | |
| SIMBA IL HOLDINGS, LLC | DEFENDANT | | 06/06/2025 | |
| THEODORA ORINGHER PC | PLAINTIFF | | 06/06/2025 | |
| DARREN TESTA | PLAINTIFF | | 06/06/2025 | |
| LAW OFFICES OF LAWRENCE HOODACK | ATTORNEY | | 07/14/2025 | |
| SERENADE NEWPORT LLC | DEFENDANT | | 07/02/2025 | |
| BRYAN GADOL | PLAINTIFF | | 06/06/2025 | |
| MORDECHAI FERDER, AS THE TRUSTEE OF TH | DEFENDANT | | 06/06/2025 | |

(overlapping docket entries:)

E-FILING TRANSACTION 31692939 RECEIVED ON 07/31/2025 03:43:14 PM. 07/31/2025 NV

PROOF OF SERVICE OF SUMMONS FILED BY GADOL, BRYAN; TESTA, DARREN ON 07/31/2025 07/31/2025 2 pages

E-FILING TRANSACTION 31701234 RECEIVED ON 08/18/2025 10:24:12 A.M. 08/18/2025 07/14/2025 NV

NOTICE - OTHER FILED BY GADOL, BRYAN; TESTA, BRYAN ON 08/18/2025 08/18/2025 06/06/2025 3 pages

Hearings:

| Description | Date | Time | Department | Judge |
|---|---|---|---|---|
| CASE MANAGEMENT CONFERENCE | 11/03/2025 | 09:00 | C11 | FISH |
| STATUS CONFERENCE | 08/18/2025 | 10:30 | C11 | FISH |

Print this page

EXHIBIT 9

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 17701 Cowan, Bldg. D, Suite 210, Irvine, CA 92614

A true and correct copy of the foregoing document entitled (*specify*): **OPPOSITION TO MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 [DOCKET NO. 51]; MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE; DECLARATIONS OF SAHAND ZARGARI AND ROBERT P. GOE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 26, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Reem J Bello    rbello@goeforlaw.com, kmurphy@goeforlaw.com**
- **Anthony Bisconti    tbisconti@bklwlaw.com, 1193516420@filings.docketbird.com,docket@bklwlaw.com**
- **George Gerro    george@gerrolaw.com**
- **Robert P Goe    rgoe@goeforlaw.com, kmurphy@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com**
- **Christopher J Harney    charney@tocounsel.com, dfunsch@tocounsel.com**
- **Steven J. Katzman    skatzman@bklwlaw.com, 1193516420@filings.docketbird.com,docket@bklwlaw.com**
- **Bahram Paya    brian.paya@payafirm.com**
- **Charles Pernicka    charles@opuslawfirm.com**
- **Matthew Rosene    mrosene@epgrlawyers.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**
- **David B Zolkin    dzolkin@wztslaw.com, maraki@wztslaw.com,sfritz@wztslaw.com,admin@wztslaw.com**

☐    Service information continued on attached page

**2.   SERVED BY UNITED STATES MAIL**:
On (*date*) August 26, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows: Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: (state the method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 26, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows:  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Mark Houle, USBC, 411 W. Fourth Street, Suite 6135, Santa Ana, CA  92701

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 26, 2025 | Susan C. Stein | /s/Susan C. Stein |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |